# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| John H. Davis, | ) | Relator, kidnapping, |
| Shelia D. Davis, | ) | Conspiracy to Kidnap, |
| Eric S. Davis, a minor by parents | ) | Theft, Conspiracy to |
| John H. Davis, father, and | ) | Commit Theft, |
| Shelia D. Davis, mother, | ) | Fraud, Conspiracy to |
| | ) | Commit Fraud, |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| **Vs.** | ) | **Case No.** |
| | ) | |
| | ) | |
| Alabama Department of Human | ) | |
| Resources of Limestone County, | ) | Interference with |
| Alabama & (all Administrators, | ) | Parental Rights, |
| Supervisors, Caseworkers, Staff), | ) | Alienation of Affection, |
| Individually and Collectively, | ) | Alienation of Familial |
| Judge Jeanne W. Anderson & | ) | Relations, RICO**,** Abuse |
| (in an individual capacity), | ) | of Process, Abuse of |
| Individually and Collectively, | ) | Power, Intentional |
| Judge James. W. Woodroof, Jr. & | ) | Infliction of Emotional |
| (in an individual capacity), | ) | Distress, Conspiracy to |
| Individually and Collectively, | ) | Inflict Emotional Distress, |
| Athens City Schools & Athens | ) | Defamation, Battery, |
| City School Board of Education | ) | Interference with Parental |
| in Alabama, | ) | Custody or Visitation, |
| Individually and Collectively, | ) | Loss of a Minor Child's |
| Glenwood Incorporated/ | ) | Society and Companion- |
| Allan Cott School, | ) | ship, Negligence in the |
| Individually and Collectively, | ) | Care of a Minor/Mentally |
| Dr. Clarence E. Mcdanal, M.D., | ) | Handicapped Person, |
| Individually and Collectively, | ) | Improper Use of/Overuse |
| Dr. Scott M. Sarrels, M. D., | ) | of Medication in the Care |
| Individually and Collectively, | ) | of a Minor/Mentally |
| Dr. Albert L. Sprinkle, M. D., | ) | Handicapped Person, |
| Individually and Collectively, | ) | Violations of HIPAA, |

Connie & Howard Shaw,                    )     Violations of 1st Amend-
Individually and Collectively,           )     ment of The United States
Lesa Greene,                             )     Constitution, Violation of
Individually and Collectively,           )     Equal Protection Clause,
Claire Tinney-Jones,                     )     Interference with
Individually and Collectively,           )     Residual Parental Rights,
Louise Collier,                          )     Conspiracy to Interfere
Individually and Collectively,           )     with Residual Parental
Dr. Tom B. Vaughan, Jr., M. D.,          )     Rights, Forgery,
Individually and Collectively,           )     Conspiracy to Commit
Angela Hurtubise,                        )     Forgery, Violation of
Individually and Collectively,           )     Fiduciary Duty, Perjury,
Does 1 – 20,                             )     Mail Fraud, Identity Theft,
Individually and Collectively,           )     Aiding and Abetting,
                                         )      Breach of Fiduciary Duty,
                                         )      Misprision, Misprision of
**Defendants.**                          )     Felony


# <u>FIRST AMENDED COMPLAINT</u>

John H. Davis, Shelia D. Davis, Eric S. Davis, a minor (during some of relevant time of Complaint, and now the last few years "Eric S. Davis" should be known as a handicapped adult – autistic/mentally challenged), by Parents, John H. Davis, Father, Shelia D. Davis, Mother, Attorney for Plaintiffs, John H. Davis (Indiana 4812-45), John H. Davis and Associates, 5201 Broadway Suites #203 and #205, Merrillville, Indiana 46410 (219) 884-2461; Mailing Address:  John H. Davis, P.O. Box 43 Crown Point, IN 46308-0043. Shelia D. Davis P.O. Box 324 Crown Point, Indiana 46308.

Plaintiff(s), John H. Davis, Shelia D. Davis,  Eric S. Davis, a minor, and presently and adult (handicapped/autistic – mentally challenged), by Parents, John H. Davis, Father, Shelia D. Davis, Mother, through their undersigned counsel for the Complaint against Defendants,  Alabama Department of Human Resources of Limestone County,  Alabama Limestone County Judge Jeanne W. Anderson, Alabama Limestone County Judge James W. Woodroof, Jr., Athens City Schools & Athens City School Board of

Education, Glenwood, Incorporated/Allan Cott School, Dr. Clarence E. Mcdanal, M.D.,  Dr. Scott M.

Sarrels, M.D., Dr. Albert L. Sprinkle, M.D., Lesa Greene, Claire Tinney-Jones, Louise Collier, Connie Shaw

and Howard Shaw, Dr. Tom B. Vaughan, Jr., Does 1-20.

<u>**PARTIES**</u>

**1.      Plaintiff(s):**

Plaintiff(s), John H. Davis, Shelia D. Davis at all times relevant hereto are, and were, residents of

Lake County in the State of Indiana.

At all times relevant hereto Eric S. Davis was a minor, hereto and is a handicapped individual, by

natural parents, John H. Davis, Father, Shelia D. Davis, Mother, Eric S. Davis being a native born of the

State of Indiana, being presently illegally and improperly held in the State of Alabama in a residential facility

– hold being unrelated to delinquency, but relating to AUTISM – and, which a placement had been

arranged, by Father, for Eric S. Davis in the State of Indiana.

**2.      Defendant(s):**

2(a).      Alabama Department of Human Resources of Limestone County, ("DHR");

2(b).      Judge Jeanne W. Anderson, ("J. Anderson");

2(c).      Judge James W. Woodroof, Jr., ("J. Woodroof");

2(d).       Athens City Schools & Athens City School Board of Education, ("Athens City Schools" &

            "Athens City School Board of Education");

2(e).      Glenwood Incorporated/Allen Cott School, ("Glenwood/Allen Cott");

2(f).      Dr. Clarence E. Mcdanal, M.D., ("C. Mcdanal");

2(g).      Dr. Scott M. Sarrels, M.D., ("S. Sarrels");

2(h).      Dr. Albert L. Sprinkle, M.D., ("A. Sprinkle");

2(i).      Mr.& Ms. Connie & Howard Shaw, ("C. Shaw" & "H. Shaw");

2(j).      Lesa Greene, ("L. Greene");

2(k).　　Louise Collier, ("L. Collier");

2(l).　　Claire Tinney-Jones, ("C. Jones");

2(m).　　Dr. Tom B. Vaughan, Jr., M. D., ("Dr. Vaughan");

2(o).　　Angela Hurtubise, ("Hurtubise").

**3.**

At all times relevant, hereto, Defendant "DHR" of Limestone County Alabama filed a petition for

Hearing in The Limestone County Court,(Judge Anderson regarding the minor, (Plaintiff) Eric S. Davis,

raising alleged issue of welfare, abandonment and custody, where the natural Father, (Plaintiff) John H.

Davis was a resident of the State of Indiana and the natural Mother (Plaintiff), Shelia D. Davis, had been

awarded custody in a divorce proceeding in the Superior Court of The State of Indiana that "DHR" has

caused to the present, the Alabama Court to continue "temporary custody" of the minor, Eric S. Davis in the

State of Alabama from 2001 to the present.  That "DHR" at all times relevant, residing in the State of

Alabama

Upon information and belief, all executive level officers, supervisory case workers, field

investigators of "DHR" directed, controlled and coordinated "DHR" activities from the (Athens) Limestone

County, Alabama offices, located at 1007 West Market Street, Athens, Alabama 35612 and from the

Alabama Department of Human Resources at their State Government Office 11 South Union Street,

Montgomery, Alabama 36130 in Montgomery County, Alabama.

That at all times relevant, hereto, Defendant, Jeanne W. Anderson (now retired) was a Judge of

the Limestone County, Alabama Court, assuming jurisdiction without a transfer of the case from the State

of Indiana Court to the State of Alabama Court in Limestone County, holding status hearings of the case of

the aforesaid, Eric S. Davis, approximately every six (6) months for the last ten (10) years – finding "no

significant change in the case" – during which Judge Jeanne W. Anderson was aware that the natural

Father, John H. Davis, was a resident of the State of Indiana and the natural Mother, Shelia D. Davis, had **not** remained a resident of the State of Alabama and was a resident of the State of Indiana.

Upon information and belief, Defendant, Judge Jeanne W. Anderson, presided, and presides over the District Court of Limestone County, Alabama from 200 Washington Street 3rd Floor, Athens, Alabama 35611 and from 503 South Jefferson Street, Athens, Alabama 35611.

That at all times relevant, hereto, Defendant Judge James W. Woodroof, was a Judge of the Limestone County, Alabama Court and ruled on a petition filed by "DHR" for child support and warrant regarding the parents of Plaintiff (Eric s. Davis), Plaintiff John H. Davis, and Plaintiff Shelia D. Davis, in a case that was still in the Court of Defendant, Judge Jeanne W. Anderson, in which Judge Anderson had assessed under Rule 32 Child Support for minor, Plaintiff Eric S. Davis, in the amount of four hundred dollars ($400.00) per month, from each of the parents, Plaintiff(s) John H. Davis and Shelia D. Davis.

Upon information and belief, Defendant, Judge James W. Woodroof, Jr., presided, and presides over the Circuit Court of Limestone County, Alabama from 200 Washington Street 3rd Floor, Athens, Alabama 35611 and from 503 South Jefferson Street, Athens, Alabama 35611.

That at all times relevant, Defendant Athens City Schools and Athens City School Board of Education conducted, operated and had authority over, Athens City Schools and Athens City School Board of Education where Plaintiff minor, Eric S. Davis, was enrolled as a student, all in the State of Alabama.

Upon information and belief, all board directors, principals, teachers of the Athens City Schools and Athens City School Board control, direct and coordinate the Athens City Schools, Athens City School Board from 455 U.S. Highway 31 North, Athens, Alabama 35611.

At all times relevant, Glenwood Incorporated/Allen Cott School in the state of Alabama, operated and conducted school and educational programs regarding housing children including autistic children, during which Plaintiff, Eric S. Davis was placed by "DHR" and housed – participating with Glenwood in reports to The Court of Limestone County, Alabama in Athens, Alabama and "DHR".

That at all times relevant hereto, Dr. Clarence E Mcdanal, ("Dr. Medanal"), practiced and was a licensed physician in the State of Alabama.

That at all times relevant hereto, Dr. Scott M. Sarrels, ("Dr. Sarrels"), was a licensed physician in the State of Alabama and practiced medicine in the State of Alabama.

That at all times relevant hereto, Dr. Albert L. Sprinkle was licensed and practiced medicine/psychiatry in the State of Alabama.

That at all times relevant hereto, Connie and Howard Shaw were residents of the State of Tennessee.

That at all times relevant, hereto, Lesa Greene was a licensed attorney in the state of Alabama and was appointed by the Defendant, ("Judge Anderson") 2(b), as Guardian ad Litem for the minor Plaintiff "E. Davis".

At all times relevant, Claire Tinney-Jones ("C. Jones") was a licensed attorney in the state of Alabama and represented "DHR", filing documents in the "J. Anderson" Court.

At all times relevant, Louise Collier, ("L. Collier") was a resident of the state of Alabama.

At all times relevant, Dr. Tom B. Vaughan, Jr., M. D., ("Dr. Vaughan") was a licensed physician in the state of Alabama associated with "Glenwood/Allen Cott" school.

At all times relevant, Angela Hurtubise was an employee of Alabama Department of Human Resources of Limestone County, ("DHR") in the state of Alabama.

## PRELIMINARY STATEMENT

### NOTE:

This preliminary is somewhat verbose, in that plaintiffs feel that in order to get due process in the ten-plus (10+) years trying to get their son back, through multiple motions, complaints, with the Alabama Court and the Indiana Family Courts, there is a need to cite case law, Constitutional law, legal regulations, and legal statutes which seem to be outright ignored, violated by the Alabama Courts, and either ignored,

misunderstood, or completely unknown by the Indiana Family Courts.  Thus, plaintiffs have amply

supplemented their complaint with exhibits, case law, statutory law, legal regulations and affidavits.

### *4.*    PRELIMINARY

4(a).     The Plaintiff, John H. Davis, ("J. Davis"), and Shelia D. Davis, ("S. Davis"), are the natural

parents of the Plaintiff, Eric Stephen Davis, ("E. Davis"), who was born in the State of Indiana.

4(b).     The parents "J. Davis" and "S. Davis" divorced in the State of Indiana and by mutual

consent, the minor child of the parents, "J. Davis" and "S. Davis", Plaintiff "E. Davis", custody was given to

the mother "S. Davis" with visitation, both physical in the State of Indiana, Holiday visits, alternating

birthdays, etc., decisions, references to schooling, religious training and church attendance given to both

parents, decisions referring to healthcare, education given to both parents, notification regarding any

serious health or emergency health issues, decision given to both parents ("J. Davis" and "S. Davis"). **(See**

**Copy of Divorce Decree marked as EXHIBIT 1 attached and made a part hereto).**

4(c).     The Lake County Court granted the above referenced divorce decree and retained

jurisdiction of the case. **(See Copy of Divorce Decree marked as EXHIBIT 1).**

4(d).     By mutual agreement, the parents consented to the mother, "S. Davis", taking the minor,

"E. Davis" to the State of Alabama where the mother had been raised.

4(e).     The minor had been diagnosed as autistic while still in the State of Indiana, and the

continuing efforts of the parents, providing and seeking medical examinations extensively, led to a further

diagnosis. **(See Affidavit of "S. Davis" regarding examination of "E. Davis" towards diagnosis of**

**autism marked as EXHIBIT 2A attached and made a part hereto). (See Affidavit of "J. Davis"**

**regarding examination of "E. Davis" towards diagnosis of autism marked as EXHIBIT 3A and 3B**

**attached and made a part hereto).**

4(f).     The parents searched out treatment plans which led to contact with Glenwood-Allan Cott

School (Defendant 2 (e)). **(See Affidavit of "J. Davis" regarding examination of "E. Davis" towards**

diagnosis of autism marked as EXHIBIT 3A and 3B).  (See Letters/Documents RE:  Initial Contacts

with "Glenwood/Allen Cott" marked as EXHIBIT 4A attached and made a part hereto).  (See Letter

from P.Michael Cole – Due Process Hearing Officer marked as EXHIBIT 4B attached and made a

part hereto).  (See Letters to Marilyn Batts of "Athens City Schools/Board" marked as EXHIBIT 4C

attached and made a part hereto).

      4(g).     Plaintiffs personally visited Glenwood, located near Birmingham, Alabama (which then had

a high reputation for training of autistic children at the time of said visit Glenwood informed the parents ("J.

Davis" and "S. Davis") that Eric Davis ("E. Davis") would have to wait until he was at least five (5) years old

before he could be enrolled.  He was then only 4 years old. **(See Affidavit of "J. Davis' " 1995 &1999**

**Visits to Glenwood School marked as EXHIBIT 3C attached and made a part hereto).**

      4(h).    After a substantial delay on the part of Glenwood in the enrollment of "E. Davis", the parents

turned to the Athens City School System (Defendant 2(d)) to provide schooling and training for Plaintiff "E.

Davis".  Athens City Schools continually denied the resources of the school for "E. Davis's" schooling and

training, but provided training and class room for another autistic child.  **(See Affidavit of "S. Davis" Re:**

**Seeking Schooling/Illinois & Alabama -Athens marked as EXHIBIT 2B and EXHIBIT 2C attached and**

**made a part hereto).**

      4(i).     Due to "E. Davis's" autism, he exhibited several of the traits of autism, which included

tantrums and some self-abusive behavior.  The parents, Plaintiffs "J. Davis" and "S. Davis", discussed with

"Athens City Schools" some methods of controlling "E. Davis' " autistic behavior which included avoiding

giving "E. Davis" sugar (sweets) and not paddling.  The "Athens City School" teachers and staff continually

refused to follow the guidance provided to assist on "E. Davis' " autistic behavior, repeatedly giving him

(other children's birthday) cake and other (Halloween/Valentine) sweets which escalated his tantrums and

paddling him which further caused damage.  As time went on, "E. Davis' " autistic symptoms worsened

rather than being improved.  Much of "E. Davis' "deepening autistic traits today are traceable to his

increased self-abusive behavior – hitting himself in the head, triggered by the "Athens City Schools"

paddling him.   "E. Davis" was eligible for training and educational funds for such training which has been

shown to enable autistic traits to diminish.  The "Athens City School System" continually refused to apply

for such funds on behalf of "E. Davis".  Subsequently, "E. Davis' "autism reached a level in which his

primary caregiver, "S. Davis", his mother, had trouble physically restraining him.  "S. Davis" took "E. Davis"

to the Huntsville Hospital Emergency Room on one major outburst of tantrum when he was ten (10) years

old.  It took at least seven (7) people – three grown men and 4 women - to assist in restraining "E. Davis"

for his hospital room.  **(See Affidavit of "S. Davis" RE: Emergency Room Huntsville Hospital marked**

**as EXHIBIT 2D attached and made a part hereto). (See Affidavit of "S. Davis" RE: "S. Davis' "**

**Problems with Alabama Licensed Attorney Slate's Petition for Placement 2001 marked as EXHIBIT**

**2I attached and made a part hereto).**

     4(j).   "S. Davis" had retained an Alabama licensed attorney to file a Petition with the Alabama

Courts to assist with the cutting through "red tape" to get "E. Davis" into the "Glenwood/Allan Cott School".

This brought the matter to "J. Anderson's" Court in Alabama. **(See Affidavit of "S. Davis" RE: Failure of**

**Attorney to Give Proper Service to Department of Mental Health for Hearing & No Full or Final**

**Resolution on Abandonment marked as EXHIBIT 2I).**   The petition filed in "J. Anderson's" Court was

scheduled for a hearing when "S. Davis" took "E. Davis" to the Huntsville Hospital Emergency Room.  After

the long wait at the hospital, "E. Davis was placed in a room/bed, sedated under a "4-point restraint" and

asleep.  It was then that "S. Davis" left, checked into a hotel as she was experiencing (severe) acute

symptoms of bronchitis, called her attorney to let him know that the child was at Huntsville Hospital -

sedated and sleep.  During that same phone call, her attorney then advised her not to go back to the

hospital.  The scheduled hearing on the petition to get "E. Davis" in "Glenwood/Allan Cott School" was then

converted into a hearing on "abandonment".  The Court, of "J. Anderson", was advised that "S. Davis" had

been instructed by her attorney that she could leave the Hospital, though "E. Davis" had not been "officially

admitted".  The Huntsville Hospital staff was informed that "S. Davis" would be at home and had the number to reach her.  The staff chose to call "DHR".   "S. Davis' " attorney, it was determined by the Court, failed to properly contact and serve the Mental Health Department of Alabama to participate in the Hearing to place "E. Davis" in "Glenwood".   No prior notice was provided to "S. Davis" that the scheduled petitioned hearing was converted into a hearing on abandonment.  Evidence of abandonment was never pursued, nor any ruling to this date - October 2014, made on any issues of abandonment.  "J. Anderson" merely gave the "DHR" representative(s), temporary custody of "E. Davis".

Defendant "J. Anderson's" Court never acquired jurisdiction over the minor "E. Davis" nor acquired jurisdiction over Plaintiffs "J. Davis" or "S. Davis" when she neglected to vacate the hearing on "S. Davis' "petition to determine the mental health of the minor "E. Davis" for placement in Glenwood/Allen Cott School (Defendant 2(e)), and instead without prior notice to "S. Davis" converted the said petition to a hearing on "DHR's" petition for abandonment.  The said Court's "converted" hearing was not fully resolved, and said Court, having no jurisdiction to grant custody to "DHR" gave "DHR" temporary custody of the minor "E. Davis".  **(See Copy of Pertinent Parts of UCCJEA marked as EXHIBIT 5A and EXHIBIT 5B attached and made a part hereto).**

Subsequently, Plaintiff "J. Davis" traveled to Alabama to look into the illegal custody of his son "E. Davis" and was served at the next Court scheduled hearing on the issue of his son "E. Davis" – with a "process" to attend the said hearing.  Plaintiff "J. Davis" advised the Court, that he had no information on the first "converted" hearing and, therefore, could not address any issues raised, resolved or unresolved. Plaintiff "J. Davis" requested a transcript of the "converted" hearing which "J. Anderson's" Court refused. To this date, Plaintiff(s) "J. Davis" has not been able to get said transcript, nor has Plaintiff "S. Davis".   To this date, both Plaintiffs have been denied a transcript of the "converted" hearing, and to this date, both Plaintiffs "J. Davis" and "S. Davis" have not been able to fully and properly address many unknown issues raised by a petition filed by "DHR".

Plaintiff "J. Davis" filed interrogatories and requests for production of documents and in a Motion to Compel some from "DHR", "DHR" stated that interrogatories and documents contained information that the Plaintiffs, "J. Davis" and "S. Davis" – the natural parents – were **not** permitted to have.  Plaintiff "J. Davis" suggested that there were some material regarding abandonment issues or issues otherwise, which the Plaintiffs could have to fully address their, then, such portions.  The documents could be redacted.   The Defendant, "J. Anderson", still denied the Plaintiff access to the petition and material filed by "DHR". Plaintiff, to this date, has been unable to fully confront the material presented to the said Court by "DHR".

4(k).     Without resolving or ruling on an allegation, the second hearing addressed the matter of "E. Davis' " possible placement in "Glenwood/Allen Cott School". **(See Affidavit of "J. Davis" regarding Stipulation of Placement of "E. Davis" in "Glenwood/Allan Cott" school marked as EXHIBIT 3E attached and made a part hereto).**  The Plaintiffs, "J. Davis" and "S. Davis" stipulated that "E. Davis" was in need of the type of care and training that "Glenwood/Allen Cott School", at that time, could provide for "E. Davis" and also informed the Court that the Plaintiffs "J. Davis" and "S. Davis" had been for a number of years attempting to get "E. Davis" into that school.

The Plaintiffs, "J. Davis" and "S. Davis", were opened to the Court's assisting in getting "E. Davis" placed into "Glenwood/Allen Cott School".  Custody did not have to be given to "DHR", as there were no established findings of neglect or abandonment.  "Glenwood/Allen Cott School" housed, at that time, many autistic - and otherwise mentally challenged children which had been placed with the assistance of the Courts or school systems without taking custody from the natural parents of the minor.  And again, "J. Anderson's" Court had no legal authority to give custody of "E. Davis" to "DHR". **(See Joint Motion to Reconsider Order/Motion for Custody and "J. Anderson's" Order Denying Motions marked as EXHIBIT 6A and EXHIBIT 6B attached and made a part hereto).**   This Court, ("J. Anderson"), was asked again to reconsider order and motion for custody.  In response to that motion, this Court, ("J. Anderson"), summarily denied this  motion for reconsideration in a manner – both unprofessional and

disrespectful to not only the petitioners of the motions ("J. Davis" and "S. Davis"), but also to the proper decorum of the same Court in which "J. Anderson" presides over, in that she merely handwrote on the cover page of this motion, "4/4/5 Ordered, motions denied – no evidence of facility in Indiana willing to accept placement. W Anderson, J…"  Again, this small handwritten notation made by "J. Anderson" on the front page of our motion.

The Court obviously took little time to consider these motions given the fact that the original natural parents', "J. Davis' " and "S. Davis' ", joint motion to reconsider custody was time-stamped at 11:59AM and denied the same day – "… no facility in Indiana willing to accept placement …".

This is the height of arrogance and disrespect for the very Court over which this Judge, "J. Anderson", presides.

As an attorney, and an officer of the Courts here in Indiana, plaintiff ("J. Davis") recognizes that it is The Court – regardless of where it is located - deserves and is due respect.  Plaintiff, "J. Davis", when appearing before any court, conducts himself in a manner respectful of that court, and when plaintiff, "J. Davis" sits as Protempore Judge - as he does often for a presiding Superior Court Judge here in Indiana, he – plaintiff "J. Davis - conducts himself in a manner respectful of the seat he holds on these occasions. **(See Case Law Highlighting Two Judges held in Criminal Contempt marked as EXHIBIT 7 attached and made apart hereto).**  The ("J. Anderson's") Court, illegally and improperly took jurisdiction over the case from the State of Indiana who maintained jurisdiction over the case – including the custody of "E. Davis" established in the divorce decree granted in the State of Indiana.

4(l).    On more than one occasion, it was apparent that the ("J. Anderson's") Court was having ex parte discussions of the mother of "E. Davis" with "DHR" and other parties. **(See Affidavit of "J. Davis" regarding ex parte communications between "J. Anderson" & "DHR" marked as EXHIBIT 3D attached and made a part hereto). (See Affidavit of "S. Davis" regarding ex parte communications between "J. Anderson" & "DHR" marked as EXHIBIT 2K attached and made a part hereto).**

Plaintiff filed numerous motions referencing visitation of "E. Davis" which had been blocked by "DHR". **(See Motion for Emergency Hearing RE: Denial of Visitation (2002) and "J. Anderson's" Order marked as EXHIBIT 8A and EXHIBIT 8B attached and made a part hereto).**

The ("J. Anderson's") Court denied a motion by "DHR" to terminate the parental rights of the Plaintiff's "J. Davis" and "S. Davis", citing there was nothing before the Court to address such an issue.  "J. Anderson", for all intents and purposes, kidnapped "E. Davis" in collusion with "DHR".   "Glenwood/Allen Cott School", on several occasions, prevented visitation of Plaintiff's "J. Davis" and "S. Davis" by the direction of "DHR" who had no reason or Court order to do so.

4(m).   "Glenwood/Allen Cott School" failed to keep "E. Davis" from self-abusive behavior, where he repeatedly hit himself in and around his head. (Note: The Alexian Brothers in Illinois – used football-type helmets to "protect" a child from such self-inflicted injuries.  This method was never considered or used by "Glenwood/Allen Cott School").  "E. Davis" caused such extensive damage or injury that surgery was required.  The decision to perform surgery on "E. Davis", was never brought to the Plaintiffs' "J. Davis" and "S. Davis" , nor were the Plaintiffs made aware of the surgery and only learned of it after the fact.  Their input or permission was never elicited without legal authority, having no legal custody of "E. Davis".  The surgery was tantamount to criminal battery alone with intentional neglect.

4(n).   "DHR" having the care and custody of "E. Davis" in a facility, "Glenwood/Allen Cott" where the staff began using an electric product/taser to maintain control over the outburst of their autistic children.  Such treatment led to "increased" trauma and "self-abusive behavior" by those cases placed by "DHR".  "Glenwood/Allen Cott" maintained and kept a staff member assigned to the house in which "E Davis" was resident, who had subsequently reportedly died of Acquired Immune Deficiency Syndrome **(A.I.D.S.)**.

4(o).   "Athens City Schools" closed "E. Davis" in closet, to keep him quiet and prevent outburst so that another child could have attention for schooling and training.  During this period, "E. Davis' " mother, "S. Davis", observed that "E. Davis' " self-abusive behavior increased the hitting of self in head – leading to

present mental condition.   "S. Davis", on several occasions, while randomly visiting "Athens School"

observed principal using a paddle on "E. Davis" which left bruises and black & blue marks on his body.

       4(p).     "DHR" solicited "Connie and Howard Shaw" in an attempt to get "Connie Shaw, sister of

"S. Davis" to agree to take custody of "E. Davis".  "DHR" continues and was continuing to controvert the

required practice "to reunite" the minor "E. Davis" with the natural parent or parents "J. Davis" and/or "S.

Davis". **(See Affidavit of "S. Davis" RE: Connie Shaw's Conversation with "DHR" about "E. Davis' "**

**Burial marked as EXHIBIT 2H attached and made a part hereto).**  "DHR" continues to prevent or initiate

the requirements of the Interstate Compact covering approximately ten (10) years to this present date or

the date of this filing. **(See Interstate Compact marked as EXHIBIT 9 attached and made a part hereto).**

       "DHR", upon initially taking physical custody of "E. Davis" placed him in Children's Hospital in

Birmingham, Alabama where he was held for approximately one (1) month before he was taken to

"Glenwood/Allen Cott".  During his stay at the children's hospital, "E. Davis's" father "J. Davis" was denied

visits without any articulated or known reason, court order or legal right or authority, in violation of "E. Davis'

" and "J. Davis' "  constitutional rights under U. S. Constitution IV and XIV Amendments.  This action also

constituted defamation in that it implied a character trait, though never specified or moral trait or some

improper action by the father.  "DHR" blocked visitation of "E. Davis" by "S. Davis" at "Glenwood/Allen Cott"

without court order or any determination of any immorality or negative character trait of "S. Davis".  "DHR"

led staff at "Glenwood/Allen Cott" to believe that "S. Davis" was or is a negative effect on her son "E.

Davis".  This constitutes defamation.  This defamation is still unresolved in Alabama among "S. Davis's"

friends, neighbors and family. **(See Affidavit of "S. Davis" Regarding Defamatory Statements marked**

**as EXHIBIT 2E, EXHIBIT 2F and EXHIBIT 2G attached and made a part hereto).**

**(See Affidavit of "S. Davis" Regarding Defamatory Statements marked as Item #4 of EXHIBIT 2D).**

       4(q).     "DHR" upon filing a petition for abandonment with the Alabama court in "J. Anderson"

court, failed to follow the Alabama Juvenile Justice Act – no 2008 – 277, effective January 1, 2009.  §12-

15-312(b). Reasonable effort refers to reasonably made to preserve and reunite families prior to placement of a child in foster care…. And in making these efforts, the health and safety of the child should be paramount.  "E. Davis" was recently, several years ago, placed in foster care.  His health is at risk in that he has been placed on multiple medications which, it has been noted, based on comments by foster care providers, that he is asleep at his age – sometimes as early as 4 pm – for the rest of the evening and night. **(See Interstate Compact marked as EXHIBIT 9).**

"DHR" improperly continues "temporary" custody for over ten (10) years added by the Alabama court, "J. Anderson".   A permanency hearing was never convened by the Alabama court, in that **no** facts have been submitted to the Alabama court to justify such a hearing.

§12-15-315  Permanency hearing for Department of Human Resources, "DHR" (a) Within twelve (12) months of the date a child is removed from the home and placed in an out-of-home care and less frequently than every twelve (12) months, thereafter, during the continuance of the child's out-of-home care, the Juvenile Court shall hold a permanency hearing.  This provision is intended to ensure that a permanency plan is prepared by "DHR".  (Note:  This has **not** been done in that that the initial "temporary custody" was granted to "DHR" only on the basis of their petition of abandonment, since that was **not** pursued, there did **not** remain a basis for "temporary custody". (i.e. placement of the child, "E. Davis", out-of-the-home placement was stipulated by the parents, "J. Davis" and "S. Davis", solely for placement at "Glenwood/Allen Cott", therefore that placement was through the parents, "J. Davis" and "S. Davis", not "DHR".

4(r).     "Athens City School" and "Athens City School Board of Education", with Marilyn Batts as Coordinator of the Special Education program, subsequent to Penley Reese being retired from that position, set in motion the rapid, downward spiral of "E. Davis's" health in autism where he went from being diagnosed as "mildly autistic" and high functioning to increased tantrums greatly caused by feeding him sweets and sugar products, paddling to control his behavior, including placing him in a closet.  Ms. Batts

refused to expand "E. Davis's" IEP (Individualized Educational Plan) to include a special class, though a special class and finds were quickly found when another autistic child entered the school.  "E. Davis's" present autistic symptoms and the continuing autistic deterioration, compounded by other intervening acts is the reason "E. Davis" will, it is believed, always be in need of an institutional and professional type of care.  "E. Davis's" parents agreed and stipulated to "E. Davis's" placement in "Glenwood/Allen Cott" subsequent to which there was **no** legal reason to continue custody in "DHR".

Subsequent to "DHR"'s petition for abandonment of "E. Davis's" and the "J. Anderson" Court converting the hearing scheduled by the court - pursuant to filing for assistance in placing "E. Davis" in Glenwood, by "S. Davis's" Alabama attorney; "S. Davis" had sought the assistance of "DHR", through their Athens, Alabama supervisor, Shannon Cameron, for a certified (for handicap child or autism) child care individual.  Background: "S. Davis" knew Shannon Cameron when "S. Davis" and Shannon Cameron were children.  Shannon Cameron had been adopted, along with another child, from a foster home.  Shannon Cameron's adopted mother would bring Shannon Cameron and her adopted sister to "S. Davis's" home where "S. Davis's" mother – a skilled seamstress, would make clothes ordered by Shannon Cameron's mother.  As young adults, "S. Davis" dated a young man in Athens for over a year and, "S. Davis" decided not to continue dating this young man.  Shannon Cameron starting dating the same young man, thereafter, and shortly thereafter the young man stopped dating Shannon Cameron, stating that, "Shannon Cameron reminded him 'too much' of "S. Davis" whom he had been seeking to re-new their ("S. Davis'" and his) dating.  Cameron, "S. Davis" learned, was heartbroken.  This along with a reputation that the Colliers had ("S. Davis's" family/maiden name) in the small town of Athens, Alabama, that the elder Collier - having eleven plus children, never sought any help for his family outside the home – provided the feeling that they (The Colliers) thought they were better than other Black families in and around the City of Athens.

Cameron stated to "S. Davis" regarding "S. Davis's" request for certified/licensed caretaker that "DHR" would not provide any help to "The Colliers".  Cameron subsequently did mail a list of

certified/licensed child care individuals to "S. Davis". **(See Affidavit of "S. Davis" RE: Shannon Cameron's ("DHR's") Statement Refusing Services for "E. Davis" marked as Item #2 of EXHIBIT 2C).**

**Background:**  Personal, antagonistic background from which the abandonment petition filed by "DHR" grew:

4(s).      As set forth in this preliminary earlier, "S. Davis" had taken "E. Davis" to the hospital as he had gotten temporarily uncontrollable, he was placed in a bed - "S. Davis" had provided her medical insurance information, left the hospital at (three) 3 AM, having acute bronchitis ill effects, left her phone number to be reached, was going to return to the hospital in a few hours and the attorney who had filed the petition for "S. Davis" for child in need of assistance (that was converted by the "J. Anderson" Court to an abandonment hearing) was informed that her attorney – this (six) 6 AM the same morning that he – had been contacted by "DHR" and they were aware that there was no abandonment issue, therefore, "S. Davis" '… should **not** go back to the hospital because this would confuse things …".  He instructed "S. Davis" to just show-up for the scheduled shelter-care hearing.  Her attorney insisted - in effect demanded, that she not return to the hospital.  He threatened to withdraw from the case if she did.  "S. Davis" was not informed that the hearing would be an abandonment hearing.

"S. Davis" subsequently learned that the abandonment petition was filed later that afternoon after 1PM, and at approximately 7:15 AM "DHR" personnel woke "J. Anderson" contacting her at her home.    "J. Anderson's" Court never held an evidentiary hearing on an abandonment issue, though the hearing for placing "E. Davis" in "Glenwood/Allen Cott" School had been converted to an abandonment hearing.

**Background:**    "J. Anderson" attends or attended the same church as, and with, "J. Woodruff", Jerry Batts – the husband of Marilyn Batts, and as, and with Marilyn Batts – the "Athens City School" & "Athens City School Board of Education's" Special Educational Coordinator. **(See Documents Referencing Church Membership Attendance marked as EXHIBIT 10 attached and made a part hereto).**

The case of "E. Davis", in "J. Anderson's" Court, is replete with bias, personal animosities by "DHR", indirect bias and animosity for individuals from Northern Indiana, as set forth above, and outright disregard and perversion by "J. Anderson's" Court of the UCCJA – the requirement that "DHR" and/or The Court invoke the Interstate Compact to transfer the child or present the mentally challenged individual to the jurisdiction of an agency in the residential state of both parents and or the custody of either parent in Indiana, full faith and credit of The Divorce Decree of Indiana.  **(See Copy of Pertinent Parts of the UCCJEA marked as EXHIBIT 5A and EXHIBIT 5B).**

"J. Anderson", a Judge of the Athens Court, can be said to recognize the requirements of the law and the provision of the UCCJA, the Interstate Compact, the requirement of full faith and credit, The United States Constitutional rights of the parents of "E. Davis", the numerous cases citing the rights of custody, the 1st Amendment regarding free speech, and religious rights.  **(See 1st, 4th, 10th, and 14th Amendments of United States Constitution). (See Copy of Alabama Code Section 13 A – 6 – 45 : Alabama Code – Section 13 A – 6 – 45: INTERFERENCE WITH CUSTODY marked as EXHIBIT 11 attached and made a part hereto).**

**(See Copy of Exhibit Define Full faith and Credit Dictionary.com.full faith and credit.the Obligation under Article IV of U.S. Constitution for each state to recognize the Public acts, Records, and Judicial Proceedings of every other state marked as EXHIBIT 12 attached and made a part hereto). (See Copy of Pertinent Part of UCCJEA (1997) marked as EXHIBIT 5B).**

The now, older "E. Davis" has been placed in another group home where the "J. Anderson" Court and "DHR" have in the past suggested that "E. Davis" has identified with these environments, become used to and needing of them.  The fact is that "E. Davis" has been and his identification with his kidnappers does not give credit to any argument that he should remain there in "the best interest".

The "J. Anderson" Court's" personal bias and disregard for legal rights of parents are symptomatic of her personal style, which was demonstrated in a recent case, where "J. Anderson" ordered the arrest of

a mentally challenged youth, without providing the officers with enough information to properly confront the youth.  Upon their attempt to take this youth into custody, two (2) officers were shot and killed.  "J. Anderson" stated that she did not have to give the officers any more information because of the nature of juvenile court/family court.   "J. Anderson's" Court has abused the confidential nature of family court – all to the denial of individual and Constitutional rights of "E. Davis", "J. Davis" and "S. Davis", his natural parents and in contravention, as a signatori by the State of Alabama of the **UCCJA, UCCJEA** and  the laws of kidnapping.

"J. Anderson's" Court - collusively with "DHR", has circumvented the laws of the state of Alabama, the state of Indiana and the United States of America with the attitude that what she decides is law, and has on numerous occasions held ex-parte dialog with "DHR" and others regarding pertinent, privileged and private matters regarding "E. Davis" and his parents, "J. Davis and "S. Davis".  "DHR" - along with "Athens City Schools & Athens City School Board of Education", Dr. Sarrels, Connie and Howard Shaw – contrived, collected, false and clearly unsubstantiated, written and oral statements to justify their actions regarding the custody and welfare or "best interest" of "E. Davis" while a minor and into the present, in his on-going handicap of autism.  This has been done with the knowledge of "J. Anderson's" Court – all collusively to prevent the re-uniting of "E. Davis" with his natural parents, "J. Davis" and "S. Davis".

"J. Davis" has continuously sought legal educational benefits due "E. Davis" from the school in Athens, Alabama – cited as "Athens City School/Athens City Board of Education". **(See Copy of Letter from "Glenwood/Allan Cott" to Penley Reese Dated December 14, 1999 marked as EXHIBIT 4A).**

**(See Copy of Letters to Marilyn Batts Special Education Director of Athens City Schools/Athens City School Board of Education marked as EXHIBIT 4C).**

"S. Davis" was told that if she continued to press for an Individualized Educational Plan **(IEP)** for "E. Davis" when he was attending "Athens City Schools" that harm might come to him. **(See Affidavit of**

**"S. Davis" RE: "Athens City Schools/Board's" Threat of Harm to Son ("E. Davis") marked as Item #4**

**of EXHIBIT 2B).**

Marilyn Batts, of the "Athens City School" Special Education, told the Illinois school (during short

period when "E. Davis" enrolled there) that she - Marilyn Batts, was not going to let "E. Davis" 'bust her

budget', and 'that "S. Davis" was trying to bust their (Illinois school) budget'. This disrupted progress for

help for "E. Davis".

"J. Davis" and "S. Davis" learned when "S. Davis" brought "E. Davis" to the state of Alabama

returning to the "Athens City School", that the aid that was hired to work with "E. Davis" was available for

other tasks, because as soon as there were any problems such as tantrums, they ("Athens City School")

would call "E. Davis's" grandmother, "Louise Collier", who would pick him up from school within 1 – 2 hours

of his attendance. "Louise Collier" never informed "S. Davis", her daughter, that the "Athens City School"

was not using the teacher's aide to handle any autistic problems with "E. Davis" but sending him home

within 1 – 2 hours. **(See Affidavit of "S. Davis" RE: Louise Collier and Ms. Benford marked as**

**EXHIBIT 2B).**

"J. Davis" wrote the "Athens City Schools" regarding the refusal and failure to provide services for

his handicapped son, "E. Davis". **(See Copy of Letter from "J. Davis" to Athens City Schools Dated**

**April 25, 2000 marked as EXHIBIT 4C).**

**(See Copy of Letter from "J. Davis" to Athens City Schools Dated May 11, 2000 marked as**

**EXHIBIT 4C).**

Louise Collier (the child's, "E. Davis'", grandmother), on more than one occasion, sent her son,

Jeruald Collier, who is the uncle of "E. Davis", to pick "E. Davis up from the school. The school informed

"S. Davis" that Jeruald Collier was clearly intoxicated on several of these occasions. "Athens City Schools"

and Louise Collier placed "E. Davis" at risk of life on these occasions. **(See Affidavit of "S. Davis" RE:**

**Jeruald Collier's Driving "E. Davis" from Athens City Schools marked as EXHIBIT 2B).** "E. Davis' "

autism – due to lack of early help and intervention sought by his natural parents, "J. Davis" and "S. Davis", from the "Athens City School" system is the cause of his present deteriorated condition along with harmful and neglectful activities of "Glenwood/Allen Cott" school.

"S. Davis" learned that as "Glenwood/Allen Cott" school's quality of care diminished and deteriorated to merely keeping the autistic individual medicated into docility, the staff members were also using tasers-like devices to control the autistic tantrums of the handicap/autistic children in their care including "E. Davis".  "S. Davis" saw evidence on "E. Davis' " body of such abuse. **(See Copy of Article Regarding Controversy over Shocking and Tasering Mentally Ill Children (People) with Autism marked as EXHIBIT 13 attached and made a part hereto).**

**(http://www.cbsnews.com/news/controversy-over-shocking-people-with-autism-behavioral-disorders/).**

"S. Davis" was placed in fear of **harm** to her son, "E. Davis", when she complained – "DHR", through illegal ruling of "J. Anderson's" Court is guilty of criminal battery, neglect, child abuse, mental distress, kidnapping.

The "J. Anderson" Court was used by "DHR" to react to any complaints or concerns by "J. Davis" and "S. Davis" by attaining court orders preventing the parents from seeing or communicating with their son - "E. Davis", and on one occasion, such order attained by "DHR" from the "J. Anderson" Court – without prior notification or hearing by the court – prevented the parents from access to "E. Davis" for six (6) months. (See affidavit, also case law which the "J. Anderson" Court should be held to be knowledgeable of and should follow pertinent Constitutional Amendments).  "Glenwood/Allen Cott" school had a relationship with "E. Davis's" parents, "J. Davis" and "S. Davis" long before "E. Davis" was placed there.  Note: Thus, no justification of any continued Court of "J. Anderson" with "E. Davis".  **(See Exhibits of Such Prior Contacts).**

"DHR" and unsubstantiated court orders worked to alienate the officials and staff from the parents, "J. Davis" and "S. Davis".

"J. Anderson", collusively with "DHR", denied "E. Davis" over ten (10) years "the right to be taught and practice the religion, faith, and beliefs of his natural parents – "J. Davis" and "S. Davis" - violation of the 1st Amendment.  "J. Davis was raised in the Seventh-day Adventists faith where Sabbath is observed from sunset Friday to sunset Saturday.  "E. Davis was taken to Sunday worship.  "S. Davis" had converted to Seventh-day Adventism before "E. Davis" was born.  Additionally, "E. Davis" was held from and prevented from the learning of his heritage of his father's family – consisting of his mother's Jewish maiden name, "Messiah" from her father whose ancestry is said to be from Spain and of Jewish heritage.

"J. Davis" learned, months before "J. Davis's" aunt - on his mother's side, was killed in an auto accident, **(See Copy of Autopsy - Death Report marked as EXHIBIT 14 attached and made a part hereto)**, that the surname "Messiah" comes from the fact that someone in this line of ancestry was not only Jewish, but was a Rabbi in Spain, prior to Queen Isabella expelling Jews from Spain.  "J. Davis'" mother was born in Panama.  "J. Davis" also has Norwegian ancestry through his maternal great-grandfather.  "J. Davis" has Pakistani ancestry through his maternal great-grandmother, and his father is African American and Dakota American Indian.

"S. Davis", "E. Davis's" mother, is also a descendant of the Cherokee American Indians.

"J. Davis" and S. Davis" learned after the fact that during "E. Davis's" self-hitting, (which is a systematic trait of autism), he injured one of his eyes from the repeated self hitting and had an operation. This was never revealed to the parents who learned of this only after the fact.  The parents of "E. Davis" had not lost their parental rights, and this operation -without their consent – was illegal and constitutes a criminal battery.

The fact that "DHR", "Athens City Schools and Athens City School Board of Education" have, over the years (ten-plus [10+] years signed off and/or solicited the illegal signing off or representation of the

familiar authority to receive Social Security Insurance (**SSI**) and Medicaid, constitutes fraud – and the part

of "Athens City Schools and Athens City School Board of Education" ("E. Davis" places in Glenwood under

the educational authority of "Athens City Schools and Athens City School Board of Education").  "DHR", "J.

Anderson's" Court and members of "S. Davis's" family, Connie Shaw and Howard Shaw, Louise Collier –

individually and collectively have committed fraud, in that there was no authority by these individuals to

seek SSI and Medicaid.   Percentage of such funds are given to "Athens City Schools", "DHR", "J.

Anderson's" Court, and "Lesa Greene" - and we believe that some of those funds went to "Connie and

Howard Shaw" as administrative cost and fees - constitutes violations of **RICO**. **(See Provision of**

**Collection of SSI and Medicaid marked as EXHIBIT 15 attached and made a part hereto).**

The above individuals also have violated elements which constitute racketeering under Racketeer

Influenced and Corrupt Organizations Act **(RICO).**

"DHR" - having knowledge of familial discord with "S. Davis's" (Collier) family, has solicited, bribed,

coerced, threatened members of the Collier family to assist them in the illegal activities regarding "E.

Davis's" care, custody and placement.   The attempts to obtain fairness, proper, and legal rulings of "J.

Anderson's" Court has been and is perverted by personal bias, illegal self-serving interest of the defendant

named herein by their individual, collective and collusive actions.  "S. Davis" was informed by Marilyn Batts,

on one occasion, that she, ("Marilyn Batts"), had no funds for the handicap, "E. Davis'" special education –

IEP, "She had no funds for someone from Northern Indiana". **(See Affidavit of "S. Davis" RE: Northern**

**Indiana marked as Item #10 through Item # 11 of EXHIBIT 2B).**

This view and attitude has plagued the efforts of "J. Davis" and "S. Davis" to get help for their son,

"E. Davis".

When "J. Davis" argued for ruling of the "J. Anderson" Court, she, "J. Anderson", stated

sarcastically "Appeal me Mr. Davis …"   The "J. Anderson" Court feels immune from any reversal or

interference with any of her rulings, which is emboldened by the general atmosphere in Alabama regarding

"Northerners" and particularly "Northern Indiana".      Also, note the fact that when the federal government

sought to prosecute the (then) Alabama State Governor (Don Siegelman) recently, they could **not** get a jury

to convict him on even one (1) of twenty-seventy (27) counts.  The local citizens are reported to have said

'We will not convict one of our own'.  The federal government had to move the case to the state of Georgia

where they were successful in getting a conviction.

**(See Article on Don Siegelman marked as EXHIBIT 16 attached and made a part hereto).**

http://blog.al.com/spotnews/2008/03/siegelman_returns_home_after_n.html

        **(See Copies of Three (3) Limestone County Historical Society Plaques RE: 'Limestone**

**County Occupied by Federal Troops during Civil War' and 'Athens Sacked and Plundered', and**

**'(Trinity) School for Freed Slaves by New Yorkers' marked as EXHIBIT 17 attached and made a part**

**hereto).**

        **(See Copy of Article from Encyclopedia of Alabama called 'Sack of Athens' by Christopher**

**B. Paysinger, Athens, Alabama marked as EXHIBIT 18 attached and made a part hereto).**

http://www.encyclopediaofalabama.org/article/h-1819

        **(See Copy of Website Document of Limestone County, Alabama, Largest Slave Holders**

**from 1860 Slave Census Schedules and Surname Matches For African American on 1870 Census**

**marked as EXHIBIT 19 attached and made apart hereto).[Transcribed by Tom Blake March 2003.**

**(2015, December).   http://freepages.genealogy.rootsweb.ancestry.com/~ajac/allimestone.htm**

        **(See Copy of 'Daily South' marked as EXHIBIT 20 attached and made apart hereto).**

**http://thedailysouth.southernliving.com/2014/11/20/bourbon-and-boweties-made-by-proud-**

**southern-hands/**

        In elementary school, as a child "S. Davis" was taught that Southerners should never align

themselves with a Northerner or go against another Southerner.

Obtaining transcripts of hearings were denied "J. Davis" by the "J. Anderson" Court and there are records where other insulated family courts have changed, deleted many transcripts before turning them over to parents or their attorneys. **(See Article RE: (Southern) Judge Altered Transcript Records marked as EXHIBIT 21 attached and made a part hereto). http://www.ppcforchange.com/court-reporter-removed-remarks/**

The town of Athens has a deep hatred for Northerners, particularly Northern Indiana along with the personal animosity toward "S. Davis" and some members of her "Collier" family, along with the intense rivalry and competitiveness of some of the "Collier" siblings.  Just resolution of the harm to a handicap child, "E. Davis" is not possible in Athens, Alabama or in fact Alabama.  In the words of Christopher B. Paysinger, Athens, Alabama "Although these acts hastened the end of the Civil War, they also became engrained in the southern memory, fostering the views that became embodied in Lost Cause ideology." This animosity has rested cowardly on the shoulders of our "J. Davis'" and "S. Davis'" handicap son, "E. Davis".

The "J. Anderson" Court has suggested "unusual circumstances" in the case of "E. Davis" which seems to suggest "E. Davis'" autism is unusual and not a handicap.  The defamation perpetrated by rulings of the "J. Anderson" Court secret statements, which The Court will not reveal to "E. Davis'" parents, "J. Davis" and "S. Davis", suggesting and implying that said "J. Davis" and "S. Davis" should not be reunited with their son or have their son transferred to a facility in Indiana - which is considered and reported to be one of the best states in regards to programs, housing and treatment of autistic individuals, attacks the fitness of "E. Davis'" parents, "J. Davis" and "S. Davis", to have custody of their son.

This defamation has been spread throughout Athens, Alabama and the adjacent city of Huntsville, Alabama disparaging the characters of "J. Davis" among individuals who know his family through the Adventist Church and University of Oakwood, and "S. Davis" throughout Athens and Huntsville, Alabama.

Dr. Scott M. Sarrels, M.D.,("Dr. Sarrels"), admittedly wrote a letter to "DHR" in which he lied and informed "S. Davis" that it was the only way "E. Davis" would get into "Glenwood/Allen Cott". Dr. Sarrels refused to give "S. Davis" a copy of that letter. Additionally, "S. Davis" never authorized such a letter to be written by Dr. Sarrels. And, without proper authorization from "S. Davis", Dr. Sarrels' release of such medical information – fabrication or not - was a part of medical records of Dr. Sarrels regarding "S. Davis" and her son, whom she "S. Davis" had taken to Dr. Sarrels for medical treatment. This was a violation of HIPAA.

"Dr. Sarrels" also admitted providing the wrong medication to "E. Davis" which caused additional health problems for "E. Davis".

"DHR", "J. Anderson", "Athens City Schools and Athens City School Board of Education", Dr. Sarrels, "Woodroof", "Glenwood/Allen Cott", and "C & H Shaw" have all, individually and collectively, harmed "E. Davis", his parents, "J. Davis" and "S. Davis", by kidnapping "E. Davis", violating constitutional rights under the 1st Amendment, freedom of religion, due process under the 4th Amendment, violated rights under the Bill of Rights, the 14th Amendment, defamation in implying by innuendo, stating, writing, publishing that "J. Davis" and "S. Davis" abandoned their son, "E. Davis", failed to perform those things considered by family law as in the "best interest" of the child, "E. Davis" and, presently, the continued autistic handicap of " E. Davis ", theft in taking funds of " J. Davis " and " S. Davis " without proper legal authorization for "child support", fraud – in receiving funds for care of " E. Davis " from SSI and Medicaid, violation under RICO, battery in authorizing surgical procedure on " E. Davis " without consent or notification of " E. Davis' " parents, " J. Davis " and " S. Davis " that was not an emergency or where there was sufficient time to contact parent or parents, "J. Davis" and/or " S. Davis ", ex-parte discussions by "DHR" and "J. Anderson" of " E. Davis' "  case; violation of HIPA by Dr. Sarrels, neglect, mental distress intentionally inflicted, these and other harms set forth under claims directed toward individual defendants

which in a substantial manner was, and continues to be, motivated by personal, regional, and professional animosity.

As set forth earlier, Shannon Cameron, of "DHR", had and continues to exhibit personal animosity toward "S. Davis" (nee Collier), Marilyn Batts of "Athens City Schools and Athens City School Board of Education", "Louise Collier" defamation and false statements (prior to her present diagnosed condition of dementia), regional animosity as indicated earlier of Northerners, particularly Northern Indiana, professional animosity and bias ( " S. Davis' " attorney, locally hired for petition to "J. Anderson's" Court for assistance in getting "E. Davis" into "Glenwood/Allen Cott" school, informed "S. Davis" that "DHR" and the "J. Anderson" Court did not believe her when she testified to the fact that "J. Davis" is an attorney in Indiana).

"J. Davis" and "S. Davis" did not and do not fit the profile of the typical family and parents that "DHR" and The "J. Anderson" Court was, and is, accustomed to dealing with in Court.  "J. Davis" is a licensed attorney in the State of Indiana, Northern and Southern District Courts, The United States Supreme Court, recently admitted to the Illinois District Trial Court, and holds a Bachelor Degree in Business Administration, and a Masters of Business Administration, a Juris Doctor, is a Hearing Officer for the City of Gary Police Commission, an author of two (2) published books.

"S. Davis" holds a Bachelor Degree in Computer Science, a Master's Degree in Computer Science, a recipient of a NASA Award, given to a select few - only the Top 1% Performers at NASA.  "S. Davis" worked on the Hubble Telescope, the International Space Station, the Space Shuttle Program, The PATRIOT Air Missile System, with a third-level (3rd) Secret Security Clearance.

When "E. Davis" was born in Indianapolis, Indiana, his mother "S. Davis" took him to Atlanta, Georgia to see and meet relatives.  "E. Davis" experienced a bout of apnea which is common with some infants.  He was taken to the emergency room and as soon as his Mother "S. Davis" could get away, after "E. Davis" was admitted, she called his father, "J. Davis" who was on a flight to Atlanta, Georgia within hours. (See affidavit of "J. Davis" and "S. Davis").   Subsequent to the return home (Indianapolis, Indiana),

"S. Davis" was able to remain home as a 'stay-at-home' Mom, bonding with "E. Davis" while "J. Davis", the father worked full-time as a Deputy Prosecutor of Marion County, Indiana.

During the first two (2) to four (4) years of " E. Davis' " life, both parents felt concerned about " E. Davis' " natural development, prior to " E. Davis' " diagnoses for autism.  "J. Davis", the father, reading upon the subject, said that "E. Davis" is probably autistic long before the doctor had, so, officially diagnosed "E. Davis" with autism.  "J. Davis" and "S. Davis" had numerous tests done on "E. Davis" to pinpoint what might be the problem.

This atypical set of parents was not what "DHR" or "J. Anderson's" Court was familiar with, and this created an added bias and animosity which was directed on the "E. Davis" case, it was not what the Southern Climate was used to, color-wise (Black, Hispanic, Cherokee Indian, Jewish ethnicities).

The above listed defendants' animosity has, and continue to, intentionally and cowardly, effect the autistic son, "E. Davis" of "J. Davis" and "S. Davis".

Rather than provide help for an autistic individual, he, "E. Davis" has been and remain a "Cash Cow" for "DHR", "J. Anderson's" Court, and with solicited falsehoods, all of which The "J. Anderson" Court refuses to divulge to "J. Davis" and "S. Davis", the reuniting of "E. Davis" to his natural parents is being thwarted.  All created by personal bias and animosity.   The cases, set forth by "J. Davis" and "S. Davis", all support the position taken in the "J. Anderson" Court , which a family court judge should uphold, along with Constitutional issues, statutory requirements, both – of the state of Alabama and the state of Indiana.

Funds, illegally taken, belong to "E. Davis" in his placement in the state of Indiana.

Elian Gonzalez's father, a Cuban National, was able to obtain more American Justice and due process than "J. Davis" and "S. Davis" who are both residents of the state of Indiana, U. S. A., not Cuba.

"J. Davis" was a resident of the state of Indiana when "DHR" filed their petition for "abandonment" in the "J. Anderson" Court in the state of Alabama.  The divorce decree granted in the state of Indiana continues the agreed settlement of "J. Davis" and "S. Davis".  We were never in a debate about the custody

of "E. Davis" which was agreed that "S. Davis" would have physical custody.   Thus, the ludicrous accusation of abandonment, within one (1) to two (2) hours of leaving the hospital that was set out earlier in this preliminary, could not be directed at "J. Davis", father of "E. Davis", because "J. Davis" did not have custody.

The "J. Anderson" Court did not resolve, or rule on any issue of abandonment, and if she did it was not made known, to this date, to either "J. Davis", or "S. Davis".

The hearing held in "Emergency Custody" of "E. Davis" with "DHR" was just that: An Emergency Custody Hearing which was temporarily based upon their petition of abandonment. **(See Affidavit of "S. Davis" RE: "S. Davis' " Problems with Alabama Licensed Attorney Slate's Petition for Placement 2001 marked as EXHIBIT 2I).**

Converting " S. Davis' " and her local counsel's petition for hearing on child in need of assistance for placement in "Glenwood/Allen Cott" school, did not resolve any abandonment issue.   At a hearing subsequent to the first hearing, "J. Davis" and "S. Davis", 'stipulated' that "E. Davis" was in need of placement at a residential school for autism.  The stipulation was clearly for only the placement, once that was accomplished, there was no longer a need to keep the matter actively in "J. Anderson's" Court.

There remained no further emergency and temporary custody should have ceased with "DHR".

"S. Davis' " local attorney stated to "S. Davis" that "E. Davis' " case (SSI, Medicaid) was supporting three (3) individual salaries; which three (3) individuals were not stated.

When "J. Davis" and "S. Davis" discussed the need to petition an Alabama court to help get "E. Davis" placed in "Glenwood/Allen Cott" school (which was then considered a good facility for autistic children), we searched for an attorney in Athens, Alabama to represent us in the placement petition.

"J. Davis" saw the telephone directory ad of "Lesa Greene" and called her.  She was open to taking the case and "J. Davis" discussed the particulars of the case with her.  During the same period, "S. Davis" in Alabama, found another attorney and felt comfortable to retain him.   "J. Davis" subsequently called

"Lesa Greene" and informed her that "S. Davis" had retained a different counsel.  "S. Davis" also called her personally to thank her for her consideration regarding the case, as just the same.   "Lesa Greene", having discussed the particulars of the case of "E. Davis" with his parents ("J. Davis" and "S. Davis"), and substantial history of the family, was contacted or contacted the "J. Anderson" Court, and was appointed as Guardian ad Litem.

This blatant conflict is and has been injurious to "E. Davis", "J. Davis" and "S. Davis".  The facts do provide any improper activities, actions or inactions on the part of "J. Davis" and "S. Davis", however, the conflict should have been a basis for not appointing "Lesa Greene" as Guardian ad Litem.   Further, "Lesa Greene's" responsibility, once, appointed, should have been with the minor, "E. Davis".  However, "Lesa Greene" failed to properly represent the well being and care of "E. Davis" in "Glenwood/Allen Cott" in that he was continuously self-injuring himself to the point of having to have surgery.   One of the safety measures used, when an autistic child is self-injurious, is having a helmet provided.  "Lesa Greene" was and is negligent in her duties as Guardian ad Litem.

Subsequent to " E. Davis' " placement in "Glenwood/Allan Cott" school, "J. Davis" and "S. Davis", parents, attended several meetings at "Glenwood/Allan Cott" school where discussions were held with the staff and program heads of "Glenwood/Allan Cott" school regarding " E. Davis' " care and schooling.  DHR" was represented by members of "DHR" case workers/staff.   At one of these meetings, we discussed "E. Davis' " self-injurious (self-hitting) in his head – a trait of autism.  This subject had been broached many times.  However, at this meeting, "J. Davis" and "S. Davis" advised the "Glenwood/Allan Cott" school, Amy Waters from "DHR", and "Lesa Greene" – " E. Davis' " court-appointed Guardian ad Litem that a facility in Illinois which housed and cared for autistic children used helmets to protect the child from the effects of hitting themselves in the head.  Note: This Illinois facility was the one "E. Davis" was being considered for, before Marilyn Batts – mentioned earlier – had told the Illinois school "E. Davis" attended for a short time,

that "S. Davis" was seeking to 'bust their budget' and Marilyn Batts was not going to let "S. Davis" 'bust her

budget' if she returned to Athens.

"E. Davis' " hitting of himself in the head has been some of the cause of "E. Davis' " deteriorating

health, mentally and physically.

A recent study conducted on professional football players with the National Football League **(NFL)**

found a nexus with early dementia in players, years after retiring from professional football, where these

players had sustained multiple strikes to the head during their careers, many of whom had suffered several

concussions. **(See League of Denial - [Wikipedia] RE: NFL Head Injuries marked as EXHIBIT 22**

**attached and made a part hereto).**

The number and extent of later life early dementia in these players would be even greater without

the wearing of a helmet.  The force of the hits to the head can certainly be said to be greater than the force

of a child hitting themselves in the head.   When "D. Davis" and "S. Davis" brought the idea of wearing a

helmet to prevent injury as the Illinois facility did with their autistic children, Amy Waters of "DHR" dismissed

with disdain – as not worth attention having come from the "North".

The fact that no measures were taken to protest "E. Davis" from his hits to the head is tantamount

to criminal neglect on the part of "Glenwood/Allan Cott" school staff, "DHR" having assumed physical

custody of "E. Davis" and particularly, "Lesa Greene" as Guardian ad Litem and jointly "J. Anderson",

having provided "DHR" with access to have custody, though improperly so, of "E. Davis".

The neglect, being intentional, shifts to battery of a criminal nature.  The surgery that "E. Davis"

Had due to injury to his head from self-hitting supports the charge of criminal battery as a Class A felony.

"J. Davis" and "S. Davis" are both aware that "E. Davis" is showing signs of the early effect of self-hitting.

4(t).     "J. Anderson's" court was and is mandated by the Interstate Compact on the Placement of

Children, **(ICPC)**, to initiate the action of the ICPC – once initiated, then, proceeds to place the child,

through the interface of the receiving state (ICPC) into a like facility in the receiving state, if it is determined

that the child or mentally handicapped adult required such placement.  This process does not negate the

parents or parent ("S. Davis" & "J. Davis" or "J. Davis") from having or maintaining legal custody.  However,

"J. Anderson's" court, in concert with "DHR", have controverted the law regarding custody of "E. Davis" by

maintaining "temporary custody", the purpose of which to be the recipient of "E. Davis's" estate, which is

SSI (Social Security (Supplemental Security Income) benefits and Medicaid. **(See Partial Copy of 2007**

**Alabama Department of Human Resources Annual Report RE: "Federal Court Ends Child Welfare**

**Oversight" of Agency ("DHR") marked as EXHIBIT 23 attached and made a part hereto).**

This ploy allows the "DHR" and "J. Anderson's" court to retain portions of the said estate of "E.

Davis", which they earmarked as administrative fees and expenses, while continuing to place "E. Davis" in

group, residential-type facilities such as "Glenwood/Allen Cott" helping to provide funds in the budget of

"DHR" and "J. Anderson's" court as well as provide funds/payment to the court-appointed Guardian ad

Litem, Lesa Greene.

This ploy represents fraud and theft by "DHR" and "J. Anderson's" court.  The parents, "S.

Davis" and "J. Davis", stipulated – of the multiple needs of "E. Davis", and placement in "Glenwood/Allen

Cott" did not and does not represent a waiver of our right of custody for "E. Davis" – even when housed in a

facility for autistic children. **(See Alabama Department of Human Resources Social Services Division**

**Administrative Code RE: Multi-needs Service Plan with the R. C. Consent Decree marked as**

**EXHIBIT 24 attached and made apart hereto).**

 **(See Alabama Department of Human Resources Social Services Division Administrative**

**Code RE: Interstate/Intrastate marked as EXHIBIT 25 attached and made apart hereto).**

**(See Document: Minimum Standards for Foster Family Homes marked EXHIBIT 26 attached**

**and made apart hereto).**

**Medicaid and SSI require residence.**  And, the fact - that neither parent is in the state of Alabama

now nor have been a residence of the state of Alabama for the past ten (10) years, support the conspiracy

that "DHR" conspired with the "J. Anderson's" Court – to prevent returning "E. Davis" to the state of Indiana to be placed in a facility   whereby he and his natural mother, "S. Davis", and father, "J. Davis", would have a closer proximity to ongoing visits and relationships.  This is a violation of due process, the rights of "E. Davis", and his natural parents, "J. Davis" and "S. Davis".

The residential eligibility requirements for MEDICAID and SSI must be met and validated via signature every twelve months.  The natural parents of "E. Davis" ("J. Davis" and "S. Davis") are residents of, and have been residents of, the state of Indiana and have not consented to, participated in, or been notified by anyone in the state of Alabama as to any documents filed every twelve months updating eligibility requirements for MEDICAID and/or SSI on behalf of "E. Davis".    Therefore, it is plaintiff's beliefs, "J. Davis and "S. Davis", that "DHR", "Athens City Schools/Athens City School Board of Education", "Glenwood/Allen Cott" school, and presently Sunlight Homes collusively with The "J. Anderson" Court have committed, and are committing, a fraud in obtaining federal funds for "E. Davis" regarding MEDICAID and SSI.

This is being done, and has been done, for the last twelve years.  Even when the child is in foster and on Medicaid, the parents have to be a resident of the state. **(See Partial Copy of SSI Medicaid Residence Requirements from the Alabama MEDICAID ELIGIBILITY Administrative Rules for Residency (Rule No. 560-X-25-.04) marked as EXHIBIT 27 attached and made apart hereto).**

**(See Copy of the Alabama Verification Plan for Medicaid Recipients ("DHR") Authority marked as EXHIBIT 28 attached and made apart hereto).         (See Lucent Technologies Insurance Coverage Information marked as EXHIBIT 29 attached and made apart hereto).**

**(See PARIS Requirement marked as EXHIBIT 30 attached and made apart hereto).**

**(See PARIS Interstate Match Program marked as EXHIBIT 31 attached and made apart hereto).**  "DHR" has - over the past ten (10) plus years with bribes, threats, and subterfuge – turned to "E.

Davis's" relatives through his mother, "S. Davis", in Alabama, to cause "E. Davis" denial of relationship with

parents, by getting his aunt and uncle ("C. & H. Shaw") to have visits and contact with "E. Davis".

This deceit by "DHR" and the "J. Anderson" Court is for the purpose of disguising the fact that there

is **not** - and has **never** been a legal reason to keep physical custody of "E. Davis".

The "J. Anderson's" Court has argued when the parents sought the transfer of "E. Davis" to

Indiana, that keeping "E. Davis" was, or is, in the "best interest" of "E. Davis", that a multi-needs group is

caring for the best interest of "E. Davis".  "E. Davis's" autism is being used as an excuse for keeping him in

Alabama suggesting that his autistic needs can only be met in the state of Alabama when the state of

Indiana, has a higher quality of care for autistic individuals and a higher reputation for such care.

4(t).      "DHR" in concert with the "J. Anderson" Court has kidnapped "E. Davis" and through defrauding

Medicaid & SSI - where residence is a controlling factor and critical as to receipt of such funds.  If they

"DHR" and the "J. Anderson's" Court have used relatives, aunt and uncle - "C. & H. Shaw", to help create

the appearance that "E. Davis" has family included in Alabama, "DHR" and "J. Anderson's" court are guilty

of suborning perjury and "C. & H. Shaw" are guilty of perjury.  **(See Copy of "State False Claims Act**

**Reviews" marked as EXHIBIT 32 attached and made apart hereto).**

**(See 42 U. S. Code §1983 RE: Civil Action for Deprivation of Rights marked as EXHIBIT 33**

**attached and made apart hereto).**

**(See Copy of Pertinent Part of Lawsuit:  RE: The Social Security Act Medicare and Medicaid**

**Program – Anti-fraud/Kickbacks marked EXHIBIT 34 attached and made apart hereto).**

**(See Copy of JUSTICE NEWS: DEPARTMENT OF JUSTICE OFFIC OF PUBLIC AFFAIRS  RE:**

**Pertinent Part of Lawsuit - Social Security Act Medicare and Medicaid Program – Anti-**

**fraud/Kickbacks marked EXHIBIT 35 attached and made apart hereto).**

**(See Motion/Pleadings to "J. Anderson's" Court RE: Reconsider Order and Motion for**

**Custody - Initiate the ICPC marked as EXHIBIT 6A).**

Multiple motions- to the "J. Anderson" Court were filed to have "E. Davis" returned to Indiana to the custody of his natural mother, "S. Davis", or to his father, "J. Davis" since in the original Indiana divorce decree, the mother, by agreement, had custody, therefore custody could not be taken from the father, "J. Davis".   "J. Anderson's" court was on notice that neither parent of "E. Davis" was in Alabama, and in fact, when both parents filed a petition to Indiana Juvenile Court appearing before Judge Bonaventura, "J. Anderson" was notified.  Judge Bonaventura requested that the representative for the ICPC in Indianapolis, Indiana who filed her appearance in Judge Bonaventura's court, to contact the attorney for "DHR" in Alabama.

This representative reported to Judge Bonaventura that the "DHR" attorney (Claire Tinney-Jones) was so flustered, wroth and angry by the petition filed by "J. Davis" and "S. Davis" here in Indiana, that the representative was unable to get a cogent, or understandable explanation of why "J. Anderson" would **not** have "E. Davis" transferred to Indiana, and only got an explanation from the Guardian ad Litem, "Lesa Greene", that she guessed the Judge ("J. Anderson") "… just changed her mind".

**(See Copy of Transcripts of Judge Bonaventura's Court Hearings in 2006 and 2007 marked as EXHIBIT 36A and EXHIBIT 36B attached and made apart hereto).**

 **(See Copy of Selected Pages from a Research Paper by Vivek Sankaran RE: Judicial Oversight over the Interstate Placement of Foster Children marked as EXHIBIT 37 attached and made apart hereto).**

**(See Copy of the Universal Declaration of Human Rights marked as EXHIBIT 38 attached and made apart hereto).**

Online (email) research has shown, in a survey of the number ICPC transfers initiated by any Alabama court, only two (2) had done so.  **(See Online ICPC research RE: Only Two (2) Judges in the State of Alabama Initiated the Interstate Compact on the Placement of Children).**

"Yet, notably absent from the current debate on reforming the ICPC is any consideration of creating judicial oversight over the interstate placement process, which has been absent since it was drafted in 1960". **[1]**

Few states have specific criteria for the judge to gauge best interests so the concept remains elusive. **[2]** Some states in recent years have enacted statutes listing specific criteria for a judge to review and make findings. **[3]** The real key is the totality of circumstances. **[4]** As one court recently stated:

‘Best interest’ does **not** contain within it any idealized lifestyle; the question boils down to a judgment, consisting of many factors, about the likely future happiness of a human being. . . . Stability, love, family happiness, tolerance and ultimately, support of independence – all rank much higher in predicting future happiness than the likelihood of a college education. **[5]**

---

[1] **Research Article:** "Judicial Oversight Over the Interstate Placement of Foster Children: The Missing Element in Current Efforts to Reform the Interstate Compact on the Placement of Children", Vivek Sankaran, Clinical Assistant Professor of Law, University of Michigan Law School. Copyright © 2009, Vivek Sankaran.

[2] Elster, Solomonic Judgments: Against the Best Interest of the Child, 54 U Chi L Rev 1 (1987); Weitzman & Dixon, Child Custody Awards: Legal Standards and Empirical Patterns for Child Custody, Support and Visitation After Divorce, 12 UD Davis L Rev 471 (1979); Note, Best Interests Revisited: In Search of Guidelines, 1987 Utah L Rev 651; Charlow, Awarding Custody: The Best Interest of the Child and Other Fictions, 5 Yale L & Pol'y Rev 267 (1987).

[3] **Maine**. Me Rev Stat Ann tit 19, §752(5).

---

The on-going action of "DHR", regarding placement of "E. Davis", is not through any properly granted custody.  However, "DHR" is not following their own laws in Alabama regarding placement, permanency plan and hearings, even if aided by the court.

Under the above law, placement of a child §12-15-315, in part, sets forth 'The purpose of the permanency hearing shall be to determine the permanency plan for the child which may include whether

and, if applicable, when the child shall be 1) returned home on a specific date; 2) placed for adoption with no identified resources or with custody of foster parent wherein the "DHR" shall file a petition for termination of parental rights; (3)  permanently placed with a relative with a transfer of legal and physical custody to the relative or with transfer of physical custody to a relative with … "DHR", "ACS & ACS Board of Education" was made aware of the early care by "E. Davis's" parents in Indiana – auditory examinations, etc.  "J. Davis" and "S. Davis" continued pursuing development of "E. Davis" long before "DHR" filed their unlawful and unwarranted petition with "J. Anderson's" court.

        "J. Davis" and "S. Davis", in seeking assistance with "E. Davis's" development was referred to "Glenwood/Allan Cott" (again – long before "DHR" got involved with "E. Davis").    In this early contact with "Glenwood/Allan Cott" – though "E. Davis" was not in the system or entered into "Glenwood/Allan Cott" residency program, "Glenwood/Allen Cott" offered the parents, "J. Davis" and "S. Davis" suggestions for "autistic training, they also provided "respite care" – that is sending someone from their school in Birmingham, Alabama to the parents' home in Huntsville" to give the parents an evening off – all of this before "DHR" filed a petition.    "DHR" was fully aware of the type of care, developmental efforts and work by the parents.

---

**[4] New York.** Morton v. Morton, 158 A.D.2d 458, 551 N.Y.S.2d 51 (2d Dep't 1990).  **Utah.** Erwin v. Erwin, 773 p.2d 847 (Utah C. App. 1989) (custody to father where he wanted all of children and stayed in family home and oldest child had emotionally distanced from mother and mother had relocated, was unemployed, lived with her unemployed boyfriend and only wanted younger children).

**[5]**  Matter of Baby M, 109 N.J. 396, 537 A.2d 1227, 77 A.L.R. 4th 1 (1988).

4(u).    Alabama's own child custody practice and procedure was violated, ignored and not followed by "DHR" and aided by the "J. Anderson's" Alabama court.   Additionally, "DHR" ignored and disregarded the rights of "E. Davis's" parents, "S. Davis" and "J. Davis" and particularly the father's, "J. Davis's" regarding

the Supreme Court's holding in pertinent "… The presumption is rooted in the common experience of mankind … parent and child normally share a strong attachment …".   "DHR" was from the initiation of their first petition filed, regarding "E. Davis" that the parents of "E. Davis", "J. Davis" and "S. Davis" were always pursuing the health and care of their child, "E. Davis".

      "E. Davis" was born in the state of Indiana, where he was cared for by both parents, and during his early life, his mother, "S. Davis", was able to be at home full-time, while the father worked and was home in the evenings.   This bonding was made by the father working and the mother being a full-time, stay at home mother.  When the parents observed some developmental abnormalities, they had "E. Davis" extensively tested – hearing, physical development, etc.  The tests suggested, normality, though the parents were concerned that certain mobile, (beginning to walk) appeared to be behind for the number of months in age.

      The parents continued to pursue developmental needs, and as pointed out earlier, "E. Davis" was subsequently diagnosed as "autistic".  This early care by the parents of "E. Davis" is documented and "DHR" as well as "ACS & ACS Board of Education" were made aware.    This parental care and concerns never ceased, until "DHR", aided by "J. Anderson's" court disrupted - and continue to break and disrupt – the parenting of "E. Davis" by the natural parents, "J. Davis" and "S. Davis".

4(v).     Defendant, "J. Anderson's" court never acquired jurisdiction over the minor "E. Davis" nor over plaintiff "J. Davis" or "S. Davis" when she neglected to vacate the hearing on "S. Davis's" petition to determine the mental health of the minor "E. Davis" for placement in "Glenwood/Allan Cott" school (defendant(2e), and instead without prior notice to "S. Davis", converted the said petition to a hearing on "DHR's" petition for abandonment. (Note: which said "converted" hearing was not fully resolved) and gave "DHR" temporary custody of the minor "E. Davis" and said court, having no jurisdiction to grant custody to "DHR".

      Subsequently, plaintiff ("J. Davis") traveled to Alabama to look into the illegal custody of his son "E. Davis", and was served, at the next court scheduled hearing on the issue of his son, "E. Davis", with a

"process" to attend the said hearing.  Plaintiff, "J. Davis", advised the court that he had no information on the first hearing – the "converted" hearing – and therefore could not address any issues raised, resolved or unresolved.  Plaintiff "J. Davis" requested a transcript of the "converted" hearing, which the "J. Anderson" court refused.  To this date, plaintiff "J. Davis" has not been able to get said transcript, nor has plaintiff "S. Davis".

Both plaintiffs have - to date, been denied a transcript of the "converted" hearing, nor to this date, have plaintiffs, "J. Davis" and "S. Davis" been able to fully and properly address issues - many unknown – raised by a petition filed by "DHR".    Plaintiff "J. Davis" filed interrogatories and Request for Production of Documents, and in a Motion to Compel same from "DHR", "DHR" stated that interrogatories and documents contained information that the plaintiff "J. Davis" and "S. Davis" - the natural parents - were not permitted to have.  Plaintiff "J. Davis" suggested that there were some material regarding abandonment issues or issues otherwise, which one plaintiff could have to fully address then such portions could be redacted.      The "J. Anderson's" court still denied the plaintiff access to the petition and material filed by "DHR".

Plaintiffs, to this date, have been unable to fully confront the material present to the said court by "DHR".

4(w).    Without resolving or ruling on allegation, the second hearing addressed the matter of "E. Davis's" possible placement in "Glenwood/Allan Cott".   The plaintiffs, "J. Davis" and "S. Davis" stipulated that "E. Davis" was in need of the type of care and training that "Glenwood/Allen Cott" – at that time – could provide for "E. Davis" and also informed the court that the plaintiff, "S. Davis" had for a number of years attempted to get "E. Davis" into that school.   The plaintiff, "J. Davis" and "S. Davis", were open to the court assisting in getting "E. Davis" placed in "Glenwood/Allan Cott".  Custody did not have to be given to "DHR", as there was no established finding of neglect or abandonment.  "Glenwood/Allan Cott" housed, at that time many 'autistic' and otherwise mentally challenged children, which had been placed with the assistance of the courts or educational systems, without taking custody from the natural parents of the minor.

And, again, the "J. Anderson" court had no legal authority to give custody of "E. Davis" to "DHR". The "J. Anderson" court, legally or properly took jurisdiction over the case from the state of Indiana, who maintained jurisdiction over (our) case, including the custody of "E. Davis", established in the divorce decree granted in the state of Indiana.

4(x).    On more than one occasion, it was apparent that the "J. Anderson's" court was having ex parte discussions of the matter of "E. Davis" with "DHR" and other parties.  Plaintiff "J. Davis" filed numerous motions referencing visitation of "E. Davis" which had been blocked by "DHR".  The "J. Anderson" court denied a motion by "DHR" to terminate the parental rights of the plaintiffs, "J. Davis" and "S. Davis", citing that was nothing before the court to address such an issue.  "J. Anderson", for all intents and purposes, kidnapped "E. Davis" in collusion with "DHR".   "Glenwood/Allan Cott", on several occasions, prevented visitation of plaintiffs, "J. Davis" and "S. Davis" – by the direction of "DHR" – with no reason or court order to do so.

4(y).    "Glenwood/Allen Cott" school failed to keep "E. Davis" from self-abusive behavior, where he repeatedly hit himself in an around his head (Note: The Alexian Brothers and Rockford, Illinois Group Home used football-type helmets to protect a child from such self-inflicted injuries).  This method was never considered or used by "Glenwood/Allan Cott" school.        "E. Davis" caused such extensive damage that surgery was required.  (Note: The decision - to perform surgery on "E. Davis's" ear area - was never brought to the plaintiffs, "J. Davis" and "S. Davis".  Nor, were the plaintiffs made aware of the surgery and only learned of it after the fact.  Their input or permission was never elicited. Without legal authority, having no legal custody of "E. Davis", the surgery was tantamount to criminal battery alone with intentional neglect.

4(z).    "DHR", in concert with "J. Anderson" and "J. Anderson's" court, thus, Athens/Limestone County, Alabama has, for over ten (10) years, committed and is committing Medicaid fraud in receiving such funds on behalf of "E. Davis" and other such state and federal funds on behalf of "E. Davis". Medicaid funds can only be given to a resident of a state residing is a legal requirement in order to receive

such aid/funds.  "DHR" is, and has been, aware that neither parent ("J. Davis" nor "S. Davis") is a resident of the state of Alabama.  "S. Davis" was a resident of the state of Alabama when "DHR" filed their initial petition with "J. Anderson's" court.

"DHR" has sought to correct that improper receipt of Medicaid funds by seeking to persuade, coerce and bribe members of "S. Davis's" family to take custody of "E. Davis".  For over ten (10) years, "DHR" has been illegally receiving such funds and other unknown state and federal funds, which require such funds to aid individuals in the state for which they are resident.    "J. Davis", the natural parent/father of "E. Davis", is not a resident of the state of Alabama and was not when "DHR" filed their petition.  Later, subsequent to the "DHR" initial petition and at least eight (8) years, "S. Davis" has not been a resident of the state of Alabama.

Parental rights and residual parental rights of either parent were never terminated, there being no basis for such, no known hearing on evidence.  Receipt of such federal and state funds, on behalf of "E. Davis", has been a fraud on the state of Alabama, Medicaid, and the state of Indiana - where "E. Davis" should have been transported and placed in an appropriate residential facility for autism - ten (10) years ago.   "DHR' committed and is committing this, theft, fraud and failed to get "C. & H. Shaw" to take custody, which would have been improper and illegal, and because they reside in the state of Tennessee.

"DHR's" actions have been aided by "J. Anderson's" court.

The "J. Anderson's" court was on notice that both parents "J. Davis" and "S. Davis" were residing in the state of Indiana by the fact that "J. Davis" and "S. Davis" sought the assistance of the juvenile court, Judge Bonaventura's court in Crown Point, Indiana, who directly contacted and spoke to "J. Anderson". Plaintiffs, "J. Davis" and "S. Davis, are presently unaware of what "J. Anderson" verbally stated to The Bonaventura court, but Judge Bonaventura suggested that she was not keeping the case filed in her Court open.

4(z)(1).  "J. Woodruff" - either took the entire case over from "J. Anderson or via a petition by "DHR", issued a warrant for both, "J. Davis" and "S. Davis" for child support.   Upon the initial petition that was filed in "J. Anderson's" court, The Court inquired whether "DHR" wanted child support from the parents of "E. Davis", "J. Davis" and "S. Davis".  "DHR" said, "No".  And for several years, did not want to get such child support.   The parents, "J. Davis" and "S. Davis", subsequently learned that if they, "DHR", got child support for "E. Davis" at that time, during initial hearing, they would not be able to add him ("E. Davis") to the list or pool of children for whom they, "DHR", were getting federal and state supplemental funding.

Only after "E. Davis" - for several years - was included in the 'pool' of children from whom "DHR" was getting funds, would they ("DHR") seek to get child support from the parents of "E. Davis".  After several years, "DHR" petitioned the "J. Anderson" court for child support and – without proper determination of ability and degree by the parents to pay child support, "J. Anderson" set the amount under Rule 32 at $400.00 a piece (each) for "J. Davis" and "S. Davis".  The court, regulation developing standards for setting child support, have established such arbitrary setting as punitive and "J. Anderson" has and is allowing the punitive standard to continue, stating that "J. Davis" is purposefully 'underemployed', and "S. Davis" is purposefully unemployed.  "J. Davis" is an attorney in a solo practice of law and is not turning clients away to avoid making fees.

 "J. Anderson" in collusion with "DHR" ignoring "S. Davis's" report/statement to the court that she, "S. Davis" has had multiple (hundreds) of resumes and applications for employment in both Indiana/Illinois/California/Arizona and Huntsville, Alabama after completing an expensive reemployment/placement six (3) month program paid for by Bell Laboratories as part of a downsizing (layoff) package.    "S. Davis" is not purposefully unemployed, yet "DHR" and "J. Anderson" court used the term in order to justify the punitive, illegal manner in which, both, "J. Davis" and "S. Davis" have been treated.

"DHR" additionally sought to bribe the distant relative of "S. Davis" to take custody of "E. Davis" – dangling a monthly check to entice her – again seeking 'to present and override the requirement to "reunite" the child who was a minor at time "DHR' got involved, and still in need of custodial care due to autism. Seeking to avoid the requirement to initiate the Interstate Compact, in that neither parent was in the state of Alabama - both being in the state of Indiana, "DHR" and "J. Anderson" have and are breaking the contractual requirement between the state of Alabama and the Interstate Compact.   Plaintiff, "J. Davis" petitioned the court of "J. Woodroof" for hearing on warrant and determination of child support requirement and/or amount.  "J. Woodroof's" court completely ignored and would not respond to that request.

4(z)(2).  The "temporary" custody was just that and cannot last for ten (10+) years.  "J. Anderson's" court and "DHR" is seeking and have used the judicial power of the Athens/Limestone court in an illegal and abusive manner.  There is, in fact, one legal authority to seek child support, or continue custody of "E. Davis" by the court/"DHR".

"DHR", in concert and collusion with "J. Anderson's" court, have through the illegal use of a protracted ten plus (10+) years of "temporary" custody, which was not proper and, arguably, if so should have ended once the welfare of the minor, "E. Davis", by placement in the "Glenwood/Allan Cott" facility received and continued to receive SSI and Medicaid through fraudulent means.

To date, "DHR" - in concert with "J. Anderson's" court - have been setting up an illegal smoke screen to cover the continued receipt of Medicaid and SSI for the (mentally handicapped) minor, "E. Davis", which requires legal custody by seeking to create a familial relationship with "E. Davis's" aunt and uncle, "C. & H. Shaw".

"S. Davis" had signed "E. Davis" up for SSI – for autism – prior to "DHR's" involvement in the case of "E. Davis" and was delayed by "C. & H. Shaw's" refusal to provide a letter that indicated they had been paid by "S. Davis" while "S. Davis" worked to sit with "E. Davis".  "S. Davis" was the primary care taker for "E. Davis" and would be the signatory for SSI and Medicaid.  "DHR" having no legal grounds to maintain

custody, temporary or otherwise, have continued to continue and defraud the system by multiple

machinations for the past ten plus (10+) years to avoid returning "E. Davis" to the natural parents,  or

parent, "S. Davis".

      "DHR" in concert and collusively with "J. Anderson's" court have illegally and improperly ignored

the Interstate Compact on the Placement of Children (ICPC).   "DHR" have bored their hold on "E. Davis" by

asserting a protective care status, which if it were proper, should have ended with the placement of "E.

Davis" in "Glenwood/Allan Cott" school and physical custody returned to his natural mother, "S. Davis", but

if not, then under ICPC, should have been with the natural father, "J. Davis" in the state of Indiana.  **(See**

**Interstate Compact on the Placement of Children (ICPC) marked as EXHIBIT 9).**

4(z)(3).  "Athens City Schools" & "Athens City School Board of Education" escalated the deterioration of "E.

Davis's" health regarding his autism – causing him to be in a continuously severely mental handicapped

condition.

      When "S. Davis" first brought "E. Davis" to "Athens City Schools" & "Athens City School Board of

Education", he was evaluated by the special education coordinator, Ms. Penley Reese, who indicated that

she (Penley Reese) had advanced training in the education of autistic children (including having a master's

degree with emphasis in psychometrics).   "E. Davis" was, in 1997, evaluated as "mildly autistic" and placed

in a regular class room with an aid to sit with him.          Ms. Penley Reese retained the services of a

reputable psychologist, who also evaluated "E. Davis" and found "E. Davis" to be "high functioning" and

mildly autistic.

      Marilyn Batts, through help from her husband, the Athens City attorney for Athens, got the position

of Special Education Coordinator, having forced Ms. Penley Reese into retirement.   Ms. Marilyn Batts then

stated to "S. Davis" that though "E. Davis's" autism was deteriorating rather than improving, when staff,

teacher's aide and others started giving him sweets, then paddling him to control his behavior, and placing

him in a closet, she (Marilyn Batts) would not authorize or request funds for a special class room.    Marilyn

Batts also informed "S. Davis" that she would not seek any funds for an individual from Indiana.

It is noted that "E. Davis" was born in Indiana, his father, "J. Davis" was/is a resident, then and

now, of Indiana, his mother "S. Davis" had resided in Indiana.  It is also noted, here, that Athens has a

huge,   stand-alone, community plaque in front of the courthouse which indicates the trial and prosecution

of a Russian-born, northern Army officer from Indiana who ordered the sacking and burning of churches

and was found guilty of war crimes against the City of Athens and placed in prison in Huntsville, Alabama,

however, shortly thereafter, the officer was pardoned by President Abraham Lincoln during the Civil war.

"S. Davis", in pursuing an IEP for "E. Davis" during " E. Davis' " attendance at "Athens City

Schools", experienced numerous problems through Marilyn Batts (mentioned earlier in this Preliminary).

Marilyn Batts consistently refused to help and provide the programs, plans and educational

assistance for the handicapped "E. Davis's " autism stating at numerous times that 'there were no funds …

', but generally, and more than once, stated that there 'were no funds for someone from Northern Indiana'.

On one occasion, "S. Davis" had a telephonic conference with Marilyn Batts, along with Julia

Collier Griffith, "S. Davis' " sister.  Having taught in the educational system (near South Bend) in the state of

Indiana in the past, Julia Collier Griffith was, then, employed with the Georgia School System and

questioned why Marilyn Batts was unable or unwilling to file a simple form for funding to get "E. Davis" into

"Glenwood/Allen Cott" school.  Julia Collier Griffith holds teaching credentials, certifications and a Masters

Degree in Psychology, and she received an opportunity like the Fulbright Scholarship which consisted of

funding to live in Belgium (Europe) for a period to study and research certain aspects of their educational

system for the purposes of enriching our (American) educational system.

During that telephonic conference, Marilyn Batts stated that "she would **not** write a letter to

Glenwood indicating that it was 'the least restrictive environment' for "E. Davis" …"    As indicated earlier,

this was, and has been, the type of bias, denial of educational services which continued to frustrate the parents of "E. Davis" – "J. Davis" and "S. Davis".

The individuals in Athens, Alabama – with the "Athens City Schools" & "Athens City School Board of Education", "DHR", "J. Anderson's" Court developed a biased, draconian attitude toward the matter of the handicapped "E. Davis" with a clear disdain for law, rules, legality, apparently feeling insulated from any consequences.  Marilyn Batts also responded to "S. Davis' " statement, that the previous special educational coordinator or individual for the "Athens City Schools" & "Athens City School Board of Education" had no problem providing the IEP for "E. Davis", Penley Reese, who Batts managed to get removed via early retirement, stated that 'Penley Reese did not know what she was doing as she was from the North'.

This feeling of complete insulation and immunity from any adverse consequences of injurious actions directed at "E. Davis' " need for proper educational assistance stems from the fact that Marilyn Batts' husband, Jerry Batts, is and was at all times - mentioned above, the City Attorney for Athens, with an office in the court building which housed the "J. Anderson" Court.

After refusing to seek a child support order in the "J. Anderson" Court for several years, "DHR" sought the child support only after having "E. Davis" included in a group of children of whom "DHR" had a case for funding from federal and state funding sources, which allows "DHR" to seek child support on top of the funding from federal and states sources without notice that it would represent "double dipping".

It is felt that if this comes to light, it would be claimed, simply as a clerical error.  Portions of all such funds, child support from parents and federal and state funds go toward salaries, administration expense of "DHR", "Athens City School", the "J. Anderson" Court.   As such funds assessed as child support from "J. Davis" and "E. Davis" is and continues to be improperly based upon legal authority, jurisdiction, improperly keeping "E. Davis" in the state of Alabama represents **RICO** activities by "Athens City Schools" & "Athens City School Board of Education", "DHR", "J. Anderson's" Court, all facilities – past and present which are or

have received such funds including "Glenwood Allen Cott", and any individual who are accepting such funds.

"J. Anderson's" Court ordered child support of $400.00 from both (each) parent of "E. Davis", again where "E. Davis" should be subject to housing, support, und the family court of the state of Indiana.   Also, "J. Anderson's" Court made their order under the Alabama Rule 32.  This Rule has been found to be arbitrary, punitive, and in some cases, unconstitutional in the manner it is used.

The state of Indiana revoked that method of assessing child support for those reasons.    Further, Alabama Rule 32 provides that a hearing on child support should be granted when requested by the parties assessed such child support.  The "J. Anderson's" Court has, on several occasions, denied such requests and motions.   Subsequent to assessing child support under Rule 32, the "J. Woodroof" Court issued a warrant for "J. Davis" and "S. Davis" under the Rule 32 for child support and ignored a motion for hearing regarding said warrants.

The pay of "J. Davis" was garnished in Indiana while "J. Davis" was employed with the Lake County Public Defenders' Office by "DHR" child support division and the Courts of Athens, Alabama, as was the pay of "S. Davis" while she was employed as a faculty with ITT Technical Institute.  These garnishments represents theft in that they were illegal by "DHR", the "J. Anderson" Court, the "J. Woodroof" Court and any individual who received any parts of such funds (as receiving state property).   "J. Anderson's" Court also stated that "J. Davis" was purposely under-employed and "S. Davis" was purposely unemployed.  This, in face of facts that "J. Davis" vigorously pursued legal employment with Lake County Public Defender's Office, a solo law practice, and "S. Davis" sought full-time employment in an area where, during the period referenced here, was downsizing with much of the computer work going out of the country.

Marilyn Batts disparaged the characters of "J. Davis" and "S. Davis" by statements that "E. Davis" was not given the prescribed medication for his autism.  "DHR" further carried the defamation when they

told individuals at the Birmingham Children's Hospital, where they had placed "E. Davis" before his admittance to "Glenwood/Allan Cott" school, that the parents – "J. Davis" and "S. Davis" – had abandoned "E. Davis".  These false allegations of Batts, "DHR" and false statements from "S. Sarrels", "A. Sprinkle" has assassinated the characters of "J. Davis" and "S. Davis" in Athens and Huntsville, Alabama in the communities thereof, within the Adventists church at Oakwood in Huntsville, Alabama, beyond repair.

The mental distress by the actions of all the defendants have so worn out the ability to continue to mount this fight in a way that the health of plaintiffs, "J. Davis" and "S. Davis", has suffered.   The plaintiffs have gathered their strength to mount another effort to free "E. Davis" in that his environment is no better than the lowered quality of "Glenwood/Allan Cott".  "S. Davis" was recently told that "DHR" has no intent to ever release "E. Davis" to be reunited with his natural parents, "J. Davis" and "S. Davis" in a facility reasonable accessible given travel time and distance.

"S. Davis" was told that she should just prepare to **bury** "E. Davis".

The years of family rift, conflict, competitiveness, and rancor among siblings in the Collier family can be demonstrated by several incidents in facts.  ("C. & H. Shaw") Connie Shaw (nee Collier), former employee of "DHR", some years ago, sought to get into the more lucrative profession of computer programming (engineering) and took a corporate-sponsored, in-house training course provided by Computer Sciences Corporation (CSC) – which, if she had successfully completed it, would have doubled her social science degree and work.  She dropped the course stating it was "too" difficult.

Three (3) of her sisters were, and are, successfully in the computer science engineering field with Master of Science degrees, at times, making a six-figure salary including "S. Davis".   When one of the sisters brought a house in Tennessee, Connie Shaw (nee Collier) ("C. & H. Shaw") made one statement, repeatedly and disdainfully, to other family members.  That statement was "… now that the engineers want to come to the country, everybody wants to move to Tennessee, but when we were first here, nobody wanted to move here … ".

4(z)(4).  "Athens City Schools" with authority of "Athens City School Board of Education",

collusively, individually, and collectively through staff, teachers, administrators, faculty – along with "DHR",

"J. Anderson's" Court, cultivated, coerced, bribed, intimidated, threatened members of "S. Davis' " family

(The Colliers), particularly Louise Collier ("L. Collier") and Jeruald Collier to assist in their vindictive actions

regarding the denial in the matter of "E. Davis' " special education and "temporary custody" lasting to the

present.   It is the belief of "E. Davis' " parents, "J. Davis" and "S. Davis", that some of the Collier family was

also solicited to provide false information to aid "Athens City Schools" & "Athens City School Board of

Education", in denying the special needs of the handicap (autism), "E. Davis" such false statements to this

date have not been made available to "J. Davis" or "S. Davis" presenting any rebuttal of such negative and

false statements.

"DHR" and the "J. Anderson" Court have, without divulging source or copies of negative and false

accusation against the parents of "E. Davis", 'J. Davis" and "S. Davis" have consistently negated

documented evidence of the high standards and quality of the parents of "E. Davis" by "J. Davis" and "S.

Davis" which in such facts that "J. Davis" attended medical school (Ross University Medical School) due to

a desire to learn more about autism or provide medical help for the handicap in autism.  "S. Davis" made

"DHR" and the "J. Anderson" Court aware of this, which they indicated they disbelieved her and, in fact, she

was disdainfully told that she – "S. Davis" - was lying when she also informed the "J. Anderson" Court that

"E. Davis' " father is a licensed attorney in the state of Indiana.  "S. Davis" also informed the "J. Anderson"

Court that she "S. Davis" was and had been pursuing extensive research for autism and had been using

the Dr. Ivar Lovaas training and teaching method for autism developed by a professor at the University of

California in Los Angeles (UCLA).  Subsequently, "DHR" demanded that "S. Davis" turn over all of her

research to "DHR".

As stated earlier, "S. Davis' " siblings - (Colliers) – have competitiveness and, as many families,

some degree of jealousies in the family.  "DHR", through Shannon Cameron – a supervisor with "DHR", has

been able to top some of The Collier competeness and internal family jealousies, in efforts to keep the "temporary custody" of "E. Davis".  Also, the same negative use of Connie Shaw (nee Collier)("C. & H. Shaw").  Most of the siblings in the Collier family attended colleges and universities, and several obtained Master of Science degrees in both fields of Computer Science and Engineering ("S. Davis" - Sheila, Carol & Cora Collier).

"DHR" over the years have chosen Connie Shaw (nee Collier)("C. & H. Shaw") to create the sense of family for "E. Davis", seeking justification to continue refusing to reunite "E. Davis" with his natural parents, "J. Davis" and "S. Davis".  The only semblance of a family for "E. Davis" comes from "DHR's" attempts with this fake sense of family with Connie Shaw and Jeruald Collier where Jerauld Collier has his own personal problems, having bouts with alcoholism, and Louise Collier ("L. Collier") who is now suffering from Alzheimer's/Dementia.

"E. Davis" has been denied the more enriching environment from a close and regular contact and experience with his father, ("J. Davis"), and his mother, ("S. Davis").

Furthermore, subsequent to "E. Davis'" placement in "Glenwood/Allan Cott" school, it has deteriorated into a facility where he was tasered and overly medicated so he would not wet the bed, and also kept in a zombie-like state.

"E. Davis' " DNA pedigree includes not only his mother "S. Davis' " academic and professional achievements and personal drive for excellence, but several aunts' academic excellence and achievement, and his father's "J. Davis' " academic achievements, professional achievements and drive.   Also, subsequent to the Ryan White matter in Indianapolis, Indiana where due to no fault of **Ryan White**, he contracted HIV through blood transfusions and the parents of the other children in the school took their children out of school, refusing to return their children to the school until Ryan White was removed.

The manner in which this young child was treated because of his HIV was deplorable.

Indiana then turned over a new leaf, **(See the Ryan White Care Act),** and now is one of the leading states in the care and treatment of autism, as with autism, a child or any individual should not be shunned because of an affliction which they had no control.

Indianapolis, Indiana now celebrates **Autism Day.**

Due to "DHR", the "J. Anderson's" Court refusal to initiate the Interstate Compact and allow "E. Davis" to be sent to his state of birth and placed, if necessary in a facility close to his natural parents is the same as the deplorable treatment of Ryan White.

4(z)(5).  The civil, criminal, constitutional harm perpetrated by the named defendants come from a background and environment of vindictiveness, hate, and a feeling of immunity and insulation from legal consequences.   As indicated earlier in these preliminaries, the environment included a personal bias against Northerners, particularly persons from Northern Indiana.   Furthermore, Athens – a city in Limestone County, Alabama – was, according to a website document which was transcribed by Tom Blake, March 2003, one of the largest slaveholders from the year 1860 Slave Census Schedules and Surname matches for African Americans of 1870 Census. (Collier, T., Slaveholder - 49 Slaves).

Slave migration from Limestone County, Alabama after slavery ended were measured by the significant increase in Negro relocation of colored population in Georgia, up 8000 to 545,000 **(17%)**; Texas, up 70,000 **(38%)**; North Carolina, up 31,000 **(8%)**;  Florida, up 27,000 **(41%)**;  Ohio, up 26,000 **(70%)**; Indiana, up 25,000 **(127%);** and Kansas, up from 265 to 17,000 **(6,400%)**.   Those which saw an increase in the colored population between 1860 and 1870 from 37,000 to 475,000 – the freed slaves, then migrated from Alabama as set forth above.  This provides a more in-depth background for the proclivity of the adverse treatment by Alabamians toward "E. Davis" and his natural parents, "J. Davis" and S. Davis" **(See Copy of Website Document of Limestone County, Alabama, Largest Slave Holders from 1860 Slave Census Schedules and Surname Matches For African American on 1870 Census marked as EXHIBIT 19).**

The plaintiffs invoke 42 U. S. Code §1983 – Civil action for deprivation of rights. **(See 42 U. S. Code §1983 RE: Civil Action for Deprivation of Rights marked as EXHIBIT 33).**

Additionally, as cited above, Athens, Alabama held an abiding anger, hatred for what they hold as atrocities against the city by a Union Officer from Northern Indiana. **(See Three (3) Plaques in front of the Limestone County Courthouse RE: Occupied by Federal Troops and Copy of Article - 'Sack of Athens' by Christopher B. Paysinger, Athens, Alabama marked as EXHIBIT 17 and EXHIBIT 18).**

The prevailing attitude regarding the success and fairness for any judicial action taken against an Alabamian by a non - Alabamian, is clearly shown to be impossible.  Federal prosecution of an Alabama governor was impossible in Alabama.  A citizen of Alabama said they would not go against an Alabamian and would not find Governor Siegelman guilty of any of the thirty-seven (37) counts.  The federal case had to be transferred to Atlanta, Georgia where Governor Siegelman was convicted.  Governor Siegelman has been subsequently released by the 11th Circuit Court of Appeals, after serving less than a year.   "DHR" convinced the 11the Circuit Court of Appeals to lift a 1991 consent decree requiring federal oversight which came about due to a law suit brought regarding Alabama Care for Welfare of Children in its protection. This federal oversight was found necessary and lasted for eighteen (18) years, and was in place during the illegal action of "DHR' in the instant case of "E. Davis' " rubber stamp of "DHR's" illegal action against E. Davis" and his natural parents, "J. Davis" and "S. Davis" is, and was "J. Anderson's" Court.

"DHR" obviously feels immune and insulated from successful lawsuits, emboldened by the success in the 11th Circuit Court of Appeals.

"J. Davis" and "S. Davis" were in The Bonaventura Juvenile Court in 2006 when Bonaventura suggested that we, "J. Davis" and "S. Davis", further pursue our case to have "E. Davis'" return to the natural parents and sent back to Indiana, be taken up with the judge in Athens, Alabama.   We, "J. Davis" and "S. Davis" have not been apprised of the nature of the telephone conversation between Judge Bonaventura and "J. Anderson", however, it is felt that the decision of a Birmingham, Alabama judge to lift

the federal oversight of "DHR" played into "J. Anderson's" ruling and, no doubt, argued that her Court should have jurisdiction – not withstanding "temporary custody" (again) is stated earlier, for over ten-plus (10+) years.

The "J. Anderson" Court and "DHR" - in the illegal action and inaction regarding "E. Davis' " health and welfare, abuse of process, infliction of emotional distress, criminal battery, fraud, RICO, kidnapping and theft – have, in concert with other named defendants, violated the Human Rights of "E. Davis", "J. Davis" and "S. Davis" under the Universal Declaration of Human Rights as set forth by the United Nations and signed, and consented to by the United States of America, particularly: Article 3, Article 5, Article 8, Article 9, Article 10, Article 12, Article 16, Article 17, Article 18, Article 21, Article 25, Article 26, and Article 28**. (See Copy of the Universal Declaration of Human Rights marked as EXHIBIT 38).**

4(z)(6).  Many of Athens, Alabama residents still harbor strong emotional feeling regarding the "sacking, burning, and raping of the City of Athens, Alabama" by Northern Civil War troops.   However, Athens, through "DHR" and the "J. Anderson" Court, fails to recognize the emotional hurt, physical hurt, still being perpetrated on "E. Davis" and his natural parents, "J. Davis" and "S. Davis".   The "J. Woodroof" Court of Athens, Alabama, where the illegal warrant for child support was issued on "E. Davis'" parents ("J. Davis" and "S. Davis" for child support) is as or, in fact, more egregious than the "War Between The States" during which the City of Athens, Alabama was attacked by Northern Indiana Federal troops.

"J. Anderson's" Court continued improper habit of having ex parte communication in the "E. Davis" matter again raised its head following the attorney, for "DHR", Claire Tinney-Jones ("C. Jones" offering, out of court, an attorney for "J. Davis", stating "… then, you won't have to drive down here …".  She never asked whether "J. Davis" was unable to hire his own local legal counsel, tantamount to seeking to suborn perjury.  Subsequent to that offer by "C. Jones", this "J. Anderson" Court said to "J. Davis", "… I understand you don't want an attorney …".  Clearly, "J. Anderson" had an ex parte communication with "C. Jones".  Additionally, the "J. Anderson" court never queried "J. Davis" on his desire to have or not to have an

apparent attorney, nor did "J. Anderson" seek to determine if "J. Davis" would qualify for an appointed attorney.  Again, this is tantamount to suborning perjury.  **(See Affidavit of "J. Davis" RE: Suborning Perjury marked as EXHIBIT 3D).**

**(See Affidavit of "S. Davis" RE: Communications in the "E. Davis" matter marked as EXHIBIT 2K).**

The atmosphere in the case of "E. Davis" in Athens, Alabama was, and is, akin to the revisiting of the Civil War, though on the back of a handicapped child and presently handicapped individual (autism).  The attack on the City of Athens, Alabama by soldiers from Northern Indiana during the Civil War, in no way as egregious as Athens, Alabama's attack on "E. Davis" and his natural parents, "J. Davis" and "S. Davis".

Marilyn Batts, after refusing to merely write the letter necessary to getting "E. Davis" into "Glenwood/Allen Cott" as the " … least restrictive …" educational placement to care and educate, subsequently wrote the letter for placement – only after "DHR" and the "J. Anderson" Court sought to place "E. Davis" in "Glenwood/Allen Cott" school.   Marilyn Batts, as mentioned earlier, spoke with the Illinois school, where "E. Davis" had been enrolled ant told them that "S. Davis'" motives in the Illinois school and "Athens City Schools" & "Athens City School Board of Education" was not to seek education for her handicap son, "E. Davis" (autism), but just to " … bust the school's budget …".

This statement constituted defamation and slander in the publishing of such statements, lowering the character of "S. Davis" in the care of her son.  It harmed her reputation to be other than a caring mother by publishing to a third person and the Illinois public school.  The statement can be said to be defamation per se and defamation per quod, in that it may not be immediately recognized as defamatory.  This defamation did not necessarily involve a matter of public concern.  This defamation may have been recorded, however, it was slander, per se, and/or slander per quod, if not recorded or reduced to writing.

Marilyn Batts of the "Athens City Schools" & "Athens City School Board of Education" initiated the beginning of the involvement in "E. Davis'" case/matter of "DHR" by calling "DHR" and falsely accusing "S. Davis" of not giving "E. Davis" his medication, this only after Marilyn Batts confronted with a letter from "J. Davis" regarding "Athens City Schools" & "Athens City School Board of Education" not providing a full-day schooling for "E. Davis", and subsequent to a hearing scheduled by "Athens City Schools" & "Athens City School Board of Education" officials, prompted by the pressing concerns of "E. Davis'" parents – "J. Davis" and "S. Davis", the hearing was converted, at the last minute to a mediation.   From that, it was partially or temporarily resolved that "Athens City Schools" & "Athens City School Board of Education" would and could provide an IEP (Individualized Educational Plan) for "E. Davis" with an aide to sit with "E. Davis" in class – this was never fully implemented.

Marilyn Batts called to "DHR" was motivated by the constant efforts of "E. Davis'" parents, "J. Davis" and "S. Davis" to get proper, sufficient, and full educational needs for "E. Davis" as an autistic child. Three months later, only after threatening to call "DHR" about what Marilyn Batts claimed was the failure of "S. Davis" to give "E. Davis" prescribed medication, did Marilyn Batts of "Athens City Schools" & "Athens City School Board of Education" again harm "S. Davis" by the slanderous statement – both per se and per quod.   "DHR" pursued and continued the defamation of "S. Davis" and "J. Davis" by publishing to a third person(s) false statements to several members of "S. Davis'" family, the church of "J. Davis" through Oakwood College Seventh-day Adventists Church and College – a very insulated religious sect, where "J. Davis'" family is known and where "J. Davis'" father had attended school at Oakwood College, Huntsville, Alabama – that "S. Davis" and "J. Davis" had abandoned "E. Davis", the then minor son of "S. Davis" and "j. Davis".   This false accusation was never fully aired in the "J. Anderson" Court in Athens, Alabama where the petition filed by "DHR" was made.  A full evidentiary hearing was never provided to allow "J. Davis" and "S. Davis"" to rebut, refute, or vindicate themselves as to the allegation of abandonment, falsely charged or false allegations of failure to give "E. Davis" prescribed medication.

Marilyn Batts, of the "Athens City Schools" & "Athens City School Board of Education" subsequently to finally providing a letter to "Glenwood/Allan Cott" school, as the "… least restrictive environment …" for "E. Davis", continued through 2012 – 2013 to support, state, or make innuendos to a third person (s), i. e. "Glenwood/Allan Cott" school that the parents, "J. Davis" and "S. Davis" had abandoned their son, "E. Davis", constituting numerous and repeated acts of slander, per se, and slander per quod, and defamation, per se, and defamation per quod – the third parties bind "S. Davis' " family in Athens, Alabama;  "J. Davis", a member of the Seventh-day Adventist Church, through Oakwood College/University in Huntsville, a part of the Seventh-day Adventist Church, where "J. Davis'" father once attended in Huntsville, Alabama, and "S. Davis" and "J. Davis" once taught at the colleges as adjunct faculty.

"J. Davis'" family is well known in the Seventh-day Adventist community, not only at Oakwood College/University in Huntsville, Alabama, but in (Brooklyn), New York City, New York at Bethel Church, as the grandson of "Sister Messiah" as her name is known throughout the Seventh-day Adventist community, here in the United States and abroad, including Loma Linda University, Loma Linda, California.   These defamatory statements, both slanderous as slander, per se, and slander, per quod, was and continues to circulate to third persons, to the on-going harm to the reputation of "J. Davis" and "S. Davis" – created and started by "DHR" conspiringly and collusively with the "J. Anderson" Court, who know these allegations to be false.

The "J. Anderson" Court and the "J. Woodroof" Court, motivated by personal bias, vindictiveness, self-profiteering, are gaining - and have gained,  funds to supplement their budget, thus, their salaries, to keep the falsity of abandonment alive in order to maintain a case regarding "E. Davis".   The fact that both courts, "J. Anderson" and "J. Woodroof" of the Athens, Alabama courts have failed and refused to give full faith and credit to the divorce decree of the state of Indiana court in Lake County, or initiate the Interstate Compact regarding the transfer of "E. Davis'" case to Indiana, the refusal to follow the **UCCJA** & **UCCJEA**,

where the states - Indiana and Alabama, are signatories and their own regulations in the Office of The Administration – placed both "J. Anderson's" Court and "J. Woodroof's" Court outside of the immunities for official acts and subjected them to personal liabilities, as agents of the Limestone County and the City of Athens (Alabama).  Additionally, their judicial state Bonds, are therefore held to payments of judgments for damages, or settlements for damages.

"E. Davis'" care has been financed by SSI and Medicaid – due to his handicap (autism).  "DHR", and the "J. Anderson" Court, through various subterfuges, false documents, or information have seized Social Security Trust funds from accounts of "J. Davis" and "S. Davis" - having no proper, legal right beyond the initial placement of "E. Davis" in "Glenwood/Allan Cott" school – constitutes theft of said property of "S. Davis" and "J. Davis" as property taken with legal authority, permission or consent of the rightful owners of said Social Security property, "J. Davis" and "S. Davis".

Thus, the theft of said property - by filing false information and documents by "DHR" with the rubber-stamping and conspiratorial involvement of the "J. Anderson" Court, subjects both with the charge of criminal theft – not covered by immunities for official or judicial acts.   "J. Davis" and "S. Davis" never gave consent or permission to "DHR", "J. Anderson", "J. Woodroof", "Connie Shaw", or "Howard Shaw", nor any other person or agency, department, institution or other – the right to any property, particularly Social Security or Medicaid, belonging to or which came by said to belong to "S. Davis" and "J. Davis".

This property, Social Security benefits, belong to "S. Davis" and "J. Davis", and any parts thereof, can only be accessed by the proper authority, payee designated by "J. Davis", and for her Social Security - "S. Davis", only in the state of Indiana can such funds be designated as payee to a facility in which "E. Davis" would be placed once transferred, as required, to the state of Indiana – where both his natural parents, "J. Davis" and "S. Davis" have maintained legal residence over the last ten-plus (10+) years.

The acceptance of any part of these funds or property of "S. Davis" and "J. Davis" constitutes receiving stolen property – where it is known or reasonably should have been known that said property was

and is illegally obtained.    And, it is believed, "Glenwood/Allan Cott" school – over the last ten-plus (10+) years, was aware that said property, SSI and Medicaid, was and is illegally obtained, and, thus, "Glenwood/Allan Cott" school is guilty of receiving stolen property as is "Connie & Howard Shaw".

        "Glenwood/Allan Cott", "Connie and Howard Shaw" – being aware that said property of "S. Davis" and "J. Davis" was, and is, being illegally obtained, are guilty of receiving stolen property (criminal theft – over ten-plus (10+) years), making it a Class A Felony in the State of Indiana and likewise in the State of Alabama.  The act of illegally and improperly holding "E. Davis" in the State of Alabama by the "J. Anderson" Court refusing to enact and/or initiate the Interstate Compact, which designate that once the natural parents of a minor are no longer in the State, that State must initiate a transfer to the State where the parents now reside, is in fact a violation of the Parental Rights of the natural parents of "E. Davis", "J. Davis", and "S. Davis", their due process rights under the United States Constitution.

        This holding of the minor in a perpetual state of "temporary custody" by a continuous finding of "emergency" or "no change" – from initial holding of "emergency" or "temporary" custody, being that neither parent is still in the State of Alabama - is a clear violation of the natural parents' rights, and clearly "abuse of process", such that, the intent to keep funds belonging to "E. Davis" through SSI and Medicaid, along with the act of including him in a pool of children to solicit supplemental funds from federal agencies and state agencies is clearly fraudulent by "DHR" and "J. Anderson" Court.  A percentage of such funds have been, and are being used by local governments to supplement their budget including official salaries.

        This illegal play by "DHR", "Claire Tinney-Jones", "Athens City Schools" & "Athens City School Board of Education", "J. Anderson's" Court, "Lesa Greene", "Glenwood/Allan Cott" school, "Connie & Howard Shaw", and "Louise Collier" represents theft, criminally, as set forth above, fraud - and therefore, RICO (Racketeering, Influenced Corrupt Organization), a federal crime (See copies of Federal Courts Jurisdiction & Venue Act of 2011 and Federal State False Claims Act as Exhibit X, attached and made a part hereto..).

These acts do not allow judicial immunities, and allow for punitive damages.

**Due Process and Violation of Parental Rights Generally & Residually;  And Collusive**

**Activities of All the Defendants listed - including Conspiracy, Aiding & Abetting, and Abuse of**

**Process**

"DHR", in the course of this matter of "E. Davis", has caused injury, harm –physically and mentally, beginning with the unfounded and improper, illegal filing of a petition charging the parents of "E. Davis" with abandonment (defamation), continuing action in collusion with "J. Anderson's" Court – constituting fraud, theft, violation of "E. Davis' " and natural parents', "J. Davis' " and "S. Davis' ", civil rights by aiding & abetting the illegal receipt of funds from SSI and Medicaid, having the elements of RICO.

"Athens City Schools" & "Athens City School Board" are, and were, in the conspiracy of obtaining SSI & Medicaid funds for 'E. Davis' without legal and proper authority, aiding and abetting the other defendants in the same acts, which includes violation of plaintiff's due process rights under the United States Constitution's Fifth (5th) and Fourteenth (14th) Amendments.    Thereby, "J. Anderson's" Court – misusing the judicial roles and under the color of law – provided The Court's power, using the cloak of the seclusion from public scrutiny of the family court, aided & abetted abuse of process by "DHR", to illegal access and acquisition of federal funds, SSI & Medicaid -See False Claims Act . **(See Copy of "State False Claims Act Reviews" marked as EXHIBIT 32).**

They are motivated by desire to fill the coffers of the court's budget, salaries and budget of "DHR", "Athens City School's" budget, to assist "Glenwood/Allen Cott School" in receiving funds, both federal & state through "DHR".  **(See Article from Alabama Supreme Court Judge Roy Moore RE: "Funding Crisis in Alabama's Court" marked as EXHIBIT 39 attached and made apart hereto).**

http://www.al.com/opinion/index.ssf/2014/03/funding_crisis_in_alabamas_cou.html

(See Copy of Article of Roy Moore RE: Federal Judges marked EXHIBIT 40 attached and made apart hereto). http://www.usatoday.com/story/opinion/2015/02/10/alabama-supreme-court-chief-justice-roy-moore-editorials-debates/23201283/

(See Article by USA TODAY RE: Alabama Judge marked as EXHIBIT 41 attached and made apart hereto). (USA TODAY: 2015, February 11).  Alabama Judge Again Puts Himself above Law: Our view. http://www.usatoday.com/story/opinion/2015/02/10/alabama-supreme-court-gay-marriage-editorials-debates/23200975/

(See Article RE: 'Alabama Chief Justice Orders State Judges To Defy Federal Orders' dated February 8, 2015 marked as EXHIBIT 42 attached and made apart hereto).   [Legum, Judd. (THINK PROGRESS: 2015, February 8). Alabama Chief Justice Orders State Judges To Defy Federal Order, Block Same-Sex Marriage. http://thinkprogress.org/lgbt/2015/02/08/3620690/alabama-chief-justice-orders-state-judges-defy-federal-order-block-sex-marriages/].

Note:   Such funding sources should not be held from the parent(s) of a child placed in "Glenwood/Allan Cott", particularly when "DHR" subsequently sought court to order child support.  (Child support, generally is sought where financial support for a child is lacking.  As a disabled (autistic) individual, "E. Davis" had, and has an estate – financial means – SSI & Medicaid to cover his needs, seeking additional funds has been held to be improper, and in the instant case, to seek such from the parents would be by numerous case law to be improper, and motivated by the need and desire – as stated above, to fill budget, supplement budget of the courts, school (special education) and "DHR".

"DHR" collusively and conspiratorially engaged several other individuals into the fraud, theft of property (SSI, Medicaid funds) by bribes, threats, coercing – for the purpose of obtaining false statements from family members of "S. Davis" – "Connie & Howard Shaw".  Note: "Connie & Howard Shaw" agreed to assist in baby-sitting for "E. Davis" before this case became a "DHR" case for "S. Davis" while she worked, but as soon as they  - ("Connie & Howard Shaw", had funds to do some improvements on their home, they

found that they could not continue the baby sitting chores for which they had been amply paid).   "Dr.

Sarrels" admitted that he wrote false statements - in his words, "…the only way to get "E. Davis" into

"Glenwood/Allen Cott" school …"

"J. Anderson", a sitting Judge, presumably should be aware and knowledgeable of statutes, U. S.

Constitution, relevant case law regarding family issues – particularly parental rights, full faith and credit, and

Interstate Compact.  Clearly, "J. Anderson's" Court was otherwise motivated.

Case law supports the proposition that an evidentiary hearing should be conducted and parents

advised of the specific allegations and given proper opportunity to refute, rebut and defend themselves.

This was never provided in the "E. Davis" matter. **(Britten Vs. Commonwealth 132 Va. 609, 610 S.E. 868**

**(1922)).**  A father has the right to maintain his children in his own home and cannot be compelled unless he

has refused to do so in his own home.  This would also relate to Interstate Compact initiation to transfer of

"E. Davis" to a facility in Indiana where father of "E. Davis" resides.  But then such funds – as SSI and

Medicaid from "E. Davis' " estate would come to Indiana.

Again as stated earlier, in these preliminaries, the "J. Anderson" Court, the "J. Woodroof" Court,

"Athens City Schools", "DHR", "Glenwood/Allan Cott" school and now the new placement in Alabama of "E.

Davis" would lose their "cash cow".

They, like vultures, are not interested in the "cash cow" – only the body for their funding needs.

"S. Davis" - when laid off in the computer industry as an engineer, maintained, for the time she

could her insurance benefits through COBRA – costing thousands of dollars plus.  This is **not** indicative of

abandonment which makes such defamation the more egregious.   "J. Davis" spent saving from a

retirement fund with the Lake County Indiana Government (as a Deputy Prosecuting Attorney) years before

retirement to go to medical school in Dominica at Ross University Medical School to study medicine in

order to learn more about autism – not indicative of abandonment.

"J. Davis" while in the South for a short period, prior to "DHR's" case, was there to assist in obtaining educational assistance for his son, "E. Davis" – all while the practice of law license in the state of Indiana – was not being built or advanced.  And, "J. Davis" taught as an adjunct faculty ("J. Davis" & "S. Davis" faculty members) at Alabama A&M University.  These positions gave "J. Davis" and "S. Davis" access to speech therapy from the university's special educational research programs for "E. Davis".  "E. Davis" was able to get multiple therapies (speech and occupational) from faculty & graduate students for "E. Davis".  This is hardly indicative of parents who would abandon their child.

This case has been pursued by plaintiffs "J. Davis" and "S. Davis" for ten (10) plus years, wearing us to the point of mental and physical exhaustion.  Catching our breath and re-grouping now, we continue to seek redress for our son, E. Davis", and his parents, "J. Davis" and "S. Davis".

The plaintiffs cannot recoup the years to undo the physical and mental damage, but will seek a substantial monetary remedy for "E. Davis" and the lost years of "J. Davis" in the full dedication to the practice of law, and also with "S. Davis' " full dedication to the development of computer engineering profession.

It is the belief, from the short stay in medical school of "J. Davis", (could not get enough student loan financing to continue – dropped out as money worries did not help studies either), that intervention sooner – that is, "E. Davis' " transfer to Indiana where parents, "J. Davis" and "S. Davis" had learned of multiple educational and therapeutic assistance for autism, "E. Davis" - would have advanced rather than continue to deteriorate at "Glenwood/Allan Cott" school which declined in quality to merely a warehouse where children were, and are, overmedicated and controlled along with tasers.

At this point, "E. Davis" will always be in need of a full-time institutional housing – not unlike the movie, "Rain Man".   Our broken hearts, "J. Davis" and "S. Davis" and hopes for "E. Davis' " future is not totally shattered, but greatly tarnished.

Defendant, "J. Anderson" was more than remiss in blatantly ignoring federal laws, statutes, and cases representing issues regarding decisions made and **not** made in the "E. Davis" matter including Alabama rules, cases and statutes.   "J. Davis" spoke to 'Judicial Economy' while in the "J. Anderson" Court regarding the ongoing matter of the "E. Davis" case.  In response, "J. Anderson" stated to "J. Davis", "…Mr. Davis, I am here every day!"

The "E. Davis" case has abridged the Alabama court's <u>own</u> rules – "J. Anderson's" Court, "DHR", and "DHR's" attorney cannot find Alabama rules, statutes, cases supporting the action, or lack thereof, in the "E. Davis' " matter without twisting or torturing their own Alabama rules.  "Temporary custody" for ten (10) plus years is not legally justified - See Article from Alabama Supreme Court Judge entitled, "Help Stop the Funding Crisis in the Alabama Courts System" – This explains partially why the state of Alabama has a budget, because they are not following their own Rule 1 – Another motivation for theft, fraud in the case of "E. Davis".

"Inexpensive completion" in Alabama Rule 1 certainly appears **not** to apply to the Plaintiffs - the parties named in the "J. Anderson" Court case of "E Davis", in this matter - which was required, and caused the parents, "J. Davis" particularly to travel approximately eight hundred (800) miles one-way for week upon week, and months during the initial and beyond hearings in the "E. Davis" case, and subsequently the matter of "E. Davis" and "S. Davis".

**Note:**  It is fundamentally recognized in all states that expense, travel regarding a child by a parent is factored into any child support order – as mentioned earlier, a Rule 32 assessment of $400.00 per month for each parent of "E. Davis" did not factor that expense when "E. Davis" was placed in "Glenwood/Allen Cott" school.  The travel from Northern Indiana to Southeastern Birmingham, Alabama, then increased approximately another one hundred and fifty (150) miles making a round trip of approximately two thousand (2000) miles or more, necessitating several over-night stays, <u>**even**</u> if the court properly or legitimately ordered and assessed child support, again, that support belonging to the state of Indiana.

Alabama Rule (1) Committee comments to Act. 1,1995 Amendment to Rule (c):  The purpose of amending rule 1(c) to add the words "and administered" is to recognize the affirmative duty of the court and attorneys, as officers of the court, to ensure that civil litigation is resolved **not** only fairly, but also without undo cost and delay.   The purpose of this perpetual "temporary custody" was, and continues to be, to the end of theft – in obtaining funds for "E. Davis" through SSI and Medicaid, representing fraud, RICO, and "L. Greene", "DHR", "C. Jones" (Lesa Greene, Claire Tinney-Jones) – officers of the court, are a continuous accomplice of each other in this activity.

Because custody is a status determination or "res" jurisdiction over the child is the prerequisite for a court to make a valid and enforceable custody decision, "subject matter" jurisdiction derives from statute or The Constitution, and cannot be imposed by consent or agreement of the parties under the UCCJA.  The mere physical presence of the child and a contestant does **not** allow a court to assume jurisdiction except in an emergency.

"J. Anderson" may have had emergency jurisdiction via the **initial** petition of abandonment filed by "DHR" mentioned earlier, and again, **no** resolution, evidentiary hearing, conclusion, ruling, or judgment was made on the issue presented by "DHR" on abandonment.  The hearing set for assistance to place "E. Davis" in the most 'least restrictive' educational facility (Glenwood), filed by "S. Davis' " attorney, was temporarily converted to the emergency petition filed by "DHR".

The hearing reverted back to its original purpose – for assistance in a "child in need" (autism).

Autism cannot be said to be an emergency as nothing was found to support abandonment and the emergency came and went just as quickly.  Once "E. Davis" was placed, there was no basis for the court's involvement.  **(United States vs. Shaffer 433 U.S. 186, 208 97 S. Ct. 2569).**

The Alabama court – the Court of "J. Anderson" – got involved based upon a petition alleging abandonment which could not apply to the father of "E. Davis", in that the father "did not have" custody based upon the divorce degree.

**Indiana.**  In re Paternity of R.A.F., 766 N.E.2d 718 (Ind. Ct. App. 2002), transfer denied, 783 N.E.2d 695 (Ind. 2002) **(trial court did not err in granting custody to father where the initial custody order was issued in Indiana, father continued to live in Indiana, and a Child in Need of Services (CHINS) action had been filed in Arizona removing the children from the mother's care.  Any exercise of jurisdiction by Arizona was temporary and did not affect Indiana's ability to exercise its exclusive and continuing jurisdiction).**

As mentioned several times earlier, the court in Alabama never resolved, via full evidentiary hearing, the issue of abandonment and hearing on 'child in need of services' **(CHINS)** was conducted wherein the parents of "E. Davis" __stipulated__ the CHINS, and "E. Davis" was placed in "Glenwood/Allan Cott" school.

**Indiana.**  Cabanaw v. Cabanaw, 648 N.E.2d 694 (Ind. Ct. App. 4th Dist. 1995) **(parties could not by agreement confer jurisdiction in the Florida court where Indiana had continuing jurisdiction).**

Cabanaw v. Cabanaw, 648 N.E.2d 694 (Ind. Ct. App. 4th Dist. 1995) **(parties' attempt to confer jurisdiction of Florida, where children now live with custodial mother fails because jurisdiction cannot be imposed by consent of parties).**

**NOTE:** Alabama Rules of Juvenile Procedure – Rule 16 is CONTINUANCE UNDER SUPERVISION WITHOUT ADJUDICATION – CONSENT DECREE. [Rule rescinded effective 1-9-2009.] Comment to Rescission of Rule 16, Effective January 9, 2009 – This rule was rescinded effective January 9, 2009.  Alabama Code 1975, §12-15-211, now governs consent decrees.

**NOTE:  Alabama Juvenile Law - CHILDREN IN NEED OF SERVICES §31-34-1-16 Voluntary placement of child out of home – Termination of parental rights – Transfer of legal custody.  –** (a) The division of family and children may **not**:

(1)       initiate a court proceeding to:

       (A)      terminate the parental rights concerning; or

       (B)      transfer legal custody of; or

(2)      require a parent, guardian, or custodian to consent to:

       (A)      the termination of parental rights; or

       (B)      transfer of legal custody of;

a child with an emotional, a behavioral or a mental disorder or a developmental or physical disability who is voluntarily placed out of the home for the purpose of obtaining special treatment or care, solely because the parent, guardian, or custodian is unable to provide the treatment or care. Relinquishment of custody of a child described in this subsection may not be made a condition for receipt of services or care delivered or funded by the division of family and children.

(b)      When a child described in subsection (a) is voluntarily placed out of the home to receive special treatment or care, the division of family and children and the parent, guardian, or custodian of the child may execute a **voluntary placement agreement** that includes the following:

(1)      A statement that, by entering into a voluntary placement agreement, the parent, guardian, or custodian of the child is not transferring legal custody of the child to the division of family and children.

(2)      A statement specifying the legal status of the child.

(3)      A statement specifying the rights and obligations of the parents, guardian, or custodian.

[P.L. 282-2001, §3.]  **Cited:** Collins v. Hamilton, 231 F. Supp. 2d 840 (S.D. Ind. 2002).

The state of Indiana court, where the divorce degree was made, never lost continuing jurisdiction. The "J. Anderson" Court merely ignores full faith and credit, UCCJA, and case law.

The Court of "J. Anderson"- in collusion with "DHR", has literally kidnapped "E. Davis" and the standard of the Parental Kidnapping Prevention Act of 1980 **(PKPA)** would apply.

**Georgia.** Wilson v. Gouse, 263 Ga. 887, 441 S.E.2d 57 (1994) **(PKPA applies in all interstate child custody disputes, not just those that involve kidnapping, so Georgia must look at PKPA in modification action involving relocation from Ohio, the decree state).**

**North Carolina.** In re Brode, 151 N.C. App. 690, 566 S.E.2d 858 (2002) **(PKPA does not allow a state to ignore the provisions of a sister state's custody order).**

**Pennsylvania.** Kriebel v. Kriebel, 571 Pa. 356, 812 A.2d 579 (2002) **(PKPA requires states to determine if continuing jurisdiction exists in decree state before a court in another state attempt to modify a custody order).**

**Washington.** In re Marriage of Murphy, 90 Wash. App. 488, 952 P.2d 624 (Div. 3 1998) **(if it is determined that the court issuing a custody order failed to comply with the PKPA, the order need not be given full faith and credit).**

**Georgia.** Henderson v. Justice, 223 Ga. App. 591, 478 S.E.2d 434 (1996) **(a foreign divorce decree must be domesticated by filing a certified and exemplified copy of the foreign decree in the superior court clerk's office before a Georgia court can modify its visitation provisions. A court must make appropriate factual determinations under the PKPA before assuming jurisdiction over a child custody action and modifying a foreign custody order).**

**Pennsylvania.** Skomo v. Skomo, 2004 PA Super 53, 844 A.2d 1256 (2004) **(Parental Kidnapping Prevention Act (PKPA) is federal law, and thus the Supremacy Clause requires that it be given primacy over the legislature's codification of the Uniform Child Custody Jurisdiction Act (UCCJA)).**

**Illinois.** In re Marriage of Wiseman and Dorshorst, 316 Ill. App. 3d 631, 249 Ill. Dec. 935, 737 N.E.2d 325 (2d Dist. 2000) **(in cases of conflict between the federal PKPA and our state's version of the Jurisdiction Act, the federal PKPA prevails).**

Under UCCJA, generally, the court which assumes jurisdiction under the emergency provision makes only such orders as are necessary to protect the child from harm and then directs the action to be heard in the state which has a stronger basis for jurisdiction.  The temporary protective orders should last as long as it takes to get the issue before the proper forum to seek a permanent modification.

The PKPA (Parental Kidnapping and Prevention Act of 1980) contains a similar provision.  The only prerequisite is the child's presence and substantial evidence of an emergency.

A self-serving statement of an emergency, however, is **not** enough to confer emergency jurisdiction.

**Kansas.**  In re Marriage of Anderson, 25 Kan. App. 2d 754, 969 P.2d 913 (1998). **(emergency jurisdiction does not exist if the emergency has passed).**

**Nebraska.**  In re Interest of L.W., 241 Neb. 84, 486 N.W.2d 486 (1992) **(physical presence of child is sufficient for emergency jurisdiction but not enough to make child custody determination).**

**Alabama.**  Shook v. Shook, 651 So. 2d 6 (Ala. Civ. App. 1994) **(PKPA and UCCJA prevent Alabama from making permanent modification based on emergency provision).**

**Colorado.**  Brock v. District Court of Boulder County in 20th Judicial Dist., 620 P.2d 11 (Colo. 1980). (In re State ex rel. M.C., 94 P.3d 1220 (Colo. Ct. App. 2004).  **(District court exceeded its temporary emergency jurisdiction under Uniform Child custody Jurisdiction and enforcement Act (UCCJEA) in terminating father's parental rights in dependency and neglect proceeding; Texas had exclusive jurisdiction over child-custody determination, and district court failed to contact Texas court to resolve child's placement while father was in jail and to determine adequate period of temporary placement to permit father to resolve custody in Texas court).**

**North Carolina.**  In re Brode, 151 N.C. App. 690, 566 S.E. 2d 858 (2002) **(North Carolina court properly assumed emergency jurisdiction over child who was dependent, but should have made only temporary protective orders when there was a Texas custody order in effect).**

**Vermont.** In re D.T., 170 Vt. 148, 743 A.2d 1077 (1999) **(a court exercising original jurisdiction in a CHINS case can enter only temporary orders).**     In re A.L.H., 160 Vt. 410, 630 A.2d 1288 (1993). **(court should not determine permanent custody using emergency jurisdiction).**


It is the belief of plaintiffs, "J. Davis" and "S. Davis" that "Connie & Howard Shaw" are, and have been conspiring with and are collusively enabling the "J. Anderson" Court and "DHR" to deny the rights of the natural parents of "E. Davis", ("J. Davis" and "S. Davis") in the transfer of "E. Davis" to Indiana due to motivation of continuing to access and receive funds of "E. Davis' " SSI and Medicaid.

"Connie & Howard Shaw" have, over the years, never been interested in the welfare and best interest of "E. Davis".  As an example, "S. Davis" paid "Connie & Howard Shaw" upwards of $4000.00 to baby sit "E. Davis" but they refused to provide a letter showing the utility cost, while "S. Davis" was in the residence for less than a month, so that "S. Davis' " application for SSI for "E. Davis" would begin.   The only thing which blocked it was the refusal of "Connie & Howard Shaw" to provide it - there was no financial benefit to "Connie & Howard Shaw" to provide that letter.  Yet over the past number of years, they have, under the direction of "DHR", performed acts, such as visiting "E. Davis" at "Glenwood/Allen Cott" school for purposes of allowing "DHR" and "J. Anderson" Court to state that "E. Davis" has a relationship with "family".

This ploy allows "DHR" to continue to block and prevent the reuniting of "E. Davis" with his natural parents in the state of Indiana.   "Connie & Howard Shaw" are, and have been, receiving funds from "DHR" out of SSI, Medicaid, and other funding sources to perpetrate this fraud, again, falling under RICO.

Additionally, "S. Davis" could not get the Social Security numbers of "Connie & Howard Shaw" and "Louise Collier" from them for the purposes of "S. Davis'" taxes, thus, "Connie & Howard Shaw" benefited by avoiding tax consequences for receipt of approximately $5000.00 plus for babysitting "E. Davis" while "S. Davis" worked.

"Louise Collier", likewise, benefited in the amount of $5000.00 plus income without tax consequences.

"J. Anderson's" Court, "DHR", "Glenwood/Allen Cott" school, "Connie & Howard Shaw", and "Louise Collier" all collusively, conspiring, as accomplices in perpetrating a fraud with false claims to access and share in funds from the government, SSI, Medicaid, and other funding sources for the handicapped (autistic) "E. Davis".

This constitutes fraud, theft, perjury, and misrepresentation – including kidnapping, all to the harm of "E. Davis" and his natural parents, "J. Davis" and "S. Davis".

The "J. Anderson" Court, "DHR", "Lesa Greene", "Claire Tinney-Jones", "Glenwwood/Allen Cott" school, "Athens City School", "Athens City School Board of Education", "Dr. Sarrels", "Dr. Sprinkle", and "Dr. Mcdanal" had, and continued to have a duty to perform in a manner, not harmful or in violation of the rights and welfare of "E. Davis", his natural parents, "J. Davis" and "S. Davis", which have been breached and violated, and with duties which continue to breach and violate.

The environment - plaintiffs "J. Davis" and "S. Davis" were confronted with in their attempts to get the educational needs and care of their son, "E. Davis" for "E. Davis' " handicapped condition (autism) from "Athens City School/Athens City School Board of Education", "DHR", and "J. Anderson's" Court in Limestone County, Athens, Alabama – is, and was, pregnant with hate of Northerners, particularly persons from Northern Indiana - is, and was, pregnant with personal spite reflecting their on-going emotional continuing reaction to the Civil War defeat (The Sacking and Plundering of the City of Athens, Alabama), and the economic devastation of Athens, Alabama being the largest producers of cotton by slave labor.

**(See Document – Limestone County, Alabama the Largest Slave Holders marked as EXHIBIT 19).**

What Athens, Alabama – we plaintiffs, "J. Davis" and "S. Davis" believe, felt was another slap in the face, was the building, by New York (Northern Yankee) The American Missionary Association of New York

– The Trinity School for Children of Freed Slaves in 1865.  The school was <u>twice</u> burned.  **(See Limestone County's Historical Society Plaque RE:  Trinity School marked as EXHIBIT 17).**

As mentioned earlier, plaintiff spoke to "J. Anderson's" Court about "J. Anderson's" Court's ruling in the "E. Davis" case, and she responded, "… appeal me".

The Chief Justice, Roy Moore, has several times – in recent past, spoke of his disdain of the Federal Court in particular, his refusal to remove a ten (10)-ton stone structure of the Christian Ten Commandments he was taken off the bench in that matter, but returned to the bench shortly thereafter. **(See Copy of Article of Roy Moore RE: Federal Judges marked EXHIBIT 40).**

Further, Plaintiffs earlier cited the Governor of Alabama who the federal government was unable to successfully prosecute in 28 count indictment where Alabamians stated that they would not convict one of their own.  The federal government got the case transferred to the state of Georgia and got a conviction.

Plaintiffs are **not** the federal government, and face less chances of success in Alabama.

Additionally, the injuries regarding custody, defamation, false claims, extreme mental distress, and the many other claims have been, and are being, denied as residents of the state of Indiana.   Defendants, through the Court of "J. Anderson", have, and are receiving SSI and Medicaid for "E. Davis" by false claims. Furthermore "J. Anderson" is on the Board of Directors of several funded organizations, along with members and former members of "DHR" and "Glenwood/Allen Cott" school who are under the control and direction of "DHR".

Plaintiffs believe that the activities of multi-needs groups in Alabama and Athens, Alabama, the County Facilitation Team, several member of the local Methodist church, local (United Way chapter) are sources of funds controlled by and influenced by "J. Anderson", members of "DHR", Director and former Director of "DHR", Athens City School, all are, and have been receiving federal and state funds which they supplement county budget, salaries of the  "J. Anderson" Court and staff, salaries of "DHR" staff, payments

to "Glenwood/Allen Cott" school for "E. Davis" placement and now he is in the Sunlight facility for handicapped adults and autistic individuals.

Plaintiffs found that Caroline Page – "DHR's" county director – with "J. Anderson" being on the board of directors at that time - filed tax returns under the minimum requirement to report funds **(IRS FORM 990-EZ).** Plaintiffs believe that the funds sought for the above entities went for the purposes of the wards of the state which, we believe, are illegally held by "DHR", where the bulk went to "administrative expenditures" and for the most part were obtained by misrepresentation, fraud and deceit – constituting theft, fraud and RICO. Plaintiffs believe that in the case of funds for "E. Davis", all named defendants worked in collusion, conspiracy using "Connie Shaw" and "Howard Shaw" to falsely represent the needs of "E. Davis" illegally and improperly displacing the plaintiffs, "J. Davis" and "S. Davis" – the natural parents of "E. Davis". **(See Copy State False Claims Act marked as EXHIBIT 32).**

**(See Copy of Pertinent Part of Lawsuit:  RE: The Social Security Act Medicare and Medicaid Program – Anti-fraud/Kickbacks marked EXHIBIT 34).**

 **(See Copy of JUSTICE NEWS RE: Dept. of Justice Accomplishments on False Claims Act Cases marked EXHIBIT 35). [Department of Justice Office of Public Affairs: FOR IMMEDIATE RELEASE. (2015, December 3). Justice Deparment Recovers Over $3.5 Billion From False Claims Act Cases in Fiscal Year 2015 – Recoveries Exceed $3.5 Billion for Fourth Consecutive Year. http://www.justice.gov/opa/pr/justice-department-recovers-over-35-billion-false-claims-act-cases-fiscal-year-2015].**

The numerous profit and non-profit organizations established in Athens, Alabama by staff, managers, officials of "DHR" (former and present) were and are operated, managed, controlled by the individuals mentioned herein, including:  Director Caroline Page of "DHR" (former and present), Shannon Cameron, Becky Bentley, Marilyn Batts of "Athens City School/Athens City School Board of Education", "J. Anderson" (Athens, Alabama Court), officials (former and present) of "Glenwood/Allen Cott" school, "Claire

Tinney-Jones who is the attorney for "DHR", and "Lesa Greene" who is appointed Guardian ad Litem for "E. Davis" by the "J. Anderson" Court. **(See CITIZEN'S AUDIT: Copy of IRS TAX FORM 990-EZ Filed by Caroline Page Listing "J. Anderson" as Member of the Board of Directors marked EXHIBIT 43 attached and made apart hereto).**

**(See Copy of Enewcourier.com Article RE: (Limestone County) Judges Highest Paid among Local Public Servants by Kim Rynders Posted: Saturday, August 5, 2006 9:10 P.M. marked EXHIBIT 44 attached and made apart hereto) [Rynders, Kim. (2006, August 5). "Judges Higest Paid among Local Public Servants, Elected Officials";** http://www.enewscourier.com/archives/judges-highest-paid-among-local-public-servants-elected-officials/article_e1e3ca6c-bcc2-5ee8-acdf-676329b4d763.html**].**

**(See "Claire Tinney-Jones" in Copy of Photograph – Grant for Resource Center marked as EXHIBIT 45 attached and made apart hereto).**

**(See Copy of GuideStar Premium Report for Athens Limestone County Family Resource Center marked EXHIBIT 46 attached and made apart hereto).**

These organizations include multi-needs teams (Athens, Alabama), Child Advocacy Center, and Limestone County Partnership for Children.

These organizations receive their funds from public contributions, federal funds – such as SSI, Medicaid, state and federal funds – all going towards salaries (including that of the heads of these organizations and boards).   The member and operating directives and authority come "J. Anderson" (individually), present and former heads of "DHR", Athens City School/Athens City School Board of Education, "Glenwood/Allen Cott" school in their individual capacity, and with an authority of "J. Anderson" Court and "DHR".

The funded cases/individuals are comprised of children (multi-needs and others) who are brought to the "J. Anderson" Court by "DHR" and generally made <u>wards</u> of the state – which thereby create n on-going base for funds for these organizations.

"J. Anderson' is the founder of many of these organizations and/or the co-founder such as Limestone County Partnership for Children – she is, and has been, director and on the board of directors of many of these organizations.   The "J. Anderson" Court, subsequent to "DHR" filing a petition on a child then assigns the case to one of these organizations, as in the "E. Davis" case.

The requirements - for obtaining funds for such a case of a minor or handicapped adult from SSI and Medicaid, is the submittal of a form requesting such funds.  This official document indicates a residence requirement for funding for the child or handicapped adult.  Thus, this person must be the parent or foster parent of the child or handicapped adult.  The information submitted for funding must be updated every quarter to continue funding.   The entities required to update this information include "J. Anderson's" Court - where the petition opening the case was filed, "DHR" – the entity filing the petition, the educational facility (as in the case of "E. Davis") placing the child in the 'least restrictive environment', the individual representing themselves as parents or foster parents of the child, or handicapped adult.  **(See Copy of the Alabama Verification Plan for Medicaid Recipients ("DHR") Authority marked as EXHIBIT 28).**

**NOTE:** The areas which seek whether such residency requirement in the request for Medicaid is marked as 'acceptance' on mere word of said individual – no verification present or post verification required/or sought by "DHR".   This is an outright violation for requirement to verify residency to avoid double or duplicate funding, particularly from two (2) or more different states.

The neglect to provide this information is acceptable when such is subsequently provided in a reasonable period of time.  In the "E. Davis" case, ten-plus (10+) years is not reasonable, and clearly fraud, in that the submitting of the information was known to be false initially, in that the "J. Anderson" Court, "DHR", "Athens City Schools" were aware that "J. Davis" and subsequently "S. Davis" – the natural parents of "E. Davis" were in the state of Indiana.

If "E. Davis' " placement in "Glenwood/Allan Cott" school included document(s) signed by "S. Davis" – the natural mother of "E. Davis", that information had to be updated quarterly.  That is over ten-

plus (10+) years, approximately forty (40) times to reflect changes of residency.  Failure of over forty (40) times is clearly fraud to obtain funds under the False Claims Act.   Each such incident of failure to comply is punishable as a misdemeanor or felony.  In the case of a felony, each count is punishable by $10,000.00 fine and five (5) years imprisonment.

The defendants liable for the fraud would include "J. Anderson", "J. Woodruff", "Marilyn Batts", officials of "Glenwood/Allan Cott" school.  "Dr. Sarrels" who admittedly wrote a letter with false information to have "E. Davis" admitted to "Glenwood/Allan Cott" school, and plaintiff believe "Connie Shaw" and "Howard Shaw" who acted, and are acting, in concert with other to perpetrate the fraud.

Each, in a felony charge would be subject to approximately four hundred thousand dollars ($400,000.00), and approximately two hundred years (200) in prison.

The "J. Anderson's" Court and all other defendants, "DHR", "Glenwood/Allan Cott" school, "Athens City School/Athens City School Board of Education" and others, all violated Alabama's own code regarding multi-needs cases.  The motivation again, is - and has been, on-going and abiding animus towards Northerners, particularly Northern Indiana which is being carried out on the back of the handicapped minor, "E. Davis", and his natural parents, "J. Davis" and "S. Davis".

Additionally, after initially refusing to service the educational needs of "E. Davis" - including the "J. Anderson" court, the defendants found the manner of financially benefitting themselves, and out of greed, economic need, and spite entered into a stipulation with plaintiffs "J. Davis" and "S. Davis" – the natural parents of "E. Davis" to place "E. Davis" in "Glenwood/Allan Cott" school.  Thereafter, refusing to release him to his parents (plaintiffs "J. Davis" and "S. Davis") to the state of Indiana for ten-plus (10+) years. **(See Article from Alabama Supreme Court Judge Roy Moore RE:  Funding/Money Problems to Support Alabama Court – "DHR" marked as EXHIBIT 39).**

 "J. Anderson's" Court, "DHR", "Athens City Schools/Athens City School Board of Education", "Glenwood/Allan Cott" school have breached the stipulation (contract) in that the stipulation was just to

place "E. Davis" in "Glenwood/Allan Cott" school, beyond that – nothing more – no agreement or authority was given, nor any such authority under the facts of the case of "E. Davis" could be acquired or implied.

Under Alabama Department of Human Resources Social Services Division Administrative Code Chapter 660-5-24– Multi-needs, there is no authority or requirement to take custody, temporary or otherwise to provide multi-needs.

Chapter 660-5-24 Multiple Needs Child Policy under 660-5-24-.01, legal authority sets forth the requirement for "DHR" to follow the R. C. Consent Decree. 660-5-24-.02 parents should be involved – "DHR" did not include the natural parents. 660-5-24-.03, taking custody of the child is not required and parents were not informed.

660-5-35-.04 and 660-5-35-.05 **(See Alabama Department of Human Resources Social Services Division Administrative Code marked as EXHIBIT 24).**

 **(See Alabama Department of Human Resources Social Services Division Administrative Code marked as EXHIBIT 25).**

The "J. Anderson" Court, "DHR" and collusively all other defendants are not, and have not been compliant with the R. C. Consent Decree which on pertinent part required that the natural parents of the multi-needs individual participate in the individual educational program (I. E. P.)

In the case of "E. Davis", this was and has not been done.

As indicated earlier, many of the defendants, herein – including "J. Anderson", members, officials, operating/supervisors of "DHR", faculty, staff of "Athens City Schools/Athens City School Board of Education", members, staff, supervisors of "Glenwood/Allan Cott" school, Attorney for "DHR" Claire Tinney-Jones, Marilyn Batts founded and are operators and board members of several non-profit organization getting funding from the public and government agencies – one such organization is the Family Resource Center.

Many have been listed with public interest groups as organizations on the verge of losing their tax exempt status for having <u>more</u> government funding than public funding.

When "S. Davis" took "E. Davis" to the hospital, the hospital was provided her insurance information.  This insurance was under COBRA for which "S. Davis" paid a significant monthly amount after she was laid off from Bell Laboratories. **(See Lucent Technologies Insurance Coverage Information marked as EXHIBIT 29).**

When "DHR" filed their "abandonment" petition with the "J. Anderson" Court, "DHR" had the medical records from the hospital and therefore was aware that "S. Davis" had insurance covering herself and "E. Davis".    Within a month - when E. Davis" was admitted to "Glenwood/Allen Cott" school -  "DHR", "J. Anderson's" Court, "Glenwood/Allen Cott" school were all aware of the insurance policy under COBRA covering "E. Davis".

Additionally, "S. Davis" told "Glenwood/Allen Cott" school that she had insurance covering "E. Davis" when officials of "Glenwood/Allen Cott" school were stating that they were waiting for Medicaid that was, or had been, submitted by "DHR" and them for "E. Davis".   "S. Davis", several times, informed the "Glenwood/Allen Cott" school officials that "E. Davis" was covered under the COBRA insurance.  This fact (COBRA insurance) would make "E. Davis" ineligible at that point for Medicaid.

"DHR", "J. Anderson's" Court, "Athens City Schools" & "Athens City School Board of Education", and "Glenwood/Allen Cott" school – with the knowledge that "E. Davis" was covered by insurance, yet pursuing application for Medicaid - reflect an act of intentional fraud.

Furthermore, the application/Alabama Verification Plan form submitted to Washington D. C. for Medicaid funding reflects that the agency, the Alabama Department of Human Resources, 'opts-out' of the use of the Public Assistance Reporting Information System (PARIS) database which checks duplicate funding or request in another state for Medicaid. **(See PARIS Interstate Program Requirement marked as EXHIBIT 30).**

The use of PARIS is mandatory and cannot be opted out of.  "DHR", "J. Anderson's" Court, "Athens City Schools" & "Athens City School Board of Education", "Glenwood/Allen Cott" school, each quarter when they fail to correct the funding from Medicaid, even negligently, is not a defense, but knowingly and where duplicate information can be, and is, required by use of PARIS – clearly violates the law and is clear evidence of intent to defraud the federal government.

"DHR", "J. Anderson's" Court, "Athens City Schools" & "Athens City School Board of Education" and "Glenwood/Allen Cott" school were aware that with the knowledge of residence requirements for eligibility for Medicaid that "E. Davis" should have been transferred via the Interstate Compact to the state of Indiana.   Naturally, this would cause the state of Alabama, ("J. Anderson's" Court, "DHR", "Glenwood/Allen Cott" school, "Athens City Schools" & "Athens City School Board of Education") to lose the funds for "E. Davis".

Both - "J. Davis' " wages, while employed as a public defender for the Lake County, Indiana Public Defenders Office, and "S. Davis' " wages while employed at Purdue University in Hammond, Indiana as an student and also at J. C. Penney's store in Hobart, Indiana as a Christmas holiday seasonal sales clerk (temporary employee), in the state of Indiana – salaries/wages were garnished for child support for "E. Davis" by "J. Anderson's" Court, "DHR", "J. Woodruff's" Court demonstrating additional knowledge of the residence and presence in another state (Indiana) by "J. Anderson's" Court, "DHR", "Glenwood/Allen Cott" school, "Athens City Schools" & "Athens City School Board of Education", "J. Woodruff's" Court – and any other individual who may have given false statements regarding the residence of "J. Davis" and "S. Davis" such as "Connie and Howard Shaw" or "Louise Collier".  **(See Affidavit of "S. Davis" as to Employment in the State of Indiana marked as EXHIBIT 2G).**

**See Affidavit of "J. Davis" as to Employment in the State of Indiana marked as EXHIBIT 3F attached and made apart hereto).**

Participation in Public Assistance Reporting Information (PARIS) is required by states to receive Medicaid federal funding for automated data systems.  The automated data systems should be checked quarterly.

The requirement to participate, effective October 1, 2009 as part of the Qualifying Individual (QI) Program Supplemental Funding Act of 2008, allows the sharing of enrollee and applicant information for state public assistance agencies (SPAAs) and federal agencies.   Opportunities for states using PARIS include identification of individuals eligible for Medicaid coverage but who have not applied as well as interstate data matching which can identify individuals receiving duplicate benefits from multiple states. **(See Affidavit of "S. Davis" RE: COBRA Insurance marked as EXHIBIT 2D).**

**(See PARIS Interstate Program Requirement marked as EXHIBIT 30).**

Plaintiffs believe that "J. Anderson's" Court, "DHR", "Athens City School" & "Athens City School Board of Education", "Glenwood/Allen Cott" school, "Sunlight Homes" used and is using "Connie and Howard Shaw" to cover themselves regarding obtaining federal and state funds for "E. Davis" and keeping "E. Davis" in the state of Alabama in a manner that is illegal, fraudulent, misrepresentation to commit theft of the property of "J. Davis' " and "S. Davis' " property.

The ploy supplants the parental rights of "J. Davis" and "S. Davis" as the natural parents of 'E. Davis" – essentially using "Connie and Howard Shaw" as 'foster parents' of "E. Davis".

If there were justification to place "E. Davis" in the foster care of any persons - which it is not – then "Connie and Howard Shaw" would not qualify as appropriate foster parents in that "Connie and Howard Shaw" had their son, Jarrod Shaw, taken from them some years ago by the <u>same</u> sister agency in Tennessee (Department of Human Resources), which has taken "E. Davis" from his natural parents, "J. Davis" and "S. Davis" and from the right to be in Indiana with said parents.  **(See Document: Minimum Standards for Foster Family Homes marked EXHIBIT 26).**

When plaintiffs took their case to the juvenile court, transferring the file to Crown Point, Indiana from the Gary City Court where plaintiff's divorce decree was granted which sets forth custody, visitation for the natural father, "J. Davis" of "E. Davis" (plaintiff had <u>no</u> dispute over custody in the final decree of divorce where physical custody was with the natural mother, "S. Davis" of "E. Davis".

Judge Bonaventura held two (2) hearings in the matter of plaintiffs seeking to get their son "E. Davis" back to the state of Indiana, and seeking to have the state of Alabama Court to give <u>full faith and credit</u> to the Indiana divorce decree.

 Judge Bonaventura was the Senior Judge of The Lake County Juvenile Court.

The entire file containing the divorce decree was transferred from Gary City, Family/Juvenile court in Gary, Indiana to the Juvenile Court in Crown Point, Indiana and two (2) hearings were held – the first on August 24, 2001.

(**Note:**  The "J. Anderson" Court was subsequently within approximately several months made aware of plaintiff's "J. Davis' " and "S. Davis' " presence in the Indiana Court again – notice that both plaintiffs were in the state of Indiana.

In this first hearing before Judge Bonaventura, The Court, This Court, was made aware via testimony that the plaintiffs, "J. Davis' " and "S. Davis' " numerous attempts to get the Alabama Court to free their son that were denied by the "J. Anderson" Court.

Plaintiff "J. Davis" also apprised The Crown Point Juvenile Court that "J. Davis" also served "DHR" and the "J. Anderson" Court motion and petition served under the auspices of the Gary Indiana Court – which were totally ignored by "DHR" and the "J. Anderson" Court.   "DHR" and "J. Anderson's" Court did not respond with as much as a dispute of jurisdiction of the Indiana Court.

The Crown Point Court at the August 24, 2006 hearing was also apprised of the fact that Plaintiff, "J. Davis", had filed multiple petitions and motions in the Alabama Court – all of which was denied, not withstanding that "J. Anderson" stated on more than one occasion that at any time wherein neither parent is

in the state of Alabama her Court would have the minor child, "E. Davis", transferred and the case transferred to the state of Indiana.

This statement somehow became lost even though it was essentially a mute point in that the "J. Anderson" Court never had even 'temporary jurisdiction'.

Crown Point Court in the August 24, 2006 hearing advised plaintiffs that the Court had invited Elizabeth Tegarden, Director, Child Services as an advocate – spectator for the hearing.   Tegarden - in this hearing, was asked by the Crown Point Court to investigate the status of "E. Davis" in Alabama.

Judge Bonaventura also stated in a hearing that she would personally call "J. Anderson". **(See Transcript of the Juvenile Court Hearing of August 24, 2006 – particularly Pg. 32, line 14 and other parts, marked as EXHIBIT 36A).**

To plaintiffs' knowledge, **no record** was made of a contact by Judge Bonaventura, and **no record** was made of what was said between the parties – "J. Anderson" and Judge Bonaventura.

On February 20, 2007, the second (2nd) hearing was held in Judge Bonaventura's Court where Elizabeth Tegarden stated to The Court that she (Tegarden) spoke with Lesa Greene ("L. Greene") – Guardian ad Litem in Alabama of "E. Davis" who Tegarden stated told her (Tegarden) that The Alabama Court had jurisdiction – apparently all this information was telephonic, no transmittal of any court documents, nor any other information as to <u>why</u>, after five (5) plus years, The Alabama Court felt it had jurisdiction.

At the February 20, 2007 hearing in The Crown Point Juvenile Court, Judge Bonaventura - based upon a verbal recitation by Elizabeth Tegarden of Indiana Child Services, set forth that The Alabama Court has 'continuing, exclusive jurisdiction'.  **(See Transcript of February 20, 2007 Hearing in Crown Point, Indiana marked as EXHIBIT 36B).**

At this hearing, again, it was brought out by plaintiffs under oath that "J. Anderson" stated that her Court would order the agency ("DHR") to initiate the transfer of "E. Davis" when or upon a change of

circumstances, though the "J. Anderson" Court had the responsibility to initiate the transfer under the Interstate Compact herself.  And, also again, "J. Anderson's" Court never acquired jurisdiction but, again - if so, why did "J. Anderson" initiate or order "DHR" to initiate the transfer of "E. Davis" back to Indiana where he was born, where the divorce decree was entered.

"E. Davis'" harm stemmed from the care and protection he was denied – that was available in the state of Indiana by his natural parents, plaintiffs "J. Davis' " and "S. Davis' " protection in Indiana from tasering, from over-medication, from placement in a facility in Alabama where he was exposed to AIDS, where he was allowed to injure himself from self-hitting in the head and head-banging.  How much future damage from head injuries is unknown, but the National Football League (**NFL**), through in-depth research, found that - after years of injury, hits to the head, even with a helmet – ten (10) to twenty (20) years later football players have displayed considerable damage to the brain.

The plaintiffs "J. Davis" and "S. Davis" had sought, on numerous occasions, to have "Glenwood/Allen Cott" school to incorporate the use of helmets for head protection from the common symptoms by autistic individuals hitting themselves in the head.   As stated earlier, "E. Davis" had an operation on his eye without parental authority of the natural parents, "J. Davis" and "S. Davis" from head and ear injuries.

The only harm to "E. Davis" – physical and psychological has been the denial of his right to be here in the state of Indiana close to his caring and natural parents – everyone else has used him to work out their hostility toward Northerners, particularly Northern Indiana for economic gain.

Alabama is so xenophobic.  There is an attitude that they have not lost the Civil War.  Their supermarkets are called "WINN DIXIE". Everything is "Southern Pride".  (**See Copy of 'Daily South' marked as EXHIBIT 20).**

Citizens of other states might make the state or their state a source of 'pride' – not as much the geographical location – SOUTH, NORTH, EAST, or WEST.

Plaintiff "J. Davis" - an attorney at Law, licensed in the state of Indiana, an officer of The Court, licensed with the Illinois Trial District Court and also licensed to practice with the United States Supreme Court - was sworn in and made statements under oath in Judge Bonaventura's Court.  And "S. Davis" – a computer engineer, trusted to work on the Hubble Telescope, worked on the Phased-Array Tracking-to-Intercept On Target **(PATRIOT)** Air Defense Missile System, a guided (autopilot) missile with a third (3rd) level Secret Security Clearance – was sworn in at The Bonaventura Court and made statements under oath while Elizabeth Tegarden – Director of Indiana Child Care Services reported to Judge Bonaventura that pursuant to instruction to investigate the status of the minor "E. Davis'" custody in the "J. Anderson" Alabama Court reported in the hearing of February 20, 2007 in The Bonaventura Court that she telephonically spoke to a person who said her name as "Lesa Greene" – the Guardian ad Litem of "E. Davis" that the Alabama Court had jurisdiction of the case of "E. Davis" as well as a lawyer for the agency "like our child services agency" had jurisdiction in Alabama over the "E. Davis" matter and custody.

That was sufficient for The Bonaventura Court here in Indiana to say that The Alabama Court had 'continuing, exclusive jurisdiction'.

Nothing apparently was solicited as to the basis of this 'continuing, exclusive jurisdiction' – a mere telephone conversation to plaintiffs knowledge.  Nothing was transmitted, no formal records, no records showing that a hearing was held wherein the natural parents were able to participate and address any statements, evidence of a finding that The Alabama Court has attained jurisdiction of the matter of "E. Davis".

We, plaintiffs were advised that if we, plaintiffs have any materials, cases, etc., to cite them.

The telephonic, unseen "Lesa Greene" and "attorney for the agency" – like our Child Care Services agency merely had to 'say' – without any basis, cites, documents, transmittals – that 'they have jurisdiction'.

A man (father) from Cuba – a country until recently with which The United States had severed contact, could get his son back – THE ELIAN GONZALEZ' CASE.  **(See Copy of THE ELIAN GONZALEZ' CASE marked as EXHIBIT 47 attached and made apart hereto).**

A man in prison in Texas was able - from prison, to assert his parental rights.  **[Colorado.**  Brock v. District Court of Boulder County in 20th Judicial Dist., 620 P.2d 11 (Colo. 1980). (In re State ex rel. M.C., 94 P.3d 1220 (Colo. Ct. App. 2004).  **(District court exceeded its temporary emergency jurisdiction under Uniform Child custody Jurisdiction and enforcement Act (UCCJEA) in terminating father's parental rights in dependency and neglect proceeding; Texas had exclusive jurisdiction over child-custody determination, and district court failed to contact Texas court to resolve child's placement while father was in jail and to determine adequate period of temporary placement to permit father to resolve custody in Texas court)].**

We plaintiffs, in an egregious manner, had been injured and denied due process, we believe, by hands of Courts of Law here in America.

We can cite constitutional law reflecting our denial, common law, case law, legal procedure and authority – and the physical, emotional, monetary damages.

"J. Davis", an officer of The Indiana Courts, The Trial Court of Illinois, The United States Supreme Court – has a ten (10) plus year fight to get his son from one (1) state to another state.   The matter of "S. Davis" with a third (3rd) level Secret Security Clearance – has a ten (10) plus year fight to get her son from one (1) state to another state.

Mr. Gonzalez, Elian Gonzalez' father, can get his son <u>out</u> of The United States to a country The United States had, until recently severed all relations.  A man in a Texas prison can assert his parental rights.

This has pulled at the emotional cord of the hearts of "E. Davis' " natural parents.

The fact that an Alabama man was freed after nearly thirty (30) years emphasizes the character of much of the Alabama Judicial System.  His appellate attorney stated that he pressed the authorities for several years to test the gun involved as providing evidence for his conviction.

For then (10) plus years, plaintiffs, "J. Davis" and "S. Davis", had been trying to get the Alabama Court ("J. Anderson's" Court) to release plaintiffs' son, "E. Davis", and send the matter to Indiana.  Instead of doing that, The "J. Anderson" Court in Athens, Alabama held to a "temporary custody" position lasting over ten (10) years. **(See Copy of Articles RE: Alabama Man Freed marked as EXHIBIT 48 attached and made apart hereto). [https://www.bostonglobe.com/news/nation/2015/04/03/alabama-man-freed-after-nearly-years-death-row/P0E49NGBNkiF4BZmgELPKP/story.html]**    All plaintiffs, herein, have been asking the "J. Anderson" Court in Alabama – and later the Family Juvenile Court under Judge Bonaventura, to do was to follow and apply the law rather than seek the welfare of the child/minor (now handicapped adult) in this case, which is suppose to be the mandate/mission of the Family/Juvenile Court. Several individuals in this case were consistently and singularly concerned about their budget – the cost to their entity.   Marilyn Batts of the "Athens city School" & "Athens City School Board of Education" was concerned with 'busting her budget' and even derailed the placement of "E. Davis" in a program for autistic children in Illinois by telling Illinois that "S. Davis" was 'trying to bust their (Illinois school) budget … '.

"J. Anderson" stated to "S. Davis' " Alabama attorney (Slate) that she ("J. Anderson" said that 'she was not going to bust her ("J. Anderson's Court) budget …'.  Tegarden, the Child Care Director in Indiana, reporting to Judge Bonaventura at the hearing held in Juvenile Court, Lake County Indiana stated "who is going to pay for this" referring to "E. Davis" being transferred to Indiana and placed in a facility for autistic children.

The unfortunate thing is that if any of these budget/cost conscious individuals did their homework or their due diligence, they would have discovered that "E. Davis" is, and was, under SSI, Medicaid, Social Security of the parents, "J. Davis" and "S. Davis", that he was, and is, entitled to other funding sources,

both state and federal for handicapped children and individuals who are autistic – yet when they, Alabama entities, "J. Anderson's" Court, "Athens City School" and  "Athens City Schol Board of Education", "Glenwood/Allen Cott" school, and now "Sunlight Homes" facility, "Connie and Howard Shaw" found that they could benefit economically from sources of funding for "E. Davis", then, they – those Alabama above mentioned sources, stubbornly refused to transfer "E. Davis", a cash cow to the state where he rightfully belongs.  And Tegarden, Judge Bonaventura have not done their due diligence to recognize that rather than an economic burden, "E. Davis'" funding would bring an economic benefit to the state of Indiana.

Once, it was said to be budget/cost issue with Alabama - in this case.  Now, Alabama's motivation is to enhance their budget by keeping "E. Davis" in Alabama.   However, in Indiana, Judge Bonaventura's Court found transferring "E. Davis" was an economic hardship to Indiana which was an erroneous conclusion.

Finally, a case heard by even Roy Moore was ruled that the case was improperly handled by "DHR" which almost exactly mirrored the instant case – that "DHR" had a duty to return the child, in the case, to the parents. **(See Partial Copies of Pages from T. H. v. The Jefferson County Department of Human Resources – 9/24/2010 marked as EXHIBIT 49 attached and made apart hereto). [Moore, JUDGE. (Decided: 2010, September 24).  T.H. and C.H. v. Jefferson County Department of Human Resources No. 2090264 Court of Civil Appeals of Alabama. http://www.lawyer.com/cases/8835559635024645143.html].**

As mentioned numerous times in this preliminary, our assertions have been enhanced by multiple exhibits, which greatly enlarge the volume in this complaint.  Plaintiffs, "J. Davis" and "S. Davis", believe that the volume of this complaint - with multiple exhibits, is necessitated by what plaintiffs feel is required based on their failure to resolve and get due process attempted previously in the Alabama court, and unsuccessfully sought in the Indiana court.

The Alabama Court ("J. Anderson") stated to plaintiff "J. Davis" as mentioned earlier,  in a sarcastic voice, when "J. Davis" questioned ruling of the "J. Anderson" Court, "…appeal me Mr. Davis".  And, as cited earlier, plaintiffs "J. Davis" and "S. Davis" have included in this complaint multiple examples of why they feel that an appeal to any court in Alabama would take approximately ten plus (10+) years to reach the Alabama Supreme Court, and would be unsuccessful.

The Indiana court, before Judge Bonaventura, instructed plaintiffs "J. Davis" and "S. Davis", to cite cases and law to support our position.   Plaintiffs feel it is necessary to place the multiple exhibits with this Complaint rather than allowing important statements to appear 'self-serving'.

Thus, we are not saying that the defendants collusively and continued collusively to commit Medicaid fraud.  They, the defendants - particularly "DHR", the "J. Anderson" Court, the staff of "DHR", "Glenwood/Allan Cott" school, "Athens City Schools/Athens City School Board of Education", "L. Greene", "Claire Tinney-Jones", and "J. Woodruff", have committed and are committing Medicaid fraud, and by their own rules and administrative codes, have committed Medicaid fraud.

Choosing to opt out of using the PARIS database is not an option, but a legal requirement.  All other documents and exhibits support theft, defamation, RICO, Interference with Parental Rights and other allegations herein.  And additionally documents support that all other defendants are working collusively to commit the named allegations including "Connie & Howard Shaw", "Dr. Sarrels", "Dr. Mcdanal", and "Dr. Sprinkle".

We, plaintiffs ("J. Davis" and "S. Davis") have and are serving our community and society as stated earlier in our activities for example "S. Davis' " work as a third-level secret clearance computer engineer with military research,  having received a rare award with her work for NASA, and faculty teaching at a four year University.

For example, "J. Davis" serving for many years as a Deputy Prosecuting Attorney for both Lake County Indiana and Marion County Indiana (Drug Prosecutor) working with the Drug Enforcement Agency

**(DEA)**, Marion County Sherriff's Drug Task Force, local Indianapolis Police, sitting as Protempore Judge for a Superior Court Judge in Lake County over numerous years functioning as a Hearing Officer for the Gary Police Commission, hearing cases filed by the Police Department against officers internally and externally accused of wrong, violations of rules and occasionally criminal acts.

These are the things that plaintiffs have done, yet they cannot seem to get due process, but an individual from a country which we only recently opened up dialogue can have his son return to Cuba, where an individual serving a prison sentence in Texas can get due process regarding the care and welfare of his son.

While functioning as a Hearing Officer for the Gary Police Department, plaintiff "J. Davis" has been, and is, aware of the need to have a full evidentiary hearing and to consider the evidence from both – the accusations and the defense to the accusations.  Sitting as Protempore Judge, again, plaintiff "J. Davis" has been mindful of the need to listen to and consider both sides of a matter or case.    "J. Davis", the father of "E. Davis" has a very intimate knowledge of process and procedures in courts of law.  "J. Davis" has never seen anything like the courts of Alabama.

The attorney for "DHR" has been an intricate part of the abuse suffered by plaintiffs and an intimate part of funds being received illegally by "non-profit" organizations in Alabama in that non-profits are mandated to receive over fifty (50) percent of their funds from private sources – not governmental sources. **(See Copy of Photograph – Grant for Resource Center marked as EXHIBIT 45 where the attorney for "DHR", Claire Tinney-Jones is depicted in Picture as the Third (3rd) Person from the Left).**

It is particularly emotionally stressful that, in light of the plaintiff's "J. Davis' " constant involvement in the legal system, he nor plaintiff "S. Davis" can get due process for over a period of ten-plus (10+) years.

**NOTE:**  Plaintiff, "J. Davis" – "E. Davis'" father, contacted various agencies in Indiana seeking to have "E. Davis" placed in Indiana for autistic care.  **(See Copy of Letter Addressed to "E. Davis" RE: Indiana Autistic Services and/or Placement marked as EXHIBIT 50 attached and made apart hereto).**

During August 2006, plaintiff, "S. Davis" – mother of "E. Davis", went to the North Indiana Special Education Center **(NISEC)** in Crown Point, Indiana and learned that "E. Davis" would have and could have been enrolled merely by showing that he is diagnosed as an autistic child.

Plaintiff's pursuit of due process in the state of Alabama is, and was, negated by the attitudes of the courts in Alabama. **(See Copy of Article by USA TODAY RE: 'Alabama Judge Again Puts Himself above Law: Our View' dated February 11, 2015 marked as EXHIBIT 41). (See Article RE: 'Alabama Chief Justice Orders State Judges To Defy Federal Orders' dated February 8, 2015 marked as EXHIBIT 42).**

Thus, this complaint is replete with cases, statutes, statutory law, and Constitutional Law.

## Chronology

### YEAR - 1991

"E. Davis" was born at St. Francis Hospital in Indianapolis, Indiana - **(07/21/91)**.

Plaintiff, "J. Davis" the father of "E. Davis" was employed at this time as Deputy Prosecuting Attorney with the Marion County Prosecutor's Office in Indianapolis, Indiana under the Marion County Prosecutor – Jeff Modisett, as the first Black American employed as a deputy prosecutor in the felony division of Marion County.  "J. Davis" was assigned to the Drug Task Force Unit with Marion County Prosecutor's Office. Working with the Drug Enforcement Agency **(DEA)**, Marion County Sherriff's Department, and Indianapolis Police Department.

"S. Davis", mother of "E. Davis" had taken a leave of absence from her career for the birth of her son, "E. Davis", with the thought in mind that she would spend the first of "E. Davis'" first year of life bonding with "E. Davis" while "J. Davis" worked.  The leave of absence was taken from AT&T Bell Laboratories in Naperville, Illinois as a Research Scientist.

During the first months of "E. Davis'" life, "S. Davis" took "E. Davis" with her to visit her sister in Georgia. "E. Davis" had an occurrence of apnea.  "S. Davis" immediately took "E. Davis" to the emergency room in Kennesaw-Marrietta, Georgia.   "E. Davis' " father, "J. Davis" was contacted telephonically and immediately got a flight on American Airlines in the early morning hours to fly down to Georgia.    Just prior to landing the airplane, the pilot from the cockpit made contact with the hospital letting the Kennesaw-Marrietta hospital know that "J. Davis' " flight will be landing shortly.

"J. Davis" and "S. Davis" returned to Indianapolis, Indiana where "S. Davis" was able to continue spending time with "E. Davis" during his first year of life at home, which was an apartment in Indianapolis, Indiana which "J. Davis" was able to sub-lease from Robert Rucker who had just been appointed as one of the Indiana Supreme Court Justices.

**YEAR – 1992**

Parents, "S. Davis" and "J. Davis", noticed developmental issues and concerns with their son, "E. Davis"

such as the child not crawling or walking (delayed development) after 13 months of life.   Subsequently, "S.

Davis" returned to Northern Alabama.  Shortly thereafter, "J. Davis" joined his family, "S. Davis" and "E.

Davis", in Huntsville, Alabama where he and "S. Davis" were able to spend more time directly monitoring

the development of their child, "E. Davis".   "J. Davis" and "S. Davis" took adjunct teaching positions with

Calhoun Community College and Alabama A&M University.

**YEAR – 1993**

"J. Davis" and "S. Davis" took positions with Hanover College in Hanover, Indiana with their son, "E. Davis".

"J. Davis" was hired as the Director of Corporate Funding and Foundations for Hanover College.  "S. Davis"

was also hired at Hanover College as administrative staff in the Computer Services department's computer

lab training the academic faculty and staff on the use of new software packages.

"J. Davis" said to "S. Davis" at this time, *"I believe that our son ("E. Davis") has autism"*.

**YEAR – 1994**

"S. Davis" was hired at Alabama A&M University as an academic instructor (faculty) in the Computer

Sciences Department.    Shortly thereafter, "J. Davis" joined "S. Davis" in Alabama and took a position as

adjunct faculty at Alabama A&M University in the Business Department.  At the same time, "J. Davis" also

took a position as adjunct faculty at Calhoun Community College and adjunct faculty at Oakwood College in

Huntsville, Alabama.

During the same period, "S. Davis", "J. Davis" and "E. Davis" attended Oakwood College Seventh-day

Adventist Church in Huntsville, Alabama.  "J. Davis" and "S. Davis" were able to utilize the childcare and

the Alabama A&M University's Special Education Department's Speech Clinic for "E. Davis" where he was

given speech therapy by graduate student researchers.

(NOTE:  Marilyn Batts of Athens City Schools received her training and degree in Special Education from Alabama A&M University.   Also, there was a teacher who received her training from the same Special Education department at Alabama A&M University who was hired by Marilyn Batts for *another* autistic child in the Athens City Schools during the *same* period that "E. Davis' " mother and father, "S. Davis" and "J. Davis" were seeking services/teachers for the autistic "E. Davis".  The principal for Cowart Elementary school where "E. Davis" attended received his degree from the same Elementary Education/Special Education Department at Alabama A&M University).

During this period, "J. Davis" and "S. Davis" as faculty members of Alabama A&M University were able to take classes as full-time students in several areas and they elected to take classes (Premedical/medical prerequisites e.g. Chemistry, Biology and Physics) which provided them more intricate knowledge regarding autism thus allowing them to understand nuances regarding the latest research in autism from the medical field.

During that same period, "J. Davis" learned that a research professor in the Physics department, Dr. Putcha Venkateswarlu - commonly known at Alabama A&M University as "V-12", had met and worked with Pauli.  According to his biography, "Wolfgang Pauli was a physicist and recipient of the 1945 Nobel Prize for Physics for his discovery in 1925 of the Pauli exclusion principle.  After Wolfgang Pauli's return to Hamburg in 1924, he participated in the creation of quantum mechanics.  His analysis of the philosophical foundations and methodology of physics played a central role in the so-called Copenhagen interpretation of quantum mechanics.  The outbreak of World War II and possible threat of Nazi persecution led him to the U. S., but he returned to Europe in 1946".    "J. Davis" spoke with Dr. Putcha Venkateswarlu ("V-12") at length on or about December 1994 and learned that he ("V-12") had been at Alabama A&M University since 1982.

"J. Davis" felt that no one at Alabama A&M University seemed to be aware that they had such a prestigious academician at the school who, by that time, was ninety (~90) years old.  "J. Davis" felt that something

should be done to memorialize Dr. Putcha Venkateswarlu's ("V-12's") tenure at Alabama A&M University. Given his ("V-12's") age, "J. Davis" felt that this should be done immediately.

Then "J. Davis" and "S. Davis" proposed the idea of taping an interview with Dr. Putcha Venkateswarlu in the research optics lab and taping an interview of Dr. James Thompson of the Chemistry department who first mentioned to "J. Davis" that this professor, Dr. Putcha Venkateswarlu, had worked with Pauli. Subsequently, "S. Davis" taped the research optics lab under the guidance and direction of Dr. Putcha Venkateswarlu ("V-12's") and "J. Davis".  And, a member of the Physics department (Dr. Nickolai Kukhtarev) turned on the laser beam to demonstrate how some of the research was being performed.

Shortly thereafter, "J. Davis" interviewed Dr. James Thompson regarding the Pauli Exclusion Principle, and he placed some of the related equations on a blackboard.  This entire interview of was filmed by "S. Davis". Thereafter, "J. Davis" made copies of the taped interviews and sent a copy for copyright to Washington D. C. and obtained a copyright of the taped interviews.  "J. Davis" gave Dr. Thompson a copy of the taped interviews and permission to show them at Alabama A&M University.  A year or so later, after "S. Davis" and "J. Davis" left Alabama A&M University, Dr. Thompson showed the tapes to several of his classes. Within a few years, Dr. Putcha Venkateswarlu ("V-12") passed away at his desk at the University. Immediately thereafter, "J. Davis" and "S. Davis" learned that the Physics department had an interest in the tape that Dr. James Thompson had obtained from "J. Davis".   Within a year of Dr. Putcha Venkateswarlu's ("V-12's") death, the Physics department created a memorial.   *The Annual Putcha Venkateswarlu Memorial" lecture* was established in 1998 by Dr. Ravindra Lal in memory of Dr. Putcha Venkateswarlu, who was known at AAMU (Alabama A&M University) as the "Father of Experimental Optics Research." Since 1998, the lecture series has featured approximately 16 Nobel Laureate Prize Winners in physics or chemistry.

It should be noted that the scientist Wolfgang Pauli worked with the scientist Albert Einstein who is said to have had autistic-type symptoms.  It is also said that he, Einstein, had problems tying his own shoes.

Research in autism has increasingly shown that many autistic individuals have extremely high IQs though also have difficulty adjusting to what is said to be normal functions and societal interfaces.

**YEAR – 1995**

"E. Davis" was taken to Dr. Tolland to have blood work done for the purpose of identifying any anomalies relating to autism.  "S. Davis" took "E. Davis" to the Civitan-Sparks Clinic near the University of Alabama in Birmingham.   The Clinic is part of the Civitan International Research Center whose mission is to provide education research and services on developmental disabilities. **(See EXHIBIT 49).**

"E. Davis" was seen by Psychologist Rebecca Dorsett and a Child Psychiatrist Dr. Robert Estock".

The Clinic provided many essential clinical and community services for individuals and families as well as evaluation and intervention services for individuals with a broad range of physical, developmental, learning and/or behavioral challenges, in a family-centered and culturally-sensitive setting while an interdisciplinary team made up of many kinds of professionals worked closely to meet the needs of individuals and their families.

An **EEG** (electroencephalogram) test was also performed on "E. Davis".  The parents, "J. Davis" and "S. Davis" were discussing having a fragile X test that was, at the time, commonly done for cutting edge research in the autism spectrum.    Parents, "J. Davis" and "S. Davis" were also visited and introduced to Glenwood Residential/Allen Cott School for autism, the Lovaas and applied behavior analysis **(ABA)** educational research in autism.  Temple Grandin's groundbreaking book and accomplishments were introduced to the parents through this Clinic.   Still, during this period, the parents, "J. Davis" and "S. Davis" were faculty and full-time (pre-med) students at Alabama A&M University.   Mother - also homeschooled child, "E. Davis"- using the Lovaas Method/ABA treatment on the weekends.

On or about August 1995, the father of "E. Davis" applied for Supplemental Security Income **(SSI)** for "E. Davis'" autism.    "S. Davis" was asked by the SSI office in Huntsville, Alabama to supply additional information for "E. Davis'" SSI application. Specifically, they wanted a letter from Connie Shaw regarding

her utility bill for a period of approximately one (1) month that "S. Davis" spent at Connie Shaw's home.

Connie Shaw refused to supply such a letter.  Her refusal caused the application, which had already been

approved subject to receipt of that letter, to be closed.

During this year, Glenwood/Allen Cott School, working with "J. Davis" and "S. Davis" regarding "E. Davis",

began autistic-training home visits and respite care services.

## YEAR – 1996

The half of the year, "E. Davis" continued receiving intense speech therapy from the Alabama A&M

University research speech clinic.  And, the parents, "J. Davis" and "S. Davis" continued to train "E. Davis"

during the weekends using the ABA/Lovaas Method.

Also, parents, "J. Davis" and "S. Davis" continued (faculty) teaching and taking courses fulltime.

The latter part of 1996, both parents, "J. Davis" and "S. Davis", returned to Indiana with "E. Davis" and "S.

Davis" returned to work at AT&T Bell Laboratories in Naperville, Illinois.   At the same time (1996), "J.

Davis" continued to pursue his private law practice (Indiana).

## YEAR – 1997

"J. Davis" returned to the Lake County Prosecutor's Office as a Deputy Prosecuting Attorney in the Felony

Division while "S. Davis" continued working at AT&T Bell Laboratories/Lucent Technologies.   "S. Davis"

called NISEC and learned that "E. Davis" would be immediately admitted upon any documentation of

autism.  NISEC (Northwest Special Education Cooperative) is a day school for autism.

"J. Davis'" and "S. Davis'" Divorce Decree (Agreed Order) was **Granted** from the Gary Family Court in

Gary, Indiana.

"S. Davis" later moved to Illinois for travel reasons and entered "E. Davis" in the Illinois school system.  Due

to problems with after school child care for "E. Davis", "S. Davis" brought "E. Davis" to her mother's ("L.

Collier's") home in Athens, Alabama and made child care arrangements.

And also entered "E. Davis" into the Athens City School System while "S. Davis" made arrangements with her employer, Lucent Technologies, to 'work from home' in Athens, Alabama and test her work product (software) in Illinois.  After entering "E. Davis" in the Athens City School system, he was under the direction of the (then) Special Education Coordinator, Ms. Penley Reese.

### YEAR – 1998

In 1998, "S. Davis" took a position as a NASA contractor with Lockheed Martin in Huntsville, Alabama. During the interview, (Lockheed Martin) Human Resources informed "S. Davis" that the contract/employment was **only** for two (2) years.   Pursuant to the divorce agreement, "J. Davis" began visiting his son, "E. Davis" in Athens, Alabama on average twice a month traveling from Indiana.   The first year at Athens City Schools, "E. Davis" was only provided a teacher's aide in a regular classroom.  "J. Davis" and "S. Davis" discussed additional services by the elementary educational system for the handicapped.

Athens City School system refused to provide uninterrupted/extended school day and/or school year services as required under special educational laws for the handicapped.  During this summer's interrupted school term, "E. Davis" regressed rather than progressed.   Additionally, "L. Collier", who was disgruntled about reduction in childcare payments as "S. Davis" transitioned her child care need to only two (2) hours per day and paid her half the amount that "L. Collier" was being paid for six (6) to (7) hours per day.

"S. Davis" and "J. Davis" took "E. Davis" to Chicago, Illinois to a medical doctor (M.D.) who was part of the Autism Society of America's research effort to have extensive blood work done including tests for food allergies.  A secretin treatment was purchased for "E. Davis" for approximately three-thousand dollars ($3,000.00).

Subsequent to the treatment, the child, "E. Davis", showed significant improvement with his autistic symptoms.

**YEAR – 1999**

At the beginning of 1999, "J. Davis" – in order to pursue more knowledge in autism, entered medical school at Ross University School of Medicine in Dominica in the Caribbean with the withdrawal of the funds that had accumulated in his, "J. Davis'", employment with the Lake County Prosecutor's Office and with student loans.

During the earlier part of 1999, "S. Davis" went to speak with Penley Reese and discovered that Penley Reese suddenly retired and was replaced Marilyn Batts as Special Education Coordinator for the Athens City School system.

Marilyn Batts tersely informed "S. Davis" that they, (the Athens City School system), does **not** provided services for anyone from Northern Indiana.

After a period of time, "S. Davis" returned to Athens City Schools to speak with Marilyn Batts about services for her autistic son, "E. Davis" and she said on that occasion that she had no funds in the budget for "E. Davis".   Shortly thereafter, "S. Davis" got a message from her mother, "L. Collier" that "E. Davis'" teacher's aide, Ms. Benford, said that if "S. Davis" continued to ask for services for her son, "E. Davis" that harm may come to him.

During this same period, "S. Davis" met and spoke with another parent of an autistic child in the Athens City School system.    "S. Davis" was informed by this individual that this individual's child was receiving the following: Occupational therapy, Speech Therapy, Special Teacher's aide, along with a dedicated teacher and a dedicated classroom under her child's Individualized Educational Plan (IEP) at Julian Newman Elementary school with the Athens City School system.

During the fall of 1999, "S. Davis" began to homeschooling "E. Davis".  "J. Davis" returned from medical school. And both, "J. Davis" and "S. Davis", went to Glenwood/Allan Cott School to discuss possibly entering "E. Davis" into Glenwood/Allen Cott.

Glenwood/Allan Cott wrote the Special Education Coordinator of Athens City School system a letter to Penley Reese (the last name they had as Special Education Coordinator for the school) instructing her the process for entering "E. Davis" into Glenwood/Allen Cott school which entailed merely receiving a letter from the Coordinator indicating that Glenwood/Allan Cott school was the 'least restrictive environment' for "E. Davis".

At this time, "J. Davis" and "S. Davis" continued to pursue the proper educational services from Athens City School system and "S. Davis" continued to seek services from the Limestone County Department of Human Resources through Shannon Cameron.   Also in December 1999, "S. Davis" was told by Marilyn Batts that there was another autistic child coming into the school system and funds suddenly became available for "E. Davis" to share a teacher with the other child.

During the fall of 1999, "J. Davis" took a position with Oakwood College as an adjunct instructor teaching marketing.  "J. Davis" initiated and directed his students toward a marketing project for the college's LEAP Adult Degree Completion program to use as advertisement.  The advertisement was a person leaping over a bunch of people coming down or landing past the words LEAP program, dressed in a cap and gown with a degree in hand.  This advertisement was used by the college on many billboards all over Huntsville, Alabama for several years (~2000 – ~2003)

  The marketing concept directed by "J. Davis" for his student's project was designed to picture an individual leaping towards a college degree coming down with a cap and gown and a college degree in hand.

During this same period, "J. Davis" and "S. Davis" were having difficulty with the Athens City Schools obtaining the proper educational program for their son, "E. Davis".

### YEAR – 2000

At the beginning of 2000, "E. Davis" was returned to Athens City School system by "S. Davis" and "J. Davis".  "J. Davis" continued visiting his son, "E. Davis", traveling from Indiana to Alabama.

The principal, Randall Murphy, commented that "E. Davis" appeared to be much better.

Athens City Schools placed "E. Davis" in a dedicated room and with a dedicated teacher shared by another autistic child.   "S. Davis" met the mother of the other autistic student and queried her as to whether or not she had a difficult time getting this dedicated teacher and room for her child.  She replied in astonishment as to the question and said, "Of course not!  That is an educational legal requirement by school systems for autistic individuals".

She further said in response to where she was from that she was from Michigan and it is natural to get this type I.E.P. from the school system.  Within two weeks of starting back to school, "E. Davis" began to display autistic tantrums when the teacher turned her attention to the other autistic child.   "S. Davis" learned this from speaking with the dedicated teacher and her aide.

In order to control "E. Davis'" tantrums, the aide and the dedicated teacher started putting "E. Davis" into a dark closet to prevent his further disruption of the teaching of the other autistic child.  Additionally, "E. Davis" was taken to the principal's office where the principal paddled him on a daily basis to further seek controlling his autistic tantrums.

In February, "S. Davis" and "J. Davis" requested an emergency I.E.P meeting with Marilyn Batts, the Athens City School Special Education Coordinator to resolve the crisis that was taken place.  During this period, "S. Davis" and "J. Davis" noted the rapid deterioration of "E. Davis'" autistic behavior.  "J. Davis" wrote to Marilyn Batts that something needs to be done to correct the deterioration of "E. Davis'" autistic behavior and tantrums.    "J. Davis'" written communications regarding these problems pointed out the educational laws regarding providing proper and appropriate I.E.P for "E. Davis".

"E. Davis'" behavior became more and more difficult to handle even at home.

Marilyn Batts, at this time, threatened to get "E. Davis" into the Juvenile Justice system.

"S. Davis" called Marilyn Batts and said to Marilyn Batts that "E. Davis" needs to be placed into Glenwood Residential/Allan Cott School as the 'least restrictive environment' for "E. Davis".  Marilyn Batts informed "S.

Davis" that she (Marilyn Batts) will **not** write the necessary letter to have "E. Davis" placed in Glenwood/Allan Cott School.

The school is required, and continues to be required, to be responsible for any Athens City School student placed into "Glenwood/Allan Cott".

("S. Davis" and "J. Davis" learned after this time period that Marilyn Batts and Jeanne Anderson are, and were, close friends and knew each other as church members of the United Methodist Church in Athens, Alabama.  We also learned that Jerry Batts, the husband of Marilyn Batts, was the City Attorney for the City of Athens and subsequently became a Judge in one of the Athens-Limestone County courts.  We, "J. Davis" and "S. Davis" believe that Marilyn Batts had been informally discussing "E. Davis'" school situation and the communications she, Marilyn Batts, had been having with "J. Davis" and "S. Davis - the parents of "E. Davis").

"J. Davis" and "S. Davis" had another emergency I.E.P. meeting with the principal, teachers and Marilyn Batts (Special Education Coordinator) and in that meeting Marilyn Batts denied "E. Davis" an extended-school year that is when she threatened to place him in the Juvenile Justice system.

Marilyn Batts subsequently offered to have "E. Davis" placed in the day school component of "Glenwood/Allan Cott" school.  This would have entailed "S. Davis" driving every school day morning (Monday through Friday) one hundred miles (100) from Athens, Alabama to Birmingham, Alabama returning to Huntsville, Alabama one hundred (100) miles to go to work, leaving work and driving a hundred (100) miles back to Birmingham, Alabama to pick up "E. Davis" from school, driving back one hundred (100) miles to Athens, Alabama – a total of four hundred miles (400) daily.

This naturally was unreasonable and could not be pursued by "S. Davis".

Subsequently, "J. Davis" and "S. Davis" learned that "Dr. Sarrels", solicited by caseworkers of "DHR", wrote a letter stating that "S. Davis" refused to place "E. Davis" in "Glenwood/Allan Cott" school.

"S. Davis" was allowed to take off from Lockheed Martin and began home schooling "E. Davis" for the summer using the Lovaas/ABA educational method.

"S. Davis'" work assignment as a NASA contractor with Lockheed Martin had been completed which provided the justification for Lockheed Martin to allow "S. Davis" to take time off.  During that period, "S. Davis" received a NASA Award.

"J. Davis" and "S. Davis" requests a hearing before the Athens City School Board.  The hearing was convened and the attorney retained by "S. Davis", Curtis Whitmore, was hesitant to go forward with the hearing.  And, after "J. Davis" and "S. Davis" waiting in another room for at least five (5) hours, Curtis Whitmore informed "J. Davis" and "S. Davis" that he, Curtis Whitmore, had agreed with the "Athens City Schools/Athens City School Board of Education" to convert the hearing to a mediation meeting.

"S. Davis" was invited to return to Lucent Technologies/Bell Laboratories in Illinois and "E. Davis" had been returned to the Athens City School system.

**YEAR – 2001**

"S. Davis" moved back to Illinois and subsequently brought her son, "E. Davis", to Illinois and enrolled him in the Illinois school system.   "J. Davis" and "S. Davis" met with the school system in Illinois to discuss "E. Davis'" I.E.P. and it was decided by the Illinois school system that "E. Davis" should be placed in a classroom with one teacher, one aide and twenty or more special needs students.

"J. Davis" and "S. Davis" explained that this type placement would not work with "E. Davis".   "S. Davis" and "J. Davis" asked to have "E. Davis'" Athens City School I.E.P. grandfathered into the Wheaton, Illinois school system.  That was denied.

"S. Davis" sought the legal counsel of an attorney in Illinois who contacted the Illinois school and explained to them that it was the law that the I.E.P. be provided for "E. Davis".   The Wheaton, Illinois elementary school agreed that "E. Davis' " I.E.P. could only be provided in a residential facility.  That is when all parties agreed that "E. Davis" would be placed in a residential schooling facility in Illinois.   When the Wheaton,

Illinois school system contacted Marilyn Batts, Marilyn Batts told the Wheaton Illinois School system that

"S. Davis" was just trying to bust their budget as she had been trying to bust Marilyn Batts' budget.

 During this period, "J. Davis" and "S. Davis" visited three potential residential school facilities for "E. Davis".

And, "J. Davis" and "S. Davis" observed that these facilities used football-type helmets on some of the

children to prevent injuries for those who were prone to hit themselves in the head during autism behavioral

outburst.

The statement from Marilyn Batts regarding "S. Davis" wanting to bust the Wheaton, Illinois school system

budget caused the Wheaton, Illinois school system to back off the agreement to place "E. Davis" in a

residential facility.   Shortly thereafter, the Lucent Technologies/Bell Laboratories announced the upcoming

massive layoffs and restructuring given the fact that large portions of work projects had been, and were

being, shipped overseas.

"S. Davis" moved back to Alabama with "E. Davis" and sought to re-enter "E. Davis" into "Athens City

School/Athens City School Board of Education".   "S. Davis' " employer in the layoff allowed "S. Davis" to

purchase the COBRA Insurance and "S. Davis" included the mental health component of that insurance

plan.  "S. Davis" sought out child psychiatrists and learned that "Dr. Sprinkle" and Dr. Euto would accept

her COBRA mental health insurance.

"S. Davis" took "E. Davis" to "Dr. Sprinkle".  "Dr. Sprinkle" wanted "S. Davis" to try a new prescription and

gave "S. Davis" a starter package and a prescription for this new medication.   "S. Davis" informed the

school that "E. Davis" was on a new medication.  Later that day, Marilyn Batts accused "S. Davis" of **not**

administering medication to "E. Davis" which caused "E. Davis" to have a major outburst to the point where

the dedicated teacher assigned to "E. Davis" was so distraught that she left early that day.

Furthermore, Marilyn Batts stated to "S. Davis" that she, Marilyn Batts, believes "S. Davis'" failed to give "E.

Davis" his medication and that was done purposefully in order for "S. Davis" to get Marilyn Batts to write the

letter to have "E. Davis" enter "Glenwood/Allan Cott" School.   Shortly thereafter, "S. Davis" saw "E. Davis"

and he appeared to be just fine, not noticing any difference in "E. Davis'" behavior.

This was around August of 2001.

About a week or so later, "S. Davis" learned that the school was giving "E. Davis" birthday cake, in

opposition to "S. Davis'" instructions during his I.E.P.– not to allow "E. Davis" to consume sugar items

and/or other sweets, and "E. Davis" was having severe behavior reactions caused by sugar items given to

him at the school.

"S. Davis" spoke to Marilyn Batts, again, regarding **not** allowing "E. Davis" to have sugar in school, and

Marilyn Batts said that the only way the school would stop giving "E. Davis" sugar (i.e. birthday cake,

candy, etc.) would be if "S. Davis" provided a doctor's note.

"S. Davis" took "E. Davis" to "Dr. Sarrels" and "Dr. Sarrels" refused to give "S. Davis" such a note.

With the refusal of the doctor's note, the teachers/teacher's aide continued to allow "E. Davis" to have

sugar which progressively increased his self-injurious behavior **(SIB)**.   "S. Davis" learned, during this same

period, that Marilyn Batts had called Ellen Gregg of "DHR" making the same allegations which were that "S.

Davis" was not giving "E. Davis" his medication.

"S. Davis" took "E. Davis" to the Huntsville Children's Hospital Emergency room utilizing her COBRA

mental health insurance.

Prior to taking "E. Davis" to the emergency room, "S. Davis" had retained the legal services of Attorney

Slate who was asked to assist "S. Davis" in getting assistance through the Limestone County family court to

get "E. Davis" into "Glenwood/Allan Cott" school.

Attorney Slate filed a petition, which "S. Davis" learned had been filed in the wrong court (i.e. Morgan

County court).  Subsequently, Attorney Slate re-filed a petition in the Limestone County "J. Anderson"

Court.   It was docketed or scheduled for a hearing on the petition to get "E. Davis" into "Glenwood/Allan

Cott" school.

Attorney Slate was to serve the Alabama Mental Health Department to participate in the hearing.   Attorney Slate informed the "J. Anderson" Court that he faxed the notice to the Alabama Mental Health Department. This is the period where "DHR" filed their petition with the "J. Anderson" Court as set forth in the preliminary statements of this complaint.

As stated in the preliminary, "J. Davis", seeking an attorney in Alabama to represent the interest of "E. Davis'" entry into "Glenwood/Allan Cott" school spoke with Attorney "Lesa Greene" providing the information needed to get "E. Davis" into "Glenwood/Allan Cott" school.  "S. Davis" also spoke with "Lesa Greene" and subsequently informed "Lesa Greene" that she, "S. Davis" had already retained an Alabama attorney for the petition to get "E. Davis" into "Glenwood/Allan Cott" school.

Subsequently, when the "J. Anderson" Court converted "S. Davis'" petition for assistance in getting "E. Davis" into "Glenwood/Allan Cott" school to a hearing the petition on abandonment filed by "DHR", the "J. Anderson" Court, then, appointed "Lesa Greene" as guardian ad litem.

"Lesa Greene" never informed the court that she had previously discussed representing "J. Davis" and "S. Davis", parents of "E. Davis'" petition for assistance in placing "E. Davis" into "Glenwood/Allan Cott" school. This conflict of interest on the part of "Lesa Greene" was never addressed by "Lesa Greene" or the "J. Anderson" Court.

After "DHR" moved "E. Davis" from the Huntsville Children's Hospital to Birmingham Children's Hospital, "J. Davis" father of "E. Davis" drove down from Northern Indiana to the Birmingham Children's Hospital and sought to see his son, "E. Davis", and the hospital called Limestone County "DHR" caseworker, Ellen Gregg, to see if the father of "E. Davis" was allowed to visit "E. Davis".

"DHR", without a court order, told the hospital not to allow "J. Davis" to visit his son, "E. Davis".   This was near Christmas holidays in 2001 and during that time, several students and teachers from "E. Davis'" elementary school in Athens, Alabama drove to Birmingham and were allowed to visit him.

Earlier in the year, "S. Davis" also took "E. Davis" to child psychologist, Dr. Euto, under her, "S. Davis'",

COBRA mental health insurance who was to be "S. Davis'" witness for "S. Davis'" petition to get assistance

for "E. Davis" placed into "Glenwood/Allan Cott".

"J. Davis", during this year, also, was traveling back and forth from Indiana to Alabama and was developing

his law practice in Indiana which culminated in this same year to settling a case against Blue Cross Blue

Shield for bad faith in the amount of one hundred and fifty thousand ($150,000) dollars for "J. Davis'" client.

During 2001, "J. Davis" was aggressively developing his solo law practice in Indiana which included the

above referenced settlement, and took out yellow pages ads for his law practice including having a large

permanent billboard-type sign in the parking lot adjacent to the building his office was located in, showing

his legal services.

This sign could be seen to vehicle traffic going either North or South on Broadway Avenue.

Subsequent to the large settlement referenced above, "J. Davis" has not been able to spend the type of

time to continue developing his law practice towards cases as mentioned above.   This was due to having

to go back and forth to Alabama regarding his son, his son's schooling, and subsequently the "J. Anderson"

Court and "DHR" constantly pursuing activities addressed at interfering with the parental rights of "J. Davis"

and "S. Davis" regarding their son, "E. Davis".

These nefarious activities of "J. Anderson" and "DHR" were directed at defamation and the soiling of the

characters of "J. Davis" in regards to his professional career by circulating statements in and around

Athens, Alabama and Huntsville, Alabama that "J. Davis" was not really an attorney in any state, and was

only posing as an attorney.

Additionally, these defamatory remarks found their way to sources at Oakwood College Church and the

College where "J. Davis" was, and is, very well known not only individually (teaching/developing LEAP

marketing program as mentioned above), but also through the knowledge known throughout the Adventist

church in New York, Alabama and California that "J. Davis" is the grandson of one known in the Adventist

church as Sister Messiah who was the wife of Phillip Messiah.   Phillip Messiah was well known in the Adventist church for authoring numerous religious plays written in Spanish.  The Adventist church, though large and international, is nevertheless a closed-knit church.

This defamation has been, and continues to be, a source of mental distress for "J. Davis" and "S. Davis".

"S. Davis" also learned from her attorney, (Attorney Slate), that Marilyn Batts was circulating the statements that "J. Davis" was not an attorney in any state, and only posing as an attorney.

During this same period, subsequent to the multiple layoffs at "S. Davis'" employment, "S. Davis" was offered a package which included re-training, re-education, and/or re-placement.  This package was conditioned on "S. Davis'" acceptance into an educational or certification program within a three (3) month period or "S. Davis'" completion of the company's re-placement program within a six (6) month period.  These packages were worth approximately two hundred thousand dollars ($200,000.00).

"S. Davis" was not able to fulfill these requirements within the timeframe given the problems with "Athens City Schools/Athens City School Board of Education", "DHR", and the "J. Anderson" Court and their interference with the parental rights of "S. Davis" regarding "E. Davis".

This enhanced the mental distress, continuing to the present day and lost career opportunities for "S. Davis".   This distress is also enhanced by the Alabama courts stating that "S. Davis" was, and is, purposefully unemployed, and that "J. Davis" was, and is, purposefully underemployed.

**YEAR – 2002**

The lost opportunities "S. Davis" and "J. Davis" experienced can never be recouped including any apparent possibility of, at this point in his life, bringing "E. Davis", through education and treatment, to mainstream.  All three of the plaintiffs have irretrievably lost large segments of their lives.

During the beginning of the year, "Claire Tinney-Jones", speaking to "J. Davis" in a room adjacent to the "J. Anderson" Courtroom, offered "J. Davis" a court-appointed attorney, stating that this would allow "J. Davis"

to be represented and not have to drive back and forth from Indiana and Alabama for the court proceedings.

"J. Davis" declined such an offer and was surprised, and perplexed, that the attorney for "DHR" seemed to suggest that she had the authority to have an attorney appointed to represent "J. Davis".   This suggestion by "Claire Tinney-Jones" also suggested that "J. Davis" did not have to be questioned by the court as to his financial ability to retain an Alabama counsel which, if "J. Davis" agreed to the offer without providing a financial statement to the court, would represent *suborning perjury.*

"J. Davis" and "S. Davis" waited in the hallway while "Claire Tinney-Jones" and "DHR" staff entered the "J. Anderson" courtroom.

Shortly thereafter, "J. Davis" and "S. Davis" were summoned to enter the "J. Anderson" Court.  Upon entering the "J. Anderson" courtroom, "J. Anderson" stated, to "J. Davis" and to "S. Davis", "*I understand you don't want an court-appointed attorney…"* again, without any query as to "J. Davis'" financial ability to hire his own attorney.

The "J. Anderson" Court had **not** convened a full evidentiary hearing on "DHR's" petition for abandonment. Though, this was now a court proceeding beyond the 72-hour period for resolving or ruling on the abandonment petition filed by "DHR".

Again, there was no legal justification to hold a 72-hour hearing regarding abandonment in that "DHR" filed a petition for abandonment within three hours of "S. Davis' "  leaving the Children's Hospital in Huntsville, Alabama. (See Affidavit by "S. Davis" regarding Huntsville Children's Hospital).

The "J. Anderson" Court, having **not** resolved or heard clear and convincing evidence on the abandonment petition, had **no** legal and/or official jurisdiction in the "E. Davis" matter.  The only thing logically before the "J. Anderson" Court was the petition filed by "S. Davis'" attorney for assistance by the court to have "E. Davis" entered into "Glenwood/Allan Cott" school.

The "J. Anderson" Court properly, and procedurally, should have vacated the abandonment petition by "DHR" and proceeded on the petition for placement in the "Glenwood/Allan Cott" school for "E. Davis".   "J. Davis" and "S. Davis" subsequently noticed that the next printed order by the "J. Anderson" Court crossed out two (2) of the case numbers which identified "S. Davis' " petition and handwrote two (2) of the case numbers for "DHR's" abandonment petition.

This began the saga of overlapping the abandonment petition with the petition for assistance in placing "E. Davis" into "Glenwood/Allan Cott" school.  This confusion continued, again, without ever, to this date, resolving the abandonment petition that had been filed by "DHR".   The only thing that was subsequently resolved in these few early proceedings was  that "J. Davis" and "S. Davis" stipulated/agreed with "DHR" – in open court – that "E. Davis" should be placed into "Glenwood/Allan Cott" school as the 'least restrictive environment'.

There was nothing pending regarding any concerns of the welfare, care, and treatment of "E. Davis", including the safeguard of "E. Davis" and appropriate placement of "E. Davis".  Therefore, the matter - legally, procedurally, and judicially - should have been closed.

Legal custody was never a judicial issue, and was not required in order to assist "J. Davis" and "S. Davis" in getting "E. Davis" placed into "Glenwood/Allan Cott" school.   This placement into "Glenwood/Allan Cott" school was accomplished by the fact that Marilyn Batts, finally, wrote the necessary letter from "Athens City Schools/Athens City School Board of Education" to partner with "Glenwood/Allan Cott" school for the residential and day schooling of "E. Davis".

NOTE:  This was within a few months after Marilyn Batts had *refused* to write the same letter when asked by "J. Davis" and "S. Davis".

We believe, and facts suggest, that Marilyn Batts was seeking to assist "DHR" in taking over the welfare and custody of "J. Davis'" and "S. Davis' " son, "E. Davis".   In that the "J. Anderson" Court erroneously continued proceedings in the "E. Davis" matter, "J. Davis" and "S. Davis" have been denied *due process.*

*And*, numerous petitions, motions, notice of change of residence of "S. Davis" to the state of Indiana, the knowledge of the continuing residence of "J. Davis" in the state of Indiana, have been unsuccessful and constantly ignored, or denied, in the "J. Anderson" Court.

"S. Davis" called "Lesa Greene", who had been appointed Guardian ad litem for "E. Davis" by "J. Anderson", and requested that "Lesa Greene" speak to the medical personnel at Birmingham Children's Hospital, where "E. Davis" had been placed by "DHR", to make sure that the said medical personnel give "E. Davis" the medication that he been taking for the past two (2) years prescribed by "Dr. Sprinkle".  "S. Davis" had attempted to instruct the said medical staff at Birmingham Children's Hospital regarding said medication for "E. Davis" and the medical personnel refused to take any instructions from "S. Davis" stating that she had no authority to give such instructions due to statements made by caseworkers of "DHR" – that "S. Davis" had no authority regarding "E. Davis".

"S. Davis" had attempted to reach "Lesa Greene" on multiple occasions and, when she did contact "Lesa Greene", "Lesa Greene's" response to "S. Davis' " concern about "E. Davis'" medication, was that "Lesa Greene" did not speak to anyone but Alabama attorneys and therefore refused to dialog with "S. Davis" regarding "S. Davis'" concern about "E. Davis'" getting proper medication.

"S. Davis" learned, subsequently, that "E. Davis" had gone a considerable period of time without anyone administering his required medication.   We, "J. Davis" and "S. Davis" believe that this failure to give "E. Davis" his required medication precipitated his continued decline in his ("E. Davis'") health regarding autistic symptoms.

On or about January 16, 2002, "E. Davis" was being admitted into "Glenwood/Allan Cott" school by the officials and administrators of said "Glenwood/Allan Cott" school participating in "E. Davis'" admittance into "Glenwood/Allan Cott" school were caseworkers from Limestone County "DHR", Becky Bentley and others from Limestone County "DHR".

Present, during "E. Davis'" admittance, where administrative paperwork was being prepared, was "E. Davis'" mother, "S. Davis".   "S. Davis" informed the administrators of "Glenwood/Allan Cott" School during the preparation of the entry paperwork that she, "S. Davis" had COBRA Insurance including mental health component.

During the completion of the paperwork, while "S. Davis" was present, nothing was said, or brought up, regarding the financial component of "E. Davis'" entry into "Glenwood/Allan Cott" school.

As the Limestone County "DHR" caseworkers' group was preparing to leave, Becky Bentley said to the administrators "Glenwood/Allan Cott" school who were still present in the room, "Do not show "S. Davis" any of the financial documents or any other financial information …".

The "J. Anderson" Court set another proceeding in the matter of "E. Davis" for February 2002 and on that date, "J. Davis" stated in the hallway to "Claire Tinney-Jones and other caseworkers from "DHR" that he, "J. Davis" would seek a continuance of the proceeding in order to gather information regarding the issues that were, and had been, presented to the "J. Anderson" Court.

Shortly thereafter, "Claire Tinney-Jones" and the aforesaid caseworker of "DHR" went into the "J. Anderson" courtroom.   Upon being summoned into the "J. Anderson" courtroom, "J. Anderson" began the proceeding by stating to "J. Davis" that "I understand that you want a continuance …." (Another example of ex parte communications in the "E. Davis" matter)

Just before the February 2002 proceeding started,  Becky Bentley gave some documents to "S. Davis", which upon review by "J. Davis" and "S. Davis" were orders to provide the names and addresses of both ("S. Davis'" and "J. Davis'") relatives and to return to her within thirty(30) days.

In a proceeding on or about March 2002, the "J. Anderson" Court ordered "J. Davis" and "S. Davis" to bring their individual tax return for the past two (2) years.   Shortly thereafter, "J. Davis" sent discovery material, specifically interrogatories, to "DHR" via their attorney, "Claire Tinney-Jones".

At the next proceeding, on or about May 2002, "DHR" had not yet responded to the above said

interrogatories, and other discovery requests such as requests for production of documents.

On or about May 2002, "E. Davis" became very ill at "Glenwood/Allan Cott" school, and "S. Davis" urged

"Glenwood/Allan Cott" personnel to take "E. Davis" to the hospital.  In response to this request,

"Glenwood/Allan Cott" personnel stated to "S. Davis" that they, "Glenwood/Allan Cott" personnel, were

waiting on his Medicaid to kick in.  In response to "Glenwood/Allan Cott" personnel's statement, "S. Davis"

responded that "As I told you when he ("E. Davis") was being admitted to Glenwood that I have COBRA

Insurance. Please take him to the emergency room …".

They, "Glenwood/Allan Cott" personnel still refused to take "E. Davis" to the emergency room.  Therefore,

"S. Davis" took "E. Davis" from "Glenwood/Allan Cott" school and drove him to "Dr. Sarrels" for treatment.

"S. Davis" discovered that within thirty (30) days, Dr. Mcdanal at the "Glenwood/Allan Cott" school had

placed "E. Davis" on approximately fifteen (15) different prescriptive medications.

On or about May 2002, during another court proceeding, while waiting in the hallway for the case to be

called, "J. Davis" and "S. Davis" were approached in the hallway and "Claire Tinney-Jones" asked them

whether or not they had brought their tax returns.

"J. Davis" stated, "I think that is premature".  Shortly thereafter, "Claire Tinney-Jones" with caseworkers of

"DHR" went into the "J. Anderson" courtroom.   Subsequently, "J. Davis and "S. Davis" were summoned

into the "J. Anderson" courtroom for the proceeding.

"J. Anderson" immediately stated to "J. Davis" that "You are an attorney and you understand that when a

court orders someone to do something, they must do it".   She further said, "I understand you don't have

the tax returns I ordered".

"J. Davis" responded by saying to "J. Anderson", "Your Honor, who told you that?"

 "J. Anderson" was silent for a long period and never did answer that question.

I, "J. Davis", then said, "I have my tax returns", and turned to "S. Davis" and said, "Do you have yours"?

Then, "S. Davis" said, "I have mine" and handed them to "J. Davis" who then handed both tax returns to "J. Anderson".

During the first two (2) months of "E. Davis'" admittance to "Glenwood/Allan Cott" school, "J. Davis" and "S. Davis" were experiencing no difficulty regarding visiting and/or telephoning "E. Davis".

"S. Davis" had been told by the personnel of "Glenwood/Allan Cott" school that she, "S. Davis" could visit or telephone "E. Davis" everyday if desired, and this was in conformity with their regular visitation policy.

Subsequent to "DHR" caseworker, Becky Bentley, ordering "S. Davis" and "J. Davis" to provide a list of relative's addresses and telephone numbers, which "J. Davis" and "S. Davis" did not immediately comply with, "S. Davis" learned that Becky Bentley told "Glenwood/Allan Cott" personnel that "S. Davis" should not be allowed to visit "E. Davis" so much.

This, "J. Davis" and "S. Davis" learned that this did not come from the "J. Anderson" Court.  During this same period, "DHR" was represented by an Alabama attorney, namely, "Claire Tinney-Jones".    Prior to this intervention by Becky Bentley regarding visitation of "E. Davis", "J. Davis" and "S. Davis" enjoyed a very civil and professional relationship with "Glenwood/Allan Cott" personnel.

"Dr. Sarrels" prescribed sinus medication for "E. Davis" which greatly his sinus condition, and which was to be taken for at least a month.  "Glenwood/Allan Cott" was informed about this medication requirement and based on "Lesa Greene" stating to the medical doctor at "Glenwood/Allan Cott", "Dr. Mcdanal" that they were not to take any instructions or listen to "S. Davis" regarding the prescribed medication from "Dr. Sarrels".

Thus, "E. Davis" was caused to continue suffering from his sinus infection.  Again, this physical suffering by "E. Davis" was not alleviated and caused increased SIBs (Self-injurious Behaviors) which consisted mostly of "E. Davis" hitting himself in the head and also banging his head on the concrete walls.

"Dr. Mcdanal" ordered surgery to be performed on "E. Davis" to scrap his sinuses which, the parents, "J. Davis" and "S. Davis", feel would not have been required had he, "E. Davis", been allowed to continue prescribed medication from "Dr. Sarrels".

This surgery was never brought to the attention of "J. Davis" or "S. Davis" for permission, and they, "J. Davis" and "S. Davis", only learned of this surgery *after* the fact.   It is unknown by the parents, "J. Davis" and "S. Davis", who authorized this surgery as parents or substitute parental authority.

Therefore, this constitutes *battery* against the plaintiff, "E. Davis", who at that time was a minor and was also incapable, based on autism, to assent to such a surgical procedure.

During this same period, "S. Davis" learned during the medical meetings at "Glenwood/Allan Cott" school, that "E. Davis" was on multiple prescribed medications prescribed by "Dr. Mcdanal".  "S. Davis" inquired of "Dr. Mcdanal", "Why "E. Davis" was on so many prescribed medications …"  "Dr. Mcdanal" stated that some of the prescribed medications were to prevent "E. Davis" from wetting the bed at night.

"S. Davis" then stated, "Why can't the house personnel wake him, "E. Davis", a few times during the night and take "E. Davis" to the toilet, as she did when "E. Davis" was at "S. Davis'" home".  "S. Davis" asked "Dr. Mcdanal", "Isn't that going to affect normal functions of his ("E. Davis'") urinary system?"  "Lesa Greene" interjected, at this point, in the presence of "Dr. Mcdanal" that "Dr. Mcdanal" did not have to listen to "S. Davis" regarding "E. Davis'" medications.

"S. Davis" inquired and requested the medical files and records of "E. Davis" to take to the next scheduled "J. Anderson" Court proceedings, scheduled for July 2002.   "Dr. Sarrels" stated that he was instructed by "DHR" **not** to give "S. Davis" the medical files regarding her son, "E. Davis".

In the next couple of proceedings, the parents, "J. Davis" and "S. Davis", still took the position that the "J. Anderson" did not have jurisdiction and noted that caseworkers were practicing law by ordering materials from "J. Davis" and "S. Davis" when the "DHR" caseworkers were represented by counsel.

"E. Davis" was in "Glenwood/Allan Cott" by agreement and stipulation having nothing to do with change of custody.   "J. Anderson", upon being informed that "S. Davis" was **relocating to Indiana**, said that she, "J. Anderson" will order "DHR" to initiate the initiate the Interstate Compact on the Placement of Children.

Child support was never part of the stipulation and/or agreement which the "J. Anderson" Court was aware, and accepted, in the "E. Davis" matter.   At the second (2nd) proceeding (in January 2002), "J. Davis" was handed a document which purported to be the petition filed by "DHR" for abandonment of "E. Davis" and attached to which was a document that purported to be a summons regarding the abandonment petition.

"J. Davis" was at the "J. Anderson" Court for this proceeding that was discovered to be the second (2nd) proceeding held by the "J. Anderson" Court.

"J. Davis" was at this "second" (2nd) proceeding with the thought in mind that this proceeding was for the purpose of assisting the placement of "E. Davis" into "Glenwood/Allen Cott" school pursuant to the petition filed by "S. Davis" through her (then) attorney, Slate.

Therefore, the above mentioned petition for abandonment/summons was not valid, in that service of such a document on "J. Davis" was without any legal and/or binding authority, in that "J. Davis" was present at this time for the **limited** purpose of the above mentioned "S. Davis'" petition for assistance in getting "E. Davis" into "Glenwood/Allan Cott" school.   Therefore, this court, the "J. Anderson" Court never obtained in personam jurisdiction over "J. Davis" and, therefore, any purported service of summons was invalid.

The second (2nd) proceeding was also thought, by "S. Davis", to be a proceeding on her, "S. Davis'", petition for assistance in getting "E. Davis" into "Glenwood/Allan Cott" school.

The "J. Anderson" Court, in attempting to serve "J. Davis" with a summons regarding the (filed) petition, by "DHR", for abandonment, was a misrepresentation of "J. Anderson's" authority in legal jurisdiction over "J. Davis", and on the part of "J. Anderson", this was **judicial misconduct**.

The plaintiffs, "J. Davis" and "S. Davis" believed that the "J. Anderson" Court has an on-going problem with determining proper jurisdiction over matters brought by various parties to her (The "J. Anderson") Court.

This belief is based on another example of jurisdictional dispute with the "J. Anderson" Court and the United States military authorities regarding proper jurisdiction.  The "J. Anderson" Court disputed jurisdiction of an individual charged with a criminal offense in Limestone County (Alabama) who stated, upon arrest, that he was military.

**J.A.G** (Judge Advocate General) asserted jurisdiction over this person who was, either in the military or, pending discharge from the military when the alleged criminal act took place.   The issue revolved around subject-matter jurisdiction and *in personm* jurisdiction.  Subject-matter jurisdiction was, ostensibly, rightfully, in a court of Limestone County, Alabama.  However, *in personam* jurisdiction was the issue.

Under Article 16 of the military code of justice an individual is considered a part of the United States military at the inception of their enlistment or draft.  This continues throughout their official military service.   Under Article 25, which speaks to *in personam* jurisdiction, there are exceptions affected by whether or not the individual has been officially made a part of the United States military or discharged from the United States military.

The "J. Anderson" Court has an apparent obsessive possessive attachment to the concept of **jurisdiction** as it applies to any matter that crosses the threshold of The "J. Anderson" Court.

Jurisdiction is the most fundamental and least complicated issue to be resolved in *any* court of law.

The plaintiff, "J. Davis" **never consented** to in personam jurisdiction over the plaintiff, "J. Davis", in the "J. Anderson" Court **nor agreed** to the "J. Anderson" Court having **subject-matter** jurisdiction over the "E. Davis" matter.

The initial, physical removal of "E. Davis" from Huntsville Children's Hospital by "DHR", under the auspices of their petition for abandonment that "DHR" submitted to the "J. Anderson" Court, "S. Davis" in communication with her, "S. Davis'", attorney Slate who adamantly urged "S. Davis" not to return to the hospital because "E. Davis" was already in the custody of "DHR" based on their ("DHR's") petition.   At the point where "S. Davis" first contacted her, "S. Davis'", attorney Slate, a mere three  (3) hours had elapsed

at the time that "S. Davis" had left the Huntsville Children's Hospital where "E. Davis" was already in a bed and, what they called, four (4) point restraints.  With that, "S. Davis" had left a phone number with the hospital personnel, which she could be reached and also had provided her insurance, COBRA, with the mental health component.   Had "S. Davis" not followed her, "S. Davis'", attorney's adamant and strong advice not to return shortly after that three (3) hour period, that "DHR" would not have a sufficient reason to rush to "J. Anderson" to file a petition to take "E. Davis" into custody of "DHR".

"DHR" rushed to call "J. Anderson's" home within an hour after "S. Davis" had spoken to her, "S. Davis'", attorney, to get the order to take "E. Davis" into custody for alleged abandonment.   It was approximately 6:30 A.M., about three (3) hours after "S. Davis" left the hospital, when "S. Davis" spoke with attorney Slate. And, approximately 7:15AM when "DHR" got their authority to take "E. Davis" into custody.

"S. Davis" was informed by her attorney, Slate, that he was, or had been communicating with "Claire Tinney-Jones" whom he, Slate, stated to "S. Davis" that "Claire Tinney-Jones" said she knew that there was no abandonment since the mother could be located and the attorneys know that it was just a misunderstanding.

In July, the "J. Anderson" Court had **not** held a full evidentiary hearing nor ruled on any issues of abandonment, nor provided – per "J. Davis'" request, transcripts of the first proceeding held in the matter in the "J. Anderson" Court.  Further, it had been resolved, agreed, stipulated that "E. Davis" would be placed in "Glenwood/Allen Cott" school and, in fact, at this point, "E. Davis" had already been in the "Glenwood/Allen Cott" facility for almost six (6) months.

This fact represents what should have been closure of any authority or jurisdiction alleged, or otherwise, that the "J. Anderson" Court had in the "E. Davis" matter.  Since the "J. Anderson" Court seemed to be continuing some type of assumed jurisdiction based upon the needs of "E. Davis", "J. Davis" had submitted interrogatories and requests for production from "DHR" who had for – more than three (3) months failed to respond to "J. Davis'" discovery requests.   "J. Davis" requested of the "J. Anderson" Court to compel

"DHR" to respond to "J. Davis" discovery requests.  "J. Anderson", as has been the practice of the "J. Anderson" Court, denied the request of "J. Davis", again, without any explanation as to the reason for such denial.

This matter, legally, had **no** basis to be on-going in the "J. Anderson" Court.

If it is argued that "DHR" and the "J. Anderson" Court had, what they perceived as a legal duty to secure the welfare of "E. Davis" and, by such, implied that the parents of "E. Davis" – "J. Davis" and "S. Davis", had not provided or sought to provide the proper care, education, and/or residential placement for an autistic child, this perceived duty or legal authority had clearly ended when "E. Davis" was placed in the facility of "Glenwood/Allen Cott" residential facility which fulfilled all the needs of "E. Davis" from autistic treatment or residential treatment and schooling of the autistic "E. Davis".

At this point, there was **no** clear reason which the "J. Anderson" Court could, or would, state the court's purpose in continuing any involvement in the affairs of "E. Davis" and/or his parents, "J. Davis" and "S. Davis", regarding his ("E. Davis'") care, welfare, and education.   Certainly, **no** legal basis was established to continue any custodial rights of custody regarding "E. Davis" by "DHR" and/or the "J. Anderson" Court or "Lesa Greene" – the conflicted guardian ad litem.

It appears that the "J. Anderson" Court never seemed to understand what authority the court had in the "E. Davis" matter or when it started, or when it was suppose to end.

Also, up to this point in the year 2002, no court resolution had been announced by the "J. Anderson" Court regarding legal authority by "DHR" or "J. Anderson" Court over the "E. Davis" matter, thus no authority existed to order child support.   During the last six (6) months of the year (2002), "DHR", through one of their caseworkers, ordered "Glenwood/Allen Cott" school to not allow the parents of "E. Davis", "J. Davis" and "S. Davis", to visit "E. Davis".  This was done without a court order, nor any presentation to "Glenwood/Allen Cott" school of any such court order.   Subsequently "S. Davis, upon seeing "E. Davis", discovered that "E. Davis" had taser-burn marks (approximately 10 taser burn marks on hands, feet and

front and back torso), also it was discovered that "E. Davis" had undergone a medical surgical procedure to

scrap sinuses – sinus was never diagnosed as a problem to parents.

This medical procedure was undertaken without direct, or indirect, permission or authority of the parents of

"E. Davis", "J. Davis" and "S. Davis".    Also, during this period, "S. Davis" notified the "J. Anderson" Court –

in open court – that she was relocating to the state of Indiana.   In response to "S. Davis'" statement to the

"J. Anderson" Court, "J. Anderson" stated that upon "S. Davis'" relocation to the state of Indiana, she, "J.

Anderson",  would order "DHR" to initiate the Interstate Compact for the Placement of Children for "E.

Davis".

### YEAR – 2003

During this year, the parents, "J. Davis" and "S. Davis" attended meetings with "Glenwood/Allen Cott"

school going over "E. Davis'" schooling and, at that time, the parents were informed by the officials and

teachers that "E. Davis" was the most advanced autistic student attending that school.

However, given the unauthorized surgery of the previous year and the tasering of "E. Davis" (which was

around this time banned – the parents learned) by other such facilities that had been using tasering to

control the behavior of autistic children, in that it was discovered that such behavior-controlled methods

caused seizures.

The parents of "E. Davis", "J. Davis" and "S. Davis", were beginning to note the deterioration of the facility

("Glenwood/Allen Cott") in the housing and treatment of autistic children which prompted "J. Davis" and "S.

Davis" to increase their ("J. Davis" and "S. Davis") efforts to have the "J. Anderson" Court initiate or order

"DHR" to initiate the Interstate Compact to have "E. Davis" sent to a facility in the state of Indiana, which -

under the Interstate Compact, would be handled by the "J. Anderson" Court or "DHR" - the Alabama Mental

Health Department should have been the proper agency handling the "E. Davis" matter.

The initiation of the Interstate Compact by any factions in Alabama would have been coordinated with sister

agencies in the state of Indiana.  Such process is automatic when initiating the Interstate Compact.   The

"J. Anderson" Court had, and has, the responsibility to initiate the Interstate Compact on its own, as "DHR"

had, and has, the responsibility.

The conflicted "Lesa Greene" also had, and has, ostensibly the authority, responsibility, and duty to initiate

the Interstate Compact in the "E. Davis" matter.  "S. Davis", the mother of "E. Davis" learned and

discovered that the "Glenwood/Allen Cott" staff doctor had dramatic increased the psychotropic drugs.

### YEAR – 2004

During this year (2004) was experiencing problems regarding permanency and securing employment as an

engineer.

During this year, also, "J. Davis" was at his office in the state of Indiana with the same address in the state

of Indiana that the "J. Anderson" Court, "DHR", "Lesa Greene" were all fully aware of and knowledgeable of

his residence.  In fact, during the January 2002 proceeding, "J. Davis" had personally handed "J. Anderson"

his ("J. Davis'") business card in the "J. Anderson" Court during that proceeding in the "E. Davis" matter –

This was done because "J. Anderson" and "DHR" had previously made a fuss about the address of "J.

Davis".

The address of "J. Davis' " office listed on said business with the phone number has not changed.

### YEAR –2005

In a February proceeding in the "J. Anderson" Court, "S. Davis" – while testifying under oath, informed the

"J. Anderson" Court that she ("S. Davis") had formally placed the "J. Anderson" Court on notice that she, "S.

Davis", will be residing within seven (7) days to or within the state of Indiana.

"S. Davis" subsequently filed a formal **Notice of Change of Residence** to the state of Indiana.

"J. Davis", again, sought the court's action in initiating or ordering the initiation of the **Interstate Compact**

to have "E. Davis" relocated to the state of Indiana.  During this same period, "J. Davis" had arranged to

have facilities and agencies prepared to assist in placing "E. Davis" in a facility in the state of Indiana.

Instead of initiating the Interstate Compact, the "J. Anderson" Court ordered child support from both parents under Alabama's Rule/32 which other states, having rules similar to Alabama's rule/32, have found that such a rule is improper, and some states, like the state of Indiana, have found that such a rule is not only improper and unfair, but **illegal.**

**YEAR –2006**

During the first part of this year (2006), "J. Davis" filed a petition in the Gary, Indiana Family Court for a hearing on the transfer of the "E. Davis" matter to the Gary, Indiana Family Court from the "J. Anderson" Court in Alabama.

The basis of this petition was that "J. Davis" was, and continued to assert that, the Gary, Indiana Family Court had 'continuing jurisdiction' over the family of "J. Davis", "S. Davis" and their son, "E. Davis".  This contention was, and continues to be, based upon the fact that the Gary, Indiana Court had **GRANTED** the divorce **(AGREED ORDER)** of "J. Davis" and "S. Davis" which included the custody of "E. Davis".

That divorce decree also included the visitation, joint custody of "E. Davis" as well as granting physical custody of "E. Davis" to "S. Davis".  The decree also spoke to the rights of both parents, "J. Davis" and "S. Davis" of "E. Davis", regarding medical care, schooling, and medical insurance regarding "E. Davis".

This petition was served upon "DHR" of Limestone County, Alabama who **never** responded or answered this summons.   Later, in this same year (2006), the matter of the petition spoken of herein was subsequently given a hearing date in the Court of Judge Bonaventura (Senior Judge) of the Family Court of Lake County, Indiana.

Two (2) hearings were held in Judge Bonaventura's Courtroom.  Judge Bonaventura stated during one of these hearings that she, (Bonaventura), would personally call the "J. Anderson" Court in Alabama.   Judge Bonaventura also, during one of these hearings, asked Attorney Teagarten (attorney for the CASA – Court-appointed Special Advocate, appointed by Bonaventura as Special Advocate) to attend these hearings and to determine the status of the matter of "E. Davis" in the "J. Anderson" Court - in Alabama.

Attorney Teagarten, in the second and last of the two (2) hearings held in the Bonaventura Court, reported verbally to the Court that she (Teagarten) had spoken with an individual who, Teagarten stated had informed Teagarten (via telephone) that she (this individual via telephone) was, or is, the attorney for "DHR" of Limestone County, Alabama, and identified herself as Claire Tinney-Jones.

Teagarten stated in this hearing in the Bonaventura Court that Claire Tinney-Jones stated to her (Teagarten) that she (Claire Tinney-Jones) stated that the "J. Anderson" Court had and/or has 'exclusive jurisdiction' over the matter of "E. Davis".   That beyond the statements of the above mentioned Claire Tinney-Jones, nothing further was presented (to the knowledge of "J. Davis" and/or "S. Davis") or was *ever* presented or provided to the Bonaventura Court in these hearings, either through verbal testimony or documents elicited or voluntarily submitted to the Bonaventura Court from Claire Tinney-Jones, "DHR" of Limestone County, Alabama or the "J. Anderson" Court.

Judge Bonaventura **never** brought forth the contents of any verbal or written dialog, that she (Bonaventura), or any member, or appointed member, or delegated individual had with any individual in Alabama regarding the "E. Davis" matter, nor was anything ever disclosed to "J. Davis" or "S. Davis", or to the knowledge of "J. Davis" and "S. Davis" was any such dialog, communications made a record of in these proceedings.

The two (2) hearings held in the Bonaventura Court regarding the "E. Davis" matter were closed by the Bonaventura Court without any record or documentation regarding the alleged jurisdiction of the "J. Anderson" Court.

The only documentation of these two (2) proceedings received by "J. Davis" and "S. Davis" were, and are, the court reporters' transcripts.

"J. Davis" and "S. Davis" were **never** provided any explanation from the Bonaventura's Court as to *how* she, (Bonaventura), came to a decision that the "J. Anderson" Court had jurisdiction, here in 2006, after learning from "J. Davis" and "S. Davis" during these proceedings in the Bonaventura's Court, that the "J.

Anderson" Court had taken a matter of "E. Davis" in the year 2001, and now (in 2006), still asserts that she, "J. Anderson" had jurisdiction over the "E. Davis" matter.   In addition, the Bonaventura Court stated that the divorce that was granted in the Gary, Indiana Family Court to "J. Davis" and "S. Davis" in the year 1997 was "pending".

"J. Davis" and "S. Davis", in 1997 received the divorce decree and this divorce matter, if not granted in 1997, would **not** have been "pending" for nine (9) years, but would have been **closed -** and, that is just procedural.  Thus any contention that a divorce was still pending is completely erroneous and, if stated, is purposefully misleading.   Just prior to the above mentioned Judge Bonaventura proceedings, "S. Davis" sent a motion to the "J. Anderson" Court to send "E. Davis" via the Interstate Compact to the state of Indiana as she, "S. Davis" was, and is, a resident of the state of Indiana.

All during this time, "J. Davis" was a resident and had been a resident of the state of Indiana.

"J. Anderson" in response to "S. Davis'" motion sent an **order** to "S. Davis" to move back to the state of Alabama.

This motion represented multiple motions by, either, "J. Davis" or "S. Davis" to send "E. Davis" via Interstate Compact to the state of residents of the parents of "E. Davis" – that residence being the state of Indiana. This denial and refusal by "DHR" and  "J. Anderson" Court to ignore the residence of the parents ("J. Davis" and "S. Davis") of "E. Davis" and still pursue and collect Medicaid payments from the federal government, child support from the parents, and **SSI** (Supplemental Security Income) disability payments represents *Medicaid fraud* and *theft.*

It has been, and was, determined by the parents ("J. Davis" and "S. Davis") of "E. Davis" that the state of Indiana has comparable and/or superior training, schooling and residential facilities for autistic individuals. Also, in this year (2006) the Alabama courts collusively developed what they have apparently concluded: that they could enforce an illegal child support order by having another judge in Alabama who was

previously not involved in the "E. Davis" matter, one year later of the illegal child support, issue an illegal warrant based on the previous "J. Anderson" Court order of illegal child support.

**YEAR –2007**

The second (2nd) hearing as mentioned above in 2006 regarding the alleged jurisdiction of the Alabama court was, in fact, February of 2007.

**YEAR –2008**

**YEAR –2009**

**YEAR –2010**

**YEAR –2011**

**YEAR –2012**

In this year (2012), the parents of "E. Davis", ("J. Davis" and "S. Davis") learned via a telephone conversation that "S. Davis" had with one of the staff of "Glenwood/Allan Cott" school (who (staff) said in a whispered voice) that "E. Davis" was about to be moved to another facility in that he had been at "Glenwood/Allan Cott" school beyond the school age policy.

The parents of "E. Davis", ("J. Davis" and "S. Davis"), learned from this same above mentioned staff person of "Glenwood/Allan Cott" school, that she (staff person) had heard that there was some efforts by "DHR" from Limestone County to get "E. Davis" adopted.  That she (staff person) was, herself, interested in adopting "E. Davis", but was told by "DHR" from Limestone that she was not eligible to adopt "E. Davis" because it had to be a relative of "E. Davis".

"S. Davis" was informed by a member of her immediate family that "Connie Shaw" ("S. Davis'" sister) was apparently shopping around to help "DHR" get "E. Davis" adopted.  And, in fact, "Connie Shaw" spoke with a cousin of the family to see if that cousin would be open to adopting "E. Davis".   From this information, it appeared that various individuals, cousins and the like of the family were being offered a certain amount of money from "DHR" of Limestone County, Alabama to adopt "E. Davis".

In learning of these facts, the parents of "E. Davis", ("J. Davis" and "S. Davis"), were again emotionally torn by the fact that their son, ("E. Davis"), was on some sort of auction block.

Also, in either the year 2006 or 2007, the parents of "E. Davis", ("J. Davis" and "S. Davis"), learned from the same staff person mentioned above from "Glenwood/Allan Cott" school, that an individual, who had been working over the years in the same housing unit in which "E. Davis" was housed, had passed away from **A.I.D.S**. (Acquired Immune Deficiency Syndrome) – which again continued the on-going and emotional torment of the parents of "E. Davis", ("J. Davis" and "S. Davis").

It is also necessary to indicate that this same person (staff person) of "Glenwood/Allan Cott" school who communicated with "S. Davis" telephonically about the attempted adoption and the move of "E. Davis" as well as informing about the A.I.D.S. individual, also told "S. Davis", telephonically, during a telephone conversation in the year 2011, that "E. Davis" had been taken to the hospital and was for a time in the intensive care unit.

This information only came to the attention of the parents of "E. Davis", ("J. Davis" and "S. Davis"), after the fact.   None of these very serious situations regarding "E. Davis'" environment and residential housing events were ever brought to the attention, officially, by members of the "J. Anderson" Court, "DHR" of Limestone County, Alabama, or officials/administrators of "Glenwood/Allan Cott" school.

The parents of "E. Davis", ("J. Davis" and "S. Davis"), learned of all the above mentioned events in the life of "E. Davis" while  in the care of "DHR", Claire Tinney-Jones", "Lesa Greene", "Glenwood/Allan Cott" School, and under the authority of the "J. Anderson" Court *only* after the particular events.

The parents of "E. Davis", ("J. Davis" and "S. Davis"), learned that "Connie and Howard Shaw" were somehow being used to supplant or replace the parental rights of "J. Davis" and "S. Davis".  The parents believe that "DHR", "Claire Tinney-Jones", the "J. Anderson" Court, "Lesa Greene", and "Connie and Howard Shaw" have worked collusively to take over all matters concerning "E. Davis" – not withstanding

that the natural parents of "E. Davis", "J. Davis' " and "S. Davis' ", parental rights have never been judicially terminated.

There is also the question of residual parental rights that can be said to have been at issue in the matter of "E. Davis".

<strong>YEAR –2013</strong>

<strong>YEAR –2014</strong>

<strong>YEAR –2015</strong>

The Plaintiffs, "J. Davis" and "S. Davis", set forth above – from the year 2001 to 2015, highlights of the "E. Davis" matter in the courts of "J. Anderson" of Athens-Limestone County, Alabama and Judge Bonaventura of the Juvenile Family Court of Lake County, Indiana.

These highlights cover significant events in the "E. Davis" matter.

"E. Davis", from the year 2001 to the present year (2015), has been harmed, both physically, emotionally, psychologically, socially, and deprived of a relationship with his *natural* parents, "J. Davis" and "S. Davis".

The physical harm - set forth in these chronological highlights – including those physical harms set forth in the preceding preliminaries which show physical, psychological, emotional harm caused by the actions, and lack of actions, by "Athens City Schools & Athens City School Board of Education", and "Glenwood/Allan Cott" school - can be said to be the cause of the present physical, emotional, psychological condition of "E. Davis".

It is the belief of "J. Davis" and "S. Davis" – parents of "E. Davis", that based on expert examination, both physical and psychological (autism) that "E. Davis' " present condition has been, and was, brought about over the years, in that "E. Davis" was said to be only mildly autistic and had suffered no physical trauma leading to his present physical condition until "DHR" – through the aid of the "J. Anderson" Court took **illegal** physical custody of "E. Davis" and placed "E. Davis" into the facility known as "Glenwood/Allan Cott" school and where he ("E. Davis") was allowed to remain even after the quality of care provided to the

residents of "Glenwood/Allan Cott" school had severely declined including the control of the residents by the staff and administrators of "Glenwood/Allan Cott" school included the use of tasering and excessive medications.

Additionally, the parents of "E. Davis", "J. Davis" and "S. Davis", learned that in 2012, while "E. Davis" was a resident of "Glenwood/Allan Cott" school, he ("E. Davis") was attacked by a person who was said to have been in the restroom with him such that he ("E. Davis") had to receive stitches in the back of his head.

This also enhances the present psychological, mental deterioration of "E. Davis".

Again, the parents of "E. Davis", "J. Davis" and "S. Davis", set forth the fact that "E. Davis" was inclined to follow the traits of autism i.e. SIBs (Self Inflicted Behaviors) which mostly included the hitting in his head, notwithstanding the fact that "J. Davis" and "S. Davis" brought to the attention of the staff of "Glenwood/Allan Cott" school that other such facilities in the country including one in the state of Illinois used football-type helmets to help reduce the harm suffered by such SIBs.

The parents of "E. Davis", "J. Davis" and "S. Davis", became familiar with the recent research done and being done on the pro-football players which brought out the fact that many such pro-football players – after almost twenty (20) years following retirement from the game, found that they suffered some severe brain damage.

The **NFL** continues to do wide range research in this area.

In further summary of these years, the parents of "E. Davis", "J. Davis" and "S. Davis", have been exhausted emotionally, psychologically, physically, mentally, socially and alienated from their son, "E. Davis".

During the last year, Plaintiffs "J. Davis" and "S. Davis" have done extensive research to determine the causes of action they might have against the named defendants in this complaint.

It is the belief that the ongoing kidnapping, Medicaid fraud, defamation, theft of the property of "J. Davis" and "S. Davis", (**via** recent garnishment of wages), and the present condition of "E. Davis" presents an ongoing and present harm against "E. Davis", "J. Davis" and "S. Davis".

It is the belief of plaintiffs, "J. Davis" and "S. Davis", that the allegations and claims – partially set forth above,  are and have been enabled by the Defendants, "J. Anderson", "DHR", "Claire Tinney-Jones", "Lesa Greene", "Dr. Sarrels", Dr. Mcdanal", "Dr. Sprinkle", staff and administrators of "Glenwood/Allan Cott" school and "Athens City Schools & Athens City School Board of Education" through the collusive use of erroneous information and agreement to sign *fraudulent* documents by "Connie and Howard Shaw".  And, through the same use of the cooperation in these illegal acts by "Louise Collier".

Much of the erroneous information solicited from sources by "DHR" was, and should have been, clearly erroneous and false and should have been and, in fact, Plaintiffs "J. Davis" and "S. Davis" believe was known and, should have been known, by the "J. Anderson" Court merely by following **standard procedural** policy.

Judicial policy in any court of the United States of America would have allowed the "J. Anderson" Court to become aware of the erroneous materials used to continue the matter of "E. Davis" in the "J. Anderson" Court.

Any review of official documents of any court rather than the acceptance of *verbal statements* would have caused any court, including the "J. Anderson" Court and the Bonaventura Court to have **official knowledge** of the status of the "E. Davis" matter and the divorce of "J. Davis" and "S. Davis" granted in the state of Indiana.   Due process in the "J. Anderson" Court would have required a full evidentiary hearing on any issues brought to the "J. Anderson" Court by "DHR".

 Such due process to date has been denied to "J. Davis" and "S. Davis" in the matter of "E. Davis".   It is the belief of "J. Davis" and "S. Davis" that the request for copies from the courts file in Indiana was available up

until it was sent down to the state of Alabama ("J. Anderson" Court), thus far "J. Davis" and "S. Davis" have

not been able to obtain records of the divorce that was filed in the state of Indiana court.

It is the concern that the integrity of the file has been tampered or will be tampered with by individuals

attached to the "J. Anderson" Court.

Based upon the methodology and procedures used by the state of Indiana courts that a record or some

record of the proceedings in the state of Indiana will be found and acquired by the plaintiffs and, if such

recorded documents from the state of Indiana differ from the entire file that was sent to the "J. Anderson"

Court, the plaintiffs will be seeking additional **criminal** charges against the "J. Anderson" Court for illegally

tampering with judicial documents clearly for purpose of sabotaging plaintiffs' causes of action.

It is the understanding and recently acquired knowledge that the salaries of judges in Athens-Limestone

County, Alabama far surpass the salaries of other judges in like locations in the state of Alabama.  This – in

light of the fact, that recently the Chief Judge of the Supreme of the State of Alabama (Roy Moore)

circulated a document voicing his concern about the budget problem of state court judges in the state of

Alabama.

It is also noted by plaintiffs, "J. Davis" and "S. Davis", that multiple "non-profit" organizations in Limestone

County and particularly Athens, Alabama have, and is, receiving more governmental funds than private

funds, which is legally improper in order maintain a non-profit status.   It is further noted by the plaintiffs, "J.

Davis" and "S. Davis", that "J. Anderson", Marilyn Batts, "DHR's" present and former administrators of the

Limestone County "DHR" have been, and presently are, administrators or board member of these referred

to "non-profit" organizations.   Many of these non-profit organizations were formed for the purpose of

ostensibly providing services to juvenile cases coming through the "J. Anderson" Court.  That the "J.

Anderson" Court has been, or is, assigning cases coming through her, "J. Anderson's" Court to these same

"non-profit" organizations.

It is the belief of the Plaintiffs, "J. Davis" and "S. Davis", that funds garnered from illegal receipt of Medicaid funds, government funds, and other state funds coming for the purpose of servicing the cases coming through the "J. Anderson" Court are being distributed in such a manner that significant portions of these funds are being placed in - what is generally termed in accounting jargon as a - **General Fund Account,** which allows such funds to be removed and re-distributed such that many of the funds find their way into the budget allocated to pay members of the "J. Anderson" Court (i.e. salaries, including Judge's salaries, salaries of staff members, and staff members of "DHR") and also used to pay for individuals cooperating with "DHR" as substitute parental figures including a substitution of parental figures for "E. Davis" provided by "Connie and Howard Shaw" and "Louise Collier".

The accounting of funds belonging to individuals involved in cases brought to the "J. Anderson" Court under review will indicate the source of any funds said to belong to these individual cases - Medicaid, governmental funds, and supplemental funds -should be traced to the fund's ultimate distribution or use.

Plaintiffs "J. Davis" and "S. Davis" learned that the salaries of "J. Anderson" were approximately $50,000.00 in the year 2001 and increased to more than $111, 000.00 (plus almost $5,000 from Limestone County) in the year 2006, in spite of "budget problems" – cited by Chief Judge Roy Moore. Judge Jerry Batts' (husband of Marilyn Batts) salary in the year 2006 was cited as more than $111,000.00. According to Athens News Courier, Limestone County District Judges Jeanne Anderson and Jerry Batts draw more than $111,000 per year. They top out in pay at $138,716 in 12 years. Judge Anderson draws another $4,804.80 in county supplements.

Justice Ginsburg's Supreme Court decision, in 1999, indicated that placing a mentally ill person in a community setting is far better than an institutional setting as the 'least restrictive environment'. This point is made - that Glenwood being almost a thousand (1,000) miles away from parents ("J. Davis" and "S. Davis") was more institutional than having Eric ("E. Davis") placed in Indiana where this state (Indiana) has more community houses for autistic persons who have aides to take them (autistic persons)

into the community and the school NISEC (Northwest Indiana Special Education Corporation) is a school like "Glenwood/Allan Cott" in that it is a day school.  The only difference in the matter of "E. Davis" is that "E. Davis" would have been with his *natural* parents ("J. Davis" and "S. Davis") rather than institutionalized in the state of Alabama.   Also, "E. Davis" would be *grandfathered* in by the state of Indiana from Alabama.

**Jurisdiction and Venue**

Jurisdiction is proper in this Court pursuant to **28 U.S.C., §1332(a)(2)** because **(1)** John H. Davis, Shelia D. Davis are citizens of the State of Indiana, Eric S. Davis by *natural* parents of Eric S. Davis are citizens of the State of Indiana, Eric S. Davis, born in the State of Indiana;  said parents never losing or having parental rights terminated, whereas **"DHR"**, Athens City Schools & Athens City School Board of Education, Glenwood Incorporated/Allen Cott School, Judge Jeanne W. Anderson, Judge James W. Woodroof, Dr. Sarrels, Dr. Sprinkle, Dr. Mcdanal, Lesa Greene, Louise Collier, Claire Tinney-Jones, Dr. Tom B. Vaughan, and Connie & Howard Shaw are citizens of - and/or primarily located in the State of Alabama, and 28 U.S.C. §1331 because the Plaintiff(s) have been denied a hearing on issue of custody of their minor child, Eric S. Davis pursuant to their petition regarding change of circumstances, and Athens Judge (Defendant) Anderson refusing or failing to render a ruling on numerous petitions by Plaintiff, preventing a substantive matter on which to file an appeal, in addition to a *hostile* environment in the state of Alabama regarding seeking redress in any court of Alabama.

Additionally, the Athens/Limestone County, Alabama Court, by Defendant, Judge Jeanne W. Anderson, accepted petition filed by **"DHR"** alleging abandonment of minor, Eric S. Davis, however, never held an evidentiary hearing to determine if parent(s) abandoned said minor child and gave *"temporary custody"* of said child to **"DHR"** and continues this "temporary custody" every six (6) months for more than ten (10) years where *neither* parents are now residents of the State of Alabama and during all times relevant, the father, Plaintiff, John H. Davis was **not** a resident of the State of Alabama – but a resident of the State of Indiana – both parents being *now* residents of the State of Indiana.

That, Defendant Judge Jeanne W. Anderson, blatantly disregarded and ignored requirements to give *full faith and credit* to The Lake Superior Court, Lake County, Indiana to the divorce decree of the natural parents of the above said minor Eric S. Davis, where the father, Plaintiff John H. Davis, had been

granted visitation including the said minor spending time, holidays, birthdays, etc. alternating in the home of the said father in the State of Indiana.

That, with the knowledge that *neither* parent was any longer in the State of Alabama, Defendant Judge Jeanne W. Anderson did **not** follow the requirements , along with **"DHR"**, of the Interstate Compact for Placement of Children relating to the minor, Plaintiff, Eric S. Davis.

The Court of "J. Anderson" denied, and continues to deny, plaintiffs' opportunity to oppose the Court's action and inaction due to the Court never acquiring any jurisdiction and/or authority to affect any aspect of "E. Davis' " welfare or custody;  Denial of "J. Davis' " request for transcripts of the first initial meeting of "J. Anderson's" Court in this matter;  Denial of request to compel, answers to interrogatories served on "DHR";  Denial of request to compel, production of documents served on "DHR"; Denial of request for complete petition, materials, alleged evidence, exhibits filed with the Court by "DHR".

Therefore "J. Anderson's" Court *violated,* and continues to violate, Plaintiffs' right to confront accusers, violation of plaintiffs' due process rights under The Fourth (4th) Amendment of the United States Constitution and equal rights protection under The Fourteenth (14th) Amendment of the United States Constitution.  (**42 U.S.C. §1983).**  Additionally, plaintiffs' First (1st) Amendment Rights of the United States Constitution have been, and continues to be, violated regarding the religious training and religious exercise of their son, Eric S. Davis.

Finally, **(2)** the amount in controversy exceeds $75,000 exclusive of interest and costs.

## Common Allegations

1.      At all times material hereto, Plaintiffs John H. Davis ("J. Davis"), Shelia D. Davis ("S. Davis"), and Eric S. Davis ("E. Davis", through his parents "J. Davis" and "S. Davis") were residents of Lake County in the state of Indiana.

2.      At all times material hereto, Defendant Alabama Department of Human Resources of Limestone County ("DHR") was an agency in the state of Alabama.

3.      On or about December 8, 2001, Defendant "DHR" filed and petitioned the Court of Judge Jeanne W. Anderson ("J. Anderson") against Plaintiff "S. Davis" alleging abandonment of the, then, minor "E. Davis".  No evidentiary hearing or ruling was ever made regarding the above allegations.

4.      The above-stated petition of abandonment was subsequently placed in the Federal and State Parent Locator Service about absent parents.  This dissemination constitutes defamation of both the parents, Plaintiffs "J. Davis" and "S. Davis".  This characterization was made among a substantial and respectable segment of the community in which Plaintiffs lived and worked.

5.      This harm has substantially affected both Plaintiffs' career income and continues to affect their career income to the present day.

6.      Defendant "DHR", working collusively with Athens City Schools & Athens City School Board of Education ("Athens City Schools/Board") caused the placing of "E. Davis" into Glenwood Incorporated/Allen Cott School ("Glenwood/Allen Cott") where application was made by this Defendant "DHR" for Medicaid and SSI benefits for "E. Davis" constituting fraud in that this Defendant "DHR" had knowledge that "E. Davis" was not qualified for such benefits ("E. Davis" had, in effect, COBRA Insurance).

7.      The Defendant "DHR" by the above action collusively caused, through Defendant "J. Anderson" and Defendant Judge James W. Woodroof, Jr., ("J. Woodroof") the property of Plaintiffs, "J. Davis" and "S. Davis" to wit garnishment of their salaries ("J. Davis" – Lake County, Indiana)("S. Davis" – J. C. Penney, ITT, and Purdue University – Northern Indiana)      ("S. Davis" – Approximately 12/2006,

approximately 10/2007, approximately 01/2009) ("J. Davis" – approximately 2008-2009).  This action constitutes theft of the properties of said Plaintiffs in that it was intentionally done to permanently take the properties of said Plaintiffs.  This garnishment was purported to be for child support of "E. Davis" held by the Defendants "DHR", "J. Anderson", and "J. Woodroof" without the authority or proper jurisdiction.

8.      Defendant "DHR", individually and collectively with other named defendants, obtained federal and state funds for the minor, and presently adult, "E. Davis" without proper authority or legal authorization to which said funds have been distributed among all named defendants set forth in the caption of this matter, including said Defendant "DHR", which therefore constitutes ab initio, in the matter of "E. Davis", violations set forth under **Racketeer Influenced and Corrupt Organizations** (RICO) Act.  This includes program fraud or program bribery (18 U.S.C. § 666) in that this defendant and other defendants named in the caption used and continue to use such funds to bribe and entice other individuals to support the illegal activities regarding the holding of "E. Davis" in the state of Alabama, which is also a Federal crime under 18 U.S.C. § 666.  This violation continues to the present.

9.      Defendant "DHR" by their actions in this matter, individually, collectively and collusively with other above named defendants did cause the kidnapping of "E. Davis" which acts continue to the present; That Defendant "DHR" has caused the illegal use of federal funds in this matter which relates to the (Corporate and Criminal Fraud Accountability Act) whistleblower statute SARBANES-OXLEY ACT OF 2002 18 U.S.C. §1514A (Relator);  Defendants "DHR" individually, collectively, and collusively with other above named defendants have interfered with parental rights both initially and to the present causing continued emotional distress and harm to said Plaintiffs, "J. Davis", "S. Davis" and "E. Davis";   Defendant "DHR", individually, collectively, and collusively with other named defendants, have caused alienation of affection between Plaintiffs "J. Davis", "S. Davis" with their son, "E. Davis" causing extreme emotional harm and distress and this continues to the present;  Defendant "DHR", individually, collectively, and collusively with other named defendants, have caused alienation of familial relations between Plaintiffs "J. Davis", "S.

Davis", and "E. Davis" from the beginning of the "E. Davis" matter and continuing to the present;  Defendant "DHR", individually, collectively, and collusively with other named defendants, have by the filing of false and unsubstantiated petition at the beginning of the "E. Davis" matter have caused abuse of process collusively abuse of judicial power and this abuse of process and abuse of judicial power continues to the present in that the plaintiffs have not been able to have "DHR" and/or the courts in Alabama to reverse or correct the continuing abuse of process and the abuse of judicial power to the present;  Defendant "DHR", individually, collectively, and collusively with other above named defendants, have caused battery to the minor "E. Davis" to wit continued SIBs (self inflicted behaviors - hitting himself in the head with a closed fist while minor was located at "Glenwood/Allen Cott" school – which caused deterioration of the said minor's autistic condition and continues to the present the deterioration of said "E. Davis' " autistic condition.  The effects of said SIBs could have been lessened by the use of helmets.  The effects of such injury to the head have been shown to increase over years, **(See EXHIBIT 22 – NFL)**, all to the continuing physical and mental harm to "E. Davis"; Defendant "DHR", individually, collectively, and collusively with other above named defendants, interfered and interferes with Plaintiffs', "J. Davis' " and "S. Davis' " parental custody and visitation initially and to the present; Defendant "DHR", individually, collectively, and collusively with other above named defendants, initially and intentionally to the present have, and are, causing the loss of society and companionship of "E. Davis" with his parents "J. Davis" and "S. Davis" all to the continued emotional distress;  Defendant "DHR", individually, collectively, and collusively with other above named defendants, having a duty to properly care for the minor and presently adult, "E. Davis", having the duty to properly care for the said "E. Davis" breached the said duty, thus constituting negligence in said duty causing initial deterioration and continuing deterioration to the present of "E. Davis' " autistic condition;  Defendant "DHR", individually, collectively, and collusively with other above named defendants, caused initially and to the present - by the placing of said "E. Davis" without proper legal authority into residential facilities, the overuse and misuse of medications initially and presently, administered by physicians under the control of

and the direction of the Defendant "DHR";  Defendant "DHR", individually, collectively, and collusively with other above named defendants, have solicited medical records from physicians in the matter of "E. Davis" causing said physicians, through the prompting and encouragement of the Defendant "DHR" to violate the **HIPAA** Act,  Health Insurance Portability and Accountability Act (HIPAA)) relating to medical records; Defendant "DHR", individually, collectively, and collusively with other above named defendants, and particularly Defendants "J. Anderson" and "J. Woodroof", violated and violates Plaintiffs' ("J. Davis' ", "S. Davis' ", and "E. Davis's"), 1st Amendment rights of the United States' Constitution in the exercise of their religious beliefs - in that the minor, and presently mentally handicapped adult, "E. Davis" has been illegally kept initially and to the present without judicial jurisdiction from his parents', Plaintiffs' "J. Davis' " and "S. Davis' " religious practices;  Defendant "DHR", individually, collectively, and collusively with other above named defendants particularly with "J. Anderson" and "J. Woodroof", have violated and violates plaintiffs' Equal Protection Rights under the 14th Amendment of the United States Constitution, in that, plaintiffs have initially and to the present been denied a full evidentiary hearing in regards to the continued physical holding of "E. Davis" and denial of the transfer of "E. Davis" to the state of Indiana pursuant to the **UCCJA** (Uniform Child Custody and Jurisdiction Act) and **UCCJEA** (Uniform Child Custody Jurisdiction and Enforcement Act) and the **PKPA** (Parental Kidnapping Prevention Act) of 1980 (28 U.S.C. § 1738A), all to the continued extreme emotional distress and harm of all the said plaintiffs;  Defendant "DHR", individually, collectively, and collusively with other above named defendants, particularly with "J. Anderson" and "J. Woodroof" , initially, continually, and to the present, interfered and interferes with the residual parental rights of the Plaintiffs, "J. Davis" and "S. Davis" thereby causing intentional, emotional, and physical harm which included the prevention of Plaintiffs, "J. Davis" and "S. Davis" to prevent harm to their son, "E. Davis" which included tasering (battery) by individuals at "Glenwood/Allen Cott" school as a means to control autistic behavior of "E. Davis" also causing surgical procedures (battery) to be performed on "E. Davis" without authorization and authority by Plaintiffs, "J. Davis" and "S. Davis", parents of "E. Davis".  This action

also constituted battery, criminal and civil, and constitutes the continual deterioration of "E. Davis' " autism

then and up to the present; Defendant "DHR" - individually, collectively, and collusively with other above

named defendants, caused ongoing forgery to be committed for the purposes of initiating and applying for

funds from Medicaid and SSI (Supplemental Security Income), including State and Federal Supplemental

funds for individuals reportedly under the care and authority of "DHR", "J. Anderson" Court, and the state of

Alabama through individuals put forth by the Defendant "DHR" and the above mentioned courts

representing themselves to have parental authority over the said "E. Davis".  This action (forgery) was

initially started at the outset of the "E. Davis" case and continues to the present via the monthly, bi-annual,

and annual renewal of Medicaid, SSI, state, and federal funds for "E. Davis".  This action (forgery) is also

covered under False Claims Act.  (See False Claims Act marked as EXHIBIT 32). These actions also

includes mail fraud and wire fraud (**18 U.S.C. 1341 and 1343** )( **18 U.S.C. 286** )(**18 U.S.C. 287)**; Defendant

"DHR" - individually, collectively, and collusively with other above named defendants, had a fiduciary duty

by the act of taking the physical custody and control of "E. Davis", to protect his physical and mental

wellbeing from the initiation of the "E. Davis" case and continuing to the present.  The Defendant "DHR" has

breached, and continues to breach this fiduciary duty in that numerous acts and occasions of physical harm

have been perpetrated on "E. Davis" and continues to be perpetrated on "E. Davis";  Defendant "DHR" -

individually, collectively, and collusively with other above named Defendants, has caused perjury to be

committed by individuals who were encouraged, bribed, and coerced into signing documents under the

penalty of perjury which falsely purported to give them legal authority for the purposes of the care and

residential funding for "E. Davis".  This act (perjury) by "DHR" and particularly by the "J. Anderson", "J.

Woodroof", and Lesa Greene ("L. Greene" – appointed illegally and erroneously as Guardian ad Litem by

the "J. Anderson" Court) and Claire Tinney-Jones ("C. Jones"), attorney for the Defendant "DHR" –

constitutes suborning perjury;  Defendant "DHR" - individually, collectively, and collusively with other above

named defendants, caused initially (on the outset of the "E. Davis" case) and to the present mail fraud to be

committed, in that, individuals encouraged by bribes and coerced by Defendant "DHR" to submit numerous false documents to agencies via the United States mail for the purposes of illegally obtaining funds from Medicaid, SSI, federal, and state supplemental funds for handicapped individuals said to be in the control and care of the Defendant "DHR"- including "E. Davis"; Defendant "DHR" - individually, collectively, and collusively with other above named Defendants, caused individuals to falsely identify themselves as the parent or parents of "E. Davis" for the purposes of collecting funds for "E. Davis". This constitutes aggravated identity theft and continues to the present; Defendant "DHR" - individually, collectively, and collusively with other above named defendants, aided and abetted each other in the acts of criminal and civil wrongs as is, and will be, set forth in this Complaint including all of the previously enumerated facts. And, this continues to the present;  Defendant "DHR" - individually, collectively, and collusively with other above named defendants, knew and were aware of the collusive acts, criminally and civilly as enumerated, and to be enumerated, in this Complaint, prior to and subsequent to such acts being committed which constitutes misprision.

## CLAIMS

**A.**

**"DHR"** - (Also Administrators, Directors, Supervisors, Caseworkers, and Staff – Individually and Collectively);

 **"J. Anderson**" - in her (Judge Jeanne W. Anderson's) individual capacity Also her (Judge Jeanne W. Anderson's) Staff and Administrators – Individually and Collectively;

**"J. Woodroof"** - in his (Judge James W. Woodroof, Jr.'s) individual capacity, Also his (Judge James W. Woodroof, Jr.'s) Staff and Administrators – Individually and Collectively;

**"Athens City Schools" & "Athens City School Board of Education"**- (Also Administrators, Directors, Superintendents, Coordinators, and Staff – Individually and Collectively);

**"Glenwood/Allen Cott"**- (Also Administrators, Directors, Superintendents, Coordinators, and Staff – Individually and Collectively);

**"C. Mcdanal"** – Individually and Collectively;

**"S. Sarrels"** – Individually and Collectively;

**"A. Sprinkle"** – Individually and Collectively;

**"C. Shaw" & "H. Shaw"** – Individually and Collectively;

**"L. Greene"** – Individually and Collectively;

**"C. Jones"** – Individually and Collectively;

**"L. Collier"** – Individually and Collectively;

**"Dr. Vaughan"** – Individually and Collectively;

**"Angela Hurtubise"** – Individually and Collectively.


10.     Plaintiffs restate and plead paragraphs 1 – 9 above and incorporate the same by reference as though fully set forth herein.

## COUNT I

## DEFAMATION

11.      At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within letter A herein, caused a defamation and slander to be published by

their circulating allegations that Plaintiffs, "J. Davis" and "S. Davis" abandoned their son, "E. Davis".  This

slander and defamation was in the form of a petition filed with the "J. Anderson" Court which was never fully

resolved, litigated, or vacated.  This defamation and slander was also circulated by staff of the Defendants

to the local community in Athens – Limestone County, Alabama and to family, neighbors, relatives and to

the church attended by Plaintiffs in Huntsville, Alabama, circulated through the classmates of "E. Davis",

teachers, congregation of the Oakwood Seventh-day Adventist Church/College, by innuendo, per quod, per

se,  known by the Defendants to be false lowering the character and reputation of Plaintiffs in a substantial

part of the community known by Plaintiffs.  This defamation was submitted to the national database used by

employers, schools, credit bureaus, background checks which continue to expose Plaintiffs to ongoing

character assassination - to injury of their careers, financial stability, and wellbeing – physical and

emotional health.  These material facts, as set forth herein under Count I, were caused by the individual

acts of the Defendants and/or the collusive acts of the Defendants, both directly and by **aiding and**

**abetting** each other.  These material facts cannot be controverted – particularly the posting of Plaintiffs in a

national database used by employers, schools, credit bureaus and  background checks as individuals who

abandoned their child (Eric Davis).

## COUNT II

## FRAUD

12.      At all times material hereto (on or about January 2002 through the present date),

Defendants, as set forth above within letter A herein, committed and continue to commit fraud by way of

soliciting funds from federal agencies, state agencies, Medicaid, SSI, ostensibly for the care of "E. Davis"

who with the ostensible authority of the "J. Anderson" Court was placed into the residential school of

"Glenwood/Allan Cott" in Birmingham, Alabama.  This fraud was, and is, perpetrated by officers and staff

members of the said Defendants, as set forth above within letter A herein, by seeking said funds without

proper authority, in that, said funds were known to be unavailable for the care of "E. Davis" through any

persons, agencies, or courts not having a proper jurisdiction over the person of "E. Davis".    Additionally,

said funds were improperly solicited by said Defendants who had the knowledge that the parent of "E.

Davis", at the time of said Defendants' request for such funds, had her ("S. Davis' ") own insurance policy

under COBRA -covering both, Plaintiffs, "S. Davis" and "E. Davis".    Qualification for Medcaid requires that

there are no insurance policies in effective for the person of "E. Davis".    Each application for Medicaid

funds must be renewed annually and each receipt of Medicaid funds are monthly, thus, over fourteen (14)

years of applications of Medicaid funds represents fourteen (14) separate acts of fraud, civil and criminal,

and each receipt of Medicaid funds monthly represents over fourteen (14) years, [twelve (12) times (X)

fourteen (14)], representing one hundred and sixty-eight (168) separate acts of civil and criminal fraud.

This fraud is also exemplified by the fact that all applicants for Medicaid must also prepare and submit a

PARIS Database form which is mandated by law to prevent duplication of and/or receipt of funds,

fraudulently.  The submission of this form (PARIS DB request-check form) cannot be "opted-out" however

this was exactly what Defendants purposefully did.  Each Defendant, either directly or indirectly,

participated in this fraud by their (Defendants') actions by **aiding and abetting** the acts of each.  These

material facts cannot be controverted, particularly the "opting-out" of the legally-mandated submission of

the (PARIS DB request-check) form.  Plaintiffs have been, and are being, injured and detrimentally

affected, in that, Defendants – individually and collectively, have been and are illegally using the judicial

system to keep the illegal custody of Eric Davis in the state of Alabama motivated by the fact that these

illegally-obtained Medicaid funds are partially diverted to supplement the Defendants' payrolls, salaries and

other monetary gain.  **(See EXHIBIT 15 and EXHIBIT 27).**

## COUNT III

## RELATOR

13.     At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within letter A herein, caused federal funds to be illegally diverted from

Medicaid, SSI, funds solicited from state and federal supplemental programs for handicapped individuals

which were solicited for the purported purposes and use for the care of "E. Davis" in the physical custody of

the Defendants,  and were diverted by the Defendants, illegally distributed, to the use of non-profit agencies

controlled and directed by the Defendants, also to payroll of the some of the Defendants, to the monetary

gain of some of the Defendants – all such acts being directly or individually committed and/or being **aided**

**and abetted** by all Defendants to each - and for funding several construction and buildings, facilities for

housing "DHR", "Athens City Schools/Board", and Limestone County Courthouse.

14.     The above stated facts are also made under the Whistleblower statute

(Relator)(SARBANES-OXLEY ACT OF 2002 – Corporate and Criminal Fraud Accountability Act Section

806, Section 922(b) and (c) Section 929A of the Dodd-Frank Wall Street Reform and Consumer protection

Act), and as a criminal violation under Title 18 Section 666.  These material facts cannot be controverted, in

that, the funds –fraudulently received by the Defendants, are and can be traced to the illegal **receipt** said

funds.

## COUNT IV

## KIDNAPPING

15.     At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within letter A herein, kidnapped and caused to be kidnapped and

participated in the kidnapping of the *then* minor child, "E. Davis", (now a handicapped adult), by their

(Defendants') act of taking physical custody of the said "E. Davis" using the ostensible authority of The "J.

Anderson" Court.  That said kidnapping has continued successively by the act of receiving financial support

for "E. Davis" from *federal* and *state funds* purportedly for the care of "E. Davis" and e.g. SSI and Medicaid

on a monthly basis from 12/2001 to the present.  Each such act constitutes a separate and individual act of

kidnapping.  This is supported by the refusal of the Defendants to follow the Uniform Child Custody

Jurisdiction Act **(UCCJA)**, the Uniform Child Custody Jurisdiction and Enforcement Act **(UCCJEA)**, the

Parental Kidnapping Prevention Act of 1980 **(PKPA)** (Pub.L. 96–611, 94 Stat. 3573, enacted December 28,

**1980**; 28 U.S.C. § 1738A) and the Interstate Compact for the Placement of Children **(ICPC)** as well as the

failure of The "J. Anderson" Court to give *full faith and credit* to the courts of the state of Indiana regarding

the rights of both parents set forth in a divorce decree in 1997.  These acts by Defendants - individually,

collectively, and by **aiding and abetting** each other, have injured and continue to injure and affect the

parental rights of Plaintiffs, "J. Davis" and "S. Davis" as well as the rights of "E. Davis" and continue to

cause severe mental and financial stress. (This constitutes *implied* and *expressed* kidnapping as a Federal

offense preventing "E. Davis" from being reunited with his parents in the state of Indiana).  These acts, as

set forth herein, control the acts of parents, entities such as child protective services (in the present case

"DHR") and the courts.  These material facts, as set forth in this count, cannot be controverted and sets out

a Complaint with substantial merit and represents a clear violation of Plaintiffs' due process rights under the

*United States Constitution.* (See **EXHIBIT 25**, See **EXHIBIT 47**, See **EXHIBIT 50**).

<u>COUNT V</u>

<u>THEFT</u>

16.     At all times material hereto, approximately December 2006 to January 2007,

approximately September 2007 to March 2008 (09/07 – 03/08), approximately January 2009 to August

2009 (01/09 – 08/09), Defendant "DHR" garnished salary of "S. Davis" from J. C. Penney (Indiana), ITT

(Indiana), Purdue Univ. (Indiana) without proper legal right or authorization ostensibly as child support for

"E. Davis" wherein there was no legal jurisdiction or custody of "E. Davis" by "DHR";  Defendant "DHR"

garnished wages of "J. Davis" from the Public Defender's Office – Lake County, Indiana, from

approximately January 2008 to September 2010 (01/08 to 09/10), without legal right or authorization

ostensibly for child support for "E. Davis" wherein there was **no** legal jurisdiction or custody of "E. Davis" by

"DHR";  These garnished properties were taken from "S. Davis" and "J. Davis" with the intent to

permanently deprive "S. Davis" and "J. Davis" of said property.  These acts have affected the credit

standing of "J. Davis" and "S. Davis" to the present.  This includes the intentional taking of "S. Davis' " and

"J. Davis' " funds from their Social Security Accounts to the present date.  These Acts were committed by

the Defendants, as set forth in Letter A herein, and **aided and abetted** by all Defendants.  These acts have

injured Plaintiffs to the monetary loss of said garnished funds, and all such acts were either the direct acts

of the Defendants or aided and abetted by the Defendants.  These acts caused injury to the Plaintiffs in the

state of Indiana.  These material facts cannot be controverted.

## COUNT VI

## RICO

17.      At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within Letter A herein, Defendant "DHR", in concert with all other captioned-

named defendants, individually and collectively participated in acquiring funds from federal, state, Medicaid,

SSI, and garnished funds as set forth in Count V above under the guise of using said funds for the 'care of'

and 'matter of' "E. Davis" which, upon acquiring said funds, were to an extent, diverted to the personal use

of said Defendants including their salaries, their functioning budget of the offices of "DHR", the "J.

Anderson" Court, Athens City Schools and Athens City Board of Education, the partial course of

construction of several public buildings in Athens-Limestone County, Alabama , (e. g. new Athens

Limestone County Courthouse, new "DHR" building, new Athens High School, new Athens City Schools

Board of Education building, new Athens Police Station and funding of quasi 501 (c)(3) and 501 (c)(4) "non-

profit" entities which include several named Defendants as officers and board members of said non-profits

– i.e. "J. Anderson", "C. Jones", Marilyn Batts, Tracey Sherrill ("DHR"), "Caroline Page" ("DHR"), Shannon

Cameron ("DHR") and Angela Hurtubise ("DHR");  This illegal diversion and distribution of said funds

constitutes Racketeer Influenced and Corrupt Organizations (RICO) -(18 U.S. Code Chapter 96).

Plaintiffs have been, and continue to be injured and harmed by these acts, in that, the Defendants

continue to be motivated by illegal economic gain in preventing the transfer of "E. Davis" under the

Interstate Compact to the state of Indiana.  These material facts cannot be controverted and represent

clear meritorious Complaint.  (**See EXHIBIT 41, See EXHIBIT 39**).

<u>COUNT VII</u>

**<u>ALIENATION OF AFFECTION/ALIENATION OF FAMILIAL RELATIONS/LOSS OF SOCIETY</u>**

**<u>AND COMPANIONSHIP</u>**

18.     At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within Letter A herein, caused the affections & companionship between "E.

Davis" and his natural parents, "J. Davis" and "S. Davis" to be adversely affected in that Defendant, "DHR",

instituted an unfounded petition in the "J. Anderson" Court which resulted in the removal of the physical

custody of "E. Davis" from the legal physical custody of the natural parents, "J. Davis" and "S. Davis".   This

resulted in the Defendants instituting and establishing a relationship between "E. Davis" and his aunt and

uncle, "Connie and Howard Shaw", which did **not** exist prior to this action by "DHR".  This relationship is, to

this day, continuing by the encouragement, bribery, and payment to "Connie and Howard Shaw" to

continue inserting themselves between the natural parents, "J. Davis" and "S. Davis", and their son, "E.

Davis" for the purposes of creating a **false** record that "Connie Shaw and Howard Shaw" are representative

of the proper and legal parental relationship of "E. Davis"; "DHR" has caused "J. Davis" and "S. Davis" to

lose the familial guidance regarding the ancestral history and culture of "J. Davis" and "S. Davis" with their

son, "E. Davis", including the religious practices of "J. Davis and "S. Davis".  This has, and continues to

have, emotional and stressful effects on "J. Davis" and "S. Davis" as well as "E. Davis" in that "E. Davis"

has been and is being emotionally conflicted as to his natural parents.  This also constitutes the loss of

society between the natural parents of "E. Davis", ("J. Davis" and "S. Davis"), to provide the type of society

and quality of life important to the family concept practiced by "J. Davis" and "S. Davis" which includes a

rich historical and a rich heritage and culture of "J. Davis" and "S. Davis".  "J. Davis' " heritage and culture

includes within three generations – Hispanic (Panamanian & Spain), Eastern (Pakistani), Native American

(Dakota), African (Egyptian), Anglo (Norwegian);  Cultural heritage which includes "J. Davis' " maternal

grandfather's heritage and culture stemming from his (maternal grandfather's) surname "Messiah" which

derives from his ("J. Davis' ") maternal grandfather's heritage and culture traced to the country of Spain and

the Jewish inhabitants, and the name "Messiah" deriving from a Rabbinical background.  "J. Davis" has not

been able to share this rich heritage with his son, "E. Davis" through his ("E. Davis' ") formative years and

over the last fourteen (14) years to the present date.   "S. Davis" has not, likewise, been able to share her

("S. Davis' ") rich heritage which includes Native American ("Cherokee Indian"), Anglo ("Irish and French"),

and African ("Ghanaian") heritage.  These facts - the taking of physical custody of "E. Davis", were only

made possible by the "J. Anderson" Court, erroneously and illegally, taking jurisdiction over the "E. Davis"

matter, additionally constituting judicial abuse of process and abuse of judicial power.  These material facts

cannot be controverted, in that, Plaintiffs have **never** been afforded an "evidentiary" hearing in the courts of

Alabama nor the Juvenile Court in Indiana on the issue of proper and legal jurisdiction regarding the matter

of "E. Davis".  All Defendants named in this Complaint have, either directly or indirectly, assisted in this

harm to Plaintiffs by **aiding and abetting** the actions of each other.

<u>COUNT VIII</u>

<u>ABUSE OF PROCESS/ABUSE OF JUDICIAL POWER</u>

19.     At all times material hereto (approx. December 2001 through the present date),

Defendants, as set forth above within Letter A herein,  have abused judicial process in the initial filing by

"DHR" of an "unfounded" and, to date, "unsubstantiated" petition alleging among other things the

abandonment of the then minor "E. Davis" by the natural parents, "J. Davis" and "S. Davis" causing severe

and continuing mental distress and emotional harm to both, "J. Davis" and "S. Davis", the natural parents of

"E. Davis" as well as to "E. Davis".  This abuse of judicial process continues to the present, in that,

Defendants, in concert with the Alabama court, Athens City Schools through Marilyn Batts' educational

relationship with "E. Davis" resulting in the placement of "E. Davis" into "Glenwood/Allan Cott" school have

continued to harm Plaintiffs.  These material facts cannot be controverted.  The abuse is continually

allowed by the Alabama courts through the periodic six (6) month-status hearings held in the Alabama court

and the courts of Limestone County, Alabama including the "J. Woodroof's" Court, but not exclusive to the

"J. Anderson" and "J. Woodroof" Courts.  "DHR" has and continues to elicit Defendants "Connie and

Howard Shaw" through "Connie and Howard Shaw" being represented in the continued participation in the

Limestone County courts as having the proper parental authority over the "E. Davis" matter.  "DHR" through

their illegal and erroneous activities in the matter of "E. Davis" has encouraged and participated in the

abuse of judicial power wielded by the "J. Anderson" Court, the "J. Woodroof" Court and other and

presently unknown Limestone County, Alabama courts in continuing the illegal authority over the "E. Davis"

matter.  "DHR" has expanded the abuse of power by submitting ostensibly authoritative data to the national

Parental Locator Database, these activities continue to the present harm - emotionally, economically and in

a defamatory manner to "J. Davis" and "S. Davis".  These material facts cannot be controverted.  All

Defendants named in this Complaint have, either directly or indirectly, assisted in this harm to Plaintiffs by

**aiding and abetting** the actions of each other.

## COUNT IX

## BATTERY

20.      At all times material hereto (approx. May 2002 [05/02] through the present date),

Defendant "DHR" caused - along with other Defendants named in the above caption, in particular the "J.

Anderson" Court, officers, officials, administrators, and staff members of "Glenwood/Allan Cott" school

several batteries to the person of "E. Davis" while he was in the physical custody of "DHR",

"Glenwood/Allan Cott" school, and under the orders of the "J. Anderson" Court, "Athens City School/Board" through their ("Athens City School/Board") relationship to "Glenwood/Allan Cott" school - surgery to be performed on "E. Davis".  This surgery was done without the authorization of "J. Davis" and "S. Davis", the natural parents of "E. Davis". (Approximate date of surgery – August 2002);  The batteries as stated herein include the tasering by members of "Glenwood/Allan Cott" school, ostensibly to control the autistic outbursts of "E. Davis" - as was being used to control the behavior of many children at "Glenwood/Allen Cott" school.  These acts of battery caused, and continue to cause, to the present, the deterioration of the negative autistic traits of "E. Davis".  The psychological effects of (such) tasering have been found (to be) harmful, and has been substantially outlawed in such facilities similar to "Glenwood/Allan Cott" school throughout the United States.  Such tasering has been found by the Food and Drug Administration **(FDA)** to cause seizures to the individuals who have been tasered, and such seizures have become a part of "E. Davis' " physical condition from that point to the present.  This harm has and continues to cause the natural parents of "E. Davis", "J. Davis" and "S. Davis", severe and emotional distress.  These batteries can be said to have been intentional, and thus, not only negligent but criminal.  "Connie and Howard Shaw" can be said to be equally responsible in their ("Connie and Howard Shaw's") placing themselves ("Connie and Howard Shaw"), by the prompting of "DHR" as the proper 'family representatives' of "E. Davis".   All Defendants, set forth in this Complaint, have directly or indirectly participated in the batteries committed on "E. Davis" and/or **aided and abetted** the commission of such batteries.  These material facts cannot be controverted. **(See EXHIBIT 13).**

## COUNT X

## INTERFERENCE WITH PARENTAL CUSTODY AND VISITATION/VIOLATION OF FOURTH (4TH) AMENDMENT OF THE UNITED STATES CONSTITUTION/VIOLATION OF FOURTEENTH (14TH) AMENDMENT OF THE UNITED STATES CONSTITUTION

21.     At all times material hereto (approx. December 2001 [12/01] through the present date), Defendants, as set forth above within Letter A herein, in concert with all other captioned-named Defendants, individually and collectively caused the interference and the prevention of the physical custody of "E. Davis" by the natural parents, "J. Davis" and "S. Davis", and the visitation rights of "J. Davis" and "S. Davis" by the filing of an "unsubstantiated" and "unfounded" petition filed with the "J. Anderson" Court alleging abandonment of "E. Davis", the son of "J. Davis" and "S. Davis".  Said petition has, to this date, **not** been judicially resolved via an "evidentiary" hearing of said allegations nor by properly serving "J. Davis" with notice of such allegations.  The "J. Anderson" Court accepted this petition filed by "DHR" and has, to the present, refused to give full faith and credit to the jurisdictional authority of the Indiana Court.  The refusal of the "J. Anderson" Court to grant an "evidentiary" hearing on the issue of jurisdiction is, and continues to be, a violation of the **due process** rights of "J. Davis", "S. Davis", and "E. Davis" under the Fourth Amendment of the United States Constitution, and also a violation of "J. Davis' ", "S. Davis' ", and "E. Davis' " Equal Rights protection under the Fourteenth Amendment of the United States Constitution, in that "J. Davis" and "S. Davis" were entitled to due process of the law which entails holding a full "evidentiary" hearing on the matter of custody of "E. Davis".  Such "evidentiary" hearing was **never** held by the "J. Anderson" Court or any other court of law in the state of Alabama.  Additionally, "J. Davis" and "S. Davis" were **never** afforded the Equal Protection of the law in that they ("J. Davis" and "S. Davis") were **never** provided the full disclosure of the elements constituting the alleged abandonment of "E. Davis".  These material facts cannot be controverted.   All Defendants named in this Complaint have, either directly or indirectly, assisted in this harm to Plaintiffs by **aiding and abetting** the actions of each other.

## COUNT XI

## NEGLIGENCE

22.     At all times material hereto (approx.  May 2002 [05/02] through the present date), Defendant "DHR", in concert with all other captioned-named defendants, individually and collectively

caused on-going physical and mental harm to "E. Davis", in that, "DHR" got physical custody via their

**("DHR's")** petition to the "J. Anderson" Court thereby placing them ("DHR") and other above captioned-

named Defendants in the position of having responsibility for the physical and mental care and safety of "E.

Davis".  "DHR", in said capacity, became aware that "E. Davis' " autistic traits included self-injurious

behavior (SIBs) which included "E. Davis" hitting himself ("E. Davis") with a closed fist on, and about, his

("E. Davis'") head -  also included "E. Davis" striking his ("E. Davis' ") head against walls at the facilities

where he ("E. Davis") was being housed, subsequent to the placement of "E. Davis" by "DHR" in said

housing facilities.  The parents of "E. Davis" ("J. Davis" and "S. Davis") learned that several facilities in

other states similar to the one in which "E. Davis" was housed ("Glenwood/Allan Cott") which housed

autistic children and children with mental disturbances, which included self-injurious behavior (SIBs) such

as hitting themselves on and around the head area, instituted placing football-type helmets on these

children to decrease the physical harm to these children as a result of their SIBs.  On or about May 2002,

"J. Davis" and "S. Davis" shared this information regarding helmets to administrators and staff of

"Glenwood/Allan Cott" school requesting and suggesting that they ("Glenwood/Allan Cott") institute the

same football-type helmet use for "E. Davis".  "Glenwood/Allan Cott" administrators/staff refused or

declined to institute the wearing of any protective head gear for "E. Davis".   Lesa Greene ("L. Greene"),

who had been appointed (erroneously) by the "J. Anderson" Court as Guardian ad Litem for "E. Davis" at

the on-set of the "E. Davis" matter in the "J. Anderson" Court, instructed the members of the

"Glenwood/Allan Cott" school **not** to accept or follow the suggestions regarding helmets or protective

headgear given to "Glenwood/Allan Cott" by "J. Davis" and "S. Davis".   The stated facts, in this count,

represent gross negligence on the part of "Glenwood/Allan Cott" school  - this also represent gross

negligence on the part of Lesa Greene ("L. Greene") who had taken on the responsibility of the care of "E.

Davis" in the capacity of Guardian ad Litem.  This negligence borders on or includes intentional neglect of

the physical and mental well-being of "E. Davis", thus constituting a civil wrong as well as a criminal wrong.

The above-stated facts continue to exasperate and accelerate the decline of the physical and mental health of "E. Davis", to the present. There has been research relating to the effects of individuals sustaining repeated blows to the head - National Football League (**NFL**).  This research has shown that the effects are not immediately apparent until years later.  An example of the effects appearing many years after a football player has retired is represented with the Frank Gifford case.  This physical and mental deterioration of "E. Davis", contributed to the SIBs, is being noticed by the parents of "E. Davis" ("J. Davis" and "S. Davis") to their ("J. Davis' " and "S. Davis' ") severe present mental distress.  This syndrome is Chronic Traumatic Encephalopathy (**CTE**).   "Connie Shaw and Howard Shaw" who, under the urging of "DHR" and the "J. Anderson" Court to insert themselves ("Connie Shaw and Howard Shaw") as the 'family representatives' in the "E. Davis" matter, have - and undertook, the responsibility of the physical wellbeing of "E. Davis" and therefore are equally responsible and liable in this count of negligence.

23.     The parents of "E. Davis", (Pl., "J. Davis" and "S. Davis") learned while "E. Davis" was at "Glenwood/Allan Cott" school that a staff member of "Glenwood/Allan Cott" who had Acquired Immune Deficiency Syndrome **(A.I.D.S.)** was, and had been, assigned to the specific housing facility where "E. Davis" lived, and this staff person died from A.I.D.S.  This staff person was responsible for bathing, cooking, and clothing of children in that specific house – including "E. Davis".  This staff person actively worked, and reported for work, up to - and including the month in which he (this staff person at "Glenwood/Allan Cott") died of A.I.D.S.  This fact represents gross negligence and violations of the regulations concerning staff members at "Glenwood/Allan Cott".  To the present date, "E. Davis" has not been tested for possible traits – latent or otherwise, of A.I.D.S.  Plaintiffs, "J. Davis" and "S. Davis", having been excluded, and continue to be excluded as to participating in the physical well-being of their ("J. Davis' " and "S. Davis' ") son "E. Davis", have not been able to satisfy their (Plaintiffs', "J. Davis' " and "S. Davis' ") concerns regarding this aspect of "E. Davis' " health.  These facts of negligence were made possible by the erroneous and illegal rulings of "J. Anderson" regarding custody and jurisdiction in the "E. Davis" matter.

**Dr. Clarence E. Mcdanal**, as medical provider, had to have had knowledge of the above-stated facts and

having taken no action as the physician/medical provider for children at "Glenwood/Allan Cott" school is

equally liable for the wrongs set forth in this count.  These material facts are well-supported and

documented and cannot be controverted.  All Defendants, as set forth in this Complaint, have either directly

participated in the harm, as set forth in this count, or have **aided and abetted** the commission of the harm

set forth herein.  **(See EXHIBIT 22 – *NFL)* (See EXHIBIT 24).**

<u>COUNT XII OVERUSE AND MISUSE OF MEDICATIONS/VIOLATIONS OF HIPAA</u>

24.      At all times material hereto (approximately December 2001 [12/01] through the present

date), Defendant "DHR", urged "Dr. Vaughan" and "Dr. McDanal" to provide health-related activities for "E.

Davis" to control the behavioral traits of autism.  In the course of such healthcare activities, "Dr. Vaughan"

and "Dr. McDanal" prescribed medications for "E. Davis" which were to control his autistic traits.  Some of

the medications included Risperdal. (NOTE: Risperdal has been subsequently found to have negative side-

effects which have caused the drug to be recalled).  "S. Davis", during one of the home visits from

"Glenwood/Allan Cott" school to the *then* home of "S. Davis" in Alabama, noted that there had been several

additional medications which she ("S. Davis") was instructed by the school ("Glenwood/Allan Cott") to give

to "E. Davis".  "S. Davis" further noted that "E. Davis" had not been urinating for the entire weekend of the

home visit though he had been drinking liquids, including water.  "S. Davis" upon return to "Glenwood/Allan

Cott" school inquired concerning the additional medications and also stated her concern that "E. Davis" was

not urinating.  "S. Davis" was informed by "Dr. Vaughan" that the additional medications that were being

given to "E. Davis" was to control his bed-wetting.  "S. Davis" stated that she was concerned that this

medication might affect his urinary tract.  "Dr. Vaughan" stated that he ("Dr. Vaughan") started this

additional medication on the urging of the "Glenwood/Allan Cott" staff because they, (the staff), were

bothered by the need to take "E. Davis" to the toilet at night.  Lesa Greene ("L. Greene") inserted her

purported position as Guardian ad Litem of "E. Davis" and instructed "Dr. Vaughan" that he, "Dr. Vaughan",

need **not** listen to "S. Davis" regarding any medications prescribed for "E. Davis". This medication is felt to be an overuse of medication and an unnecessary use of medication to the physical harm of "E. Davis". It is the belief that such medications – presently unknown by the parents of "E. Davis" ("J. Davis" and "S. Davis"), is and continues to be excessive and unnecessary medications for "E. Davis". This fact continues to upset and disturb "J. Davis" and "S. Davis" to the present. Also during the incident in which "Dr. Vaughan" stated that he was giving medications to "E. Davis" to control "E. Davis' " urination, "S. Davis" noticed that there was, in fact, an array of numerous additional medications that "Dr. Vaughan" had prescribed "E. Davis".

25.    "Dr. Sarrels" provided medical information regarding "E. Davis" to "DHR" and the "J. Anderson" Court, much of which was volunteered by "Dr. Sarrels".   This information was provided without the consent of the parents of "E. Davis", ("J. Davis" or "S. Davis") which constitutes a violation of Health Insurance Portability and Accountability Act (**HIPAA)**, and also negligence in addition to defamation dependent upon the alleged information contained in the material supplied - This also includes "Dr. Sprinkle".

26.    "Dr. Sprinkle" also provided medical information regarding "E. Davis" to "DHR" and the "J. Anderson" Court, much of which was volunteered by "Dr. Sprinkle" this information was provided without the consent of the parents of "E. Davis", ("J. Davis" or "S. Davis"), which constitutes a violation of HIPAA. This medication of "E. Davis" and medical treatment of "E. Davis" was also made known to the "J. Anderson" Court who used such information to make rulings and orders regarding the medical treatment and healthcare of "E. Davis".  Additionally, "J. Anderson" was aware that "Dr. Sarrels" provided information to "DHR" and also "Dr. Sprinkle", and such information was given to "J. Anderson" who used such information knowing that such information had been provided without the consent of the parents of "E. Davis", thus, constituting a violation of HIPAA.  Additionally, "J. Anderson" made much of her ("J. Anderson's") rulings regarding custody of "E. Davis" based upon such illegally acquired medical records.

All of these acts and facts violate, and continue to violate, the due process rights and Equal Protection

Rights of the Plaintiffs under the United States Constitution.  All Defendants named in this Complaint have,

either directly or indirectly, assisted in this harm to Plaintiffs by **aiding and abetting** the actions of each

other.  These material facts are well-supported and documented and cannot be controverted.

<u>COUNT XIII</u>

<u>VIOLATION OF FIRST (1ST) AMENDMENT RIGHTS/INTERFERENCE WITH RESIDUAL PARENTAL</u>

<u>RIGHTS</u>

27.     At all times material here to (approximately December 2001  [12/01] through the present

date), Defendant "DHR", by their ("DHR's ") illegal acquiring of the person of "E. Davis" via The "J.

Anderson" Court and continuing such physical custody, has impinged upon and continues to impinge upon

the First (1st) Amendment rights under the United States Constitution of "J. Davis" and "S. Davis" in the

practice of their ("J. Davis' ", "S. Davis' ", and "E. Davis' ") preferred religious beliefs in that "J. Davis" and

"S. Davis", over the last fourteen (14) years, have been denied the opportunity to observe  - as a family, "J.

Davis' ", "S. Davis' ", and "E. Davis' " preferred religious beliefs.  That "J. Davis" and "S. Davis" would be

the religious guidance for the *then* minor, "E. Davis" who is now a handicapped adult towards the practice

of their ("J. Davis' " and "S. Davis' ") religious preference.  This religious right has been, and continues to

be, hampered by Defendant, "DHR", using the ostensible authority of The "J. Anderson" Court over the

matter of "E. Davis".  This hindrance has been enhanced continually and to the present by "Connie and

Howard Shaw".  The erroneous jurisdiction of The "J. Anderson" Court over the matter of "E. Davis" cannot

be said, albeit erroneously, to affect any residual parental rights of "J. Davis" and "S. Davis" over their ("J.

Davis' " and "S. Davis' ") son, "E. Davis".  However, any and all residual rights have been ignored and

prevented entirely by the erroneous jurisdiction of The "J. Anderson" Court perpetrated by the "unfounded"

and "unsubstantiated" filing of petition filed by "DHR".  This interference has included the prevention and

denial of the parental rights of "J. Davis" and "S. Davis" to affect the placement of "E. Davis" in a residential

facility and school, and the right to affect a subsequent placement of "E. Davis" in an adult facility.

Additionally, to affect the welfare and care of "E. Davis" regarding medical treatment including surgery,

medical prescriptions, and schooling – also to affect the proper jurisdictional authority over the matter of "E.

Davis" and/or the transfer of "E. Davis" via the Interstate Compact to a facility here in the state of Indiana.

All Defendants named in this Complaint have, either directly or indirectly, assisted in this harm to

Plaintiffs by **aiding and abetting** the actions of each other.  These material facts are well-supported and

documented and cannot be controverted.

### COUNT XIV FALSE CLAIMS ACT/MAIL FRAUD/WIRE FRAUD/FORGERY

28.      At all times material hereto (approximately December 2001 [12/01] through the present

date), Defendants, as set forth above within Letter A herein, in concert with all other captioned-named

Defendants, individually and collectively, caused an application to be initiated for Medicaid and also SSI for

the use and care of and funding of said care for "E. Davis" by caseworkers of "DHR" and administrators and

medical staff and medical personnel of "Glenwood/Allan Cott" school, aided by the ostensible authority of

The "J. Anderson" Court and the educational personnel of the "Athens City Schools/Board" in their ("Athens

City Schools/Board") Special Education Division (Marilyn Batts).  This application (Medicaid & SSI, etc.)

constitutes a violation of the False Claims Act in that application for such funds for the use of "E. Davis" can

only be applied for by the natural parents ("J. Davis" and/or "S. Davis") of "E. Davis".   The natural rights of

"J. Davis" and "S. Davis" as the parental authority for "E. Davis" were never removed or terminated by legal

and proper judicial authority, nor were any residual parental rights of "J. Davis" and "S. Davis" over "E.

Davis.  Therefore, any application made under or over any other person or entity other than "J. Davis" and

"S. Davis" represents a violation of the **False Claims Act**, in that, such application purports to be made by

the proper legal representative.   "J. Davis" and "S. Davis" never made such applications.  Such application

is required to be renewed annually therefore each application from approximately December 2001 [12/01]

to the present represents fourteen (14) separate false applications and/or **expressed fraud.**  Each receipt

of checks or wired funds pursuant to said application (Medicaid & SSI, etc.) represents separate

**intentional fraud** which covers twelve (12) monthly receipts of such checks or wired funds over fourteen

(14) years **totaling** over, approximately, one-hundred and sixty-eight (168) separate false claims acts

constituting civil and criminal fraud including **mail fraud** and **wire fraud -** Representing federal criminal

violations as well as civil wrongs perpetrated against the property rights of "E. Davis" and the authority of "J.

Davis" and "S. Davis" – parents and natural guardians of the presently adult, handicapped "E. Davis".  This

also represents **implied fraud.**  The endorsement of each document for funds represents **forgery,** in that, it

has not been and continues not to represent the proper authority for receipt of such funds – also

representing criminal and civil wrongs against the plaintiffs, as well as, state and federal entities. **(See**

**EXHIBIT 32).**  Each application or annual application for such funds, (Medicaid & SSI, etc.), must be made,

by the applicant or entity applying for such funds, a part of the PARIS (Public Assistance Reporting

Information System) database.  This reporting to the PARIS database is mandated by law and cannot be

opted-out.  The Defendants, herein, did in fact submit a report/document to Washington, D.C. or the

regional Medicaid Office (Atlanta) which indicated that they (Defendants, herein) opted-out of the

*requirement* of reporting to the PARIS database. **(See EXHIBIT 30, See EXHIBIT 27).**    Plaintiffs also

reserve the right to amend this Complaint as it may relate to the state of Alabama. These material facts are

well-supported and documented and cannot be controverted.

## COUNT XV

## BREACH OF FIDUCIARY DUTY/SUBORNING PERJURY

29.      At all times material hereto (approximately December 2001 [12/01] through the present

date), Defendant "DHR", in concert with all other captioned-named defendants, individually and collectively

acquired the responsibility of the care and welfare of "E. Davis", albeit erroneously, which thereby created a

fiduciary duty to be responsible for the wellbeing, health, and care of "E. Davis".  Such fiduciary duty was

breached, in that, "E. Davis" suffered numerous incidents of physical harm including tasering by individuals

at "Glenwood/Allan Cott" school where he ("E. Davis") was placed by "DHR" through the ostensible

authority of "J. Anderson" assisted by the false parental representation of "Connie and Howard Shaw" and

"Louise Collier".  This breach also included the over and unnecessary medication of "E. Davis" while in the

care of Defendant, "DHR" and others, herein this count mentioned.  This breach has created the on-going

deterioration to the present of the autistic traits and mental health of "E. Davis".  This also includes the

harm in the unnecessary surgeries of "E. Davis" and the on-going to the present self-injurious behaviors

(SIBs) of "E. Davis".  This breach has also caused mental and severe emotional distress to the parents of

"E. Davis", ("J. Davis" and "S. Davis").  This breach also includes the failure of said named individuals in

this count to have "E. Davis" via Interstate Compact transferred to the state of Indiana.  The above-stated

breach of fiduciary duty set forth in this count can be said, and is applied to, "Lesa Greene" who acquired,

albeit erroneously, the duty of Guardian ad Litem of "E. Davis", also breached by "Lesa Greene" in the

same manner as set forth in this count.  Defendant, "DHR", by their act of causing, encouraging, and aiding

the application for Medicaid, SSI, federal and state funds for the use of "E. Davis" without the proper legal

right or authority of such applicants under penalty of perjury constitutes, and continues to constitute, for

each subsequent application, receipt and endorsement of documents or financial instruments for funds

constitutes the **suborning of perjury.**   Such application was, and is, known by the "J. Anderson" Court to

represent individuals not shown to the "J. Anderson" Court to have the legal right and authority to make

such applications for funds, thereby, representing suborning of perjury by The "J. Anderson" Court.

Additionally, the attorney for "DHR" – "Claire Tinney-Jones" invited "J. Davis" to suborn perjury by

accepting, without qualification, a court-appointed, legal counsel in the matter of "E. Davis" which "J. Davis"

declined to accept.  Attorney Slate, while representing "S. Davis" in the "E. Davis" matter and having been

paid for this representation, stated that the "J. Anderson" Court wanted "S. Davis" to accept a court-

appointed counsel again representing an attempt to suborn perjury by The "J. Anderson" Court which "S.

Davis" declined to accept.  Much of these acts, set forth in this count, represent "Fraud on the Court".

These material facts are well-supported and documented and cannot be controverted.

## COUNT XVI

## AGGRAVATED IDENTITY THEFT/AIDING AND ABETTING/MISPRISON

30.      At all times material hereto (on or about December 2001 [12/01] through the present date),

Defendant "DHR", individually and collectively with other above-named captioned Defendants, committed

aggravated identity theft, in that, said Defendant encouraged, induced, and bribed individuals to sign legal

documents and statements purporting to have the proper parental authority over "E. Davis".  This act

displaced the *true* parental rights of "J. Davis" and "S. Davis" over "E. Davis", thus taking the identity of the

natural parents, "J. Davis" and "S. Davis", of "E. Davis.  This supplanting of the identity of the natural

parents ("J. Davis" and "S. Davis") of "E. Davis" was for the purposes of *illegally* obtaining federal and state,

Medicaid and SSI funds for "E. Davis" which constitutes a criminal act and thus represents **aggravated**

**identity theft** which is a felony.  Defendant "DHR" also by their ("DHR's") acts by the agents of "DHR" e.g.

caseworkers, administrators, supervisors as stated in counts I – XV, set forth above, **aided and abetted**

said other-named Defendants as set forth above and in the caption of this case in the commission of *all*

alleged civil and criminal acts.  The "J. Anderson" Court, along with the "J. Woodroof" Court, aided and

abetted all of the acts, both civil and criminal, as set forth under these claims, in that, knowledge of said

acts were presented to both these courts by petitions and other information submitted by many Defendants

which was known to be *false* and/or *should have been known to be false*, and/or should have been verified

to be true or false, including "DHR", "Dr. Sarrels", "Dr. McDanal", "Dr. Vaughan", "Dr. Sprinkle", signed

documents by "Connie and Howard Shaw", by Attorney "Lesa Greene", by administrators and staff of

"DHR", by Marilyn Batts of the "Athens City Schools/Board", by "Glenwood/Allan Cott" school and

administrators and staff of "Glenwood/Allan Cott" school, by Attorney "Claire Tinney-Jones", by Shannon

Cameron ("DHR"), by Tracey Sherrill ("DHR"), by Ellen Gregg ("DHR"), by Becky Bentley ("DHR"), by Amy

Waters ("DHR"), by "Louise Collier", and by Angela Hurtubise ("DHR").  The Defendants also committed the

crime **misprision and misprision of a felony,** in that, "DHR" or agents of "DHR" were aware that other-

named Defendants, as set forth in the above caption, were perpetrating on-going *illegal* acts.  Each of the

Defendants, "Athens City Schools/Board" by Marilyn Batts, Judge Jeanne Anderson ("J. Anderson") and

her staff, **Judge James W. Woodroof** ("J. Woodroof") and his staff, "Glenwood/Allan Cott" school

administrators, staff, and agents of "Glenwood/Allan Cott" school, "Claire Tinney-Jones", "Lesa Greene",

"Dr. Sarrels", "Dr. Sprinkle", "Dr. McDanal", "Dr. Vaughan", "Connie and Howard Shaw", "Louise Collier"

and Angela Hurtubise ("DHR") all knew, or should have known, of the perpetration of **fraud** based upon the

application for Medicaid, SSI, federal, and state funds purportedly for the care of "E. Davis" was, in fact, a

fraud and misrepresentation of facts.  All of which constitutes felonies by the above-named individuals and

entities.

31.      These counts are set forth under 42 U.S.C. § 1983, popularly known as "Section 1983"

and 15 U.S. Code § 1122**.**  These counts are set forth as to all members of "DHR", administrators,

supervisors, directors, case workers, staff, and agents.  These material facts are well-supported and

documented and cannot be controverted.

32.      Plaintiffs also reserve the right to amend this Complaint as it may relate to the state of

Alabama.


**WHEREFORE,** Plaintiffs, John H. Davis, Shelia D. Davis, and Eric S. Davis by his (Eric S. Davis')

natural parents, John H. Davis and Shelia D. Davis, pray that The Court grants them (John H. Davis, Shelia

D. Davis, and Eric S. Davis by his (Eric S. Davis') natural parents, John H. Davis and Shelia D. Davis)

judgment against:

**a)**      Alabama Department of Human Resources of Limestone County, Alabama & (all Administrators,

Supervisors, Caseworkers, Staff) - Individually and Collectively;

**b)**      Judge Jeanne W. Anderson & (in an individual capacity) - Individually and Collectively;

**c)**      Judge James. W. Woodroof, Jr. & (in an individual capacity) -Individually and Collectively;

**d)**      Athens City Schools & Athens City School Board of Education in Alabama - Individually and

Collectively;

**e)**      Glenwood Incorporated/Allan Cott School - Individually and Collectively;

**f)**      Dr. Clarence E. Mcdanal, M.D. - Individually and Collectively;

**g)**      Dr. Scott M. Sarrels, M. D. - Individually and Collectively;

**h)**      Dr. Albert L. Sprinkle, M. D. - Individually and Collectively;

**i)**      Connie Shaw - Individually and Collectively;

**j)**      Howard Shaw - Individually and Collectively;

**k)**      Lesa Greene - Individually and Collectively;

**l)**      Claire Tinney-Jones - Individually and Collectively;

**m)**      Louise Collier - Individually and Collectively;

**n)**      Dr. Tom B. Vaughan, Jr., M. D. - Individually and Collectively;

**o)**      Angela Hurtubise - Individually and Collectively;

**p)**      And, for damages in an amount of $2.5 Billion Dollars – representing fifteen (15) Defendants,

sixteen (16) counts alleging harm to Plaintiffs, twelve (12) acts committed monthly (12 months) for fourteen

(14) years equaling (=) approximately **[12 x 12 x 14 = 2016]** two-thousand sixteen (2016) wrongful acts

committed against **each** individual Plaintiff (i.e. John H. Davis, Shelia D. Davis, and Eric S. Davis), willfully

committed, and continues to the present date;

**q)**      And, to establish a Federal Oversight Commission as to the future operations and functions of said

Alabama Department of Human Resources of Limestone County, Alabama;

**r)**      And, to recommend - to Federal authorities over Medicaid, SSI, and all other federal programs

allocated to the care and treatment of "autistic" individuals in the state of Alabama – the reorganization of

said Alabama Department of Human Resources of Limestone County, Alabama (**"DHR"**), removing the administrators and supervisors of the Athens-Limestone County, Alabama office of "DHR";

**s)**　　　And, that the Court, *sua sponte* refer the criminal portions of the allegations set forth above to federal agencies including the United States' Attorney General's Office - this relief is also sought under **42 U.S.C.** § **1983,** 15 U.S.C. Code § 1122**;**

**t)**　　　And, that, this relief anticipates compensatory as well as punitive damages**,** and all other just and proper remedies in the premises.


Date: June 16, 2016　　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　**/s/ John H. Davis**
　　　　　　　　　　　　　　　　　　John H. Davis, #4812-45
　　　　　　　　　　　　　　　　　　Attorney for Plaintiffs, John H. Davis,
　　　　　　　　　　　　　　　　　　Shelia D. Davis & Eric S. Davis (a
　　　　　　　　　　　　　　　　　　handicapped adult), by John H. Davis & Shelia
　　　　　　　　　　　　　　　　　　D. Davis

John H. Davis
Attorney at Law
P.O. Box 43
Crown Point, Indiana 46308-0043
PHONE:　　　(219) 884-2461
attyhdavis@gmail.com

## JURY DEMAND

Plaintiffs demand trial by Jury.

　　　　　　　　　　　　　　　　　　**/s/ John H. Davis**
　　　　　　　　　　　　　　　　　　**John H. Davis, #4812-45**
　　　　　　　　　　　　　　　　　　Attorney for Plaintiffs, John H. Davis,
　　　　　　　　　　　　　　　　　　Shelia D. Davis & Eric S. Davis (a
　　　　　　　　　　　　　　　　　　handicapped adult), by
　　　　　　　　　　　　　　　　　　John H. Davis & Shelia D. Davis

John H. Davis
Attorney at Law
P.O. Box 43
Crown Point, Indiana 46308-0043
PHONE:　　　(219) 884-2461
attyhdavis@gmail.com

## <u>INDEX OF EXHIBITS</u>

EXHIBIT 1             (In 3 Pages)

EXHIBIT 2A            (In 3 Pages)

EXHIBIT 2B            (In 5 Pages)

EXHIBIT 2C            (In 4 Pages)

EXHIBIT 2D            (In 4 Pages)

EXHIBIT 2E            (In 4 Pages)

EXHIBIT 2F            (In 3 Pages)

EXHIBIT 2G            (In 4 Pages)

EXHIBIT 2H            (In 3 Pages)

EXHIBIT 2I            (In 5 Pages)

EXHIBIT 2J            (In 3 Pages)

EXHIBIT 2K            (In 6 Pages)

EXHIBIT 3A            (In 3 Pages)

EXHIBIT 3B            (In 3 Pages)

EXHIBIT 3C            (In 3 Pages)

EXHIBIT 3D            (In 5 Pages)

EXHIBIT 3E            (In 3 Pages)

EXHIBIT 3F            (In 3 Pages)

EXHIBIT 4A            (In 2 Pages)

EXHIBIT 4B            (In 2 Pages)

EXHIBIT 4C            (In 10 Pages)

EXHIBIT 5A            (In 16 Pages)

EXHIBIT 5B            (In 1 Page)

EXHIBIT 6A            (In 6 Pages)

EXHIBIT 6B            (In 2 Pages)

EXHIBIT 7             (In 1 Page)

EXHIBIT 8A            (In 8 Pages)

EXHIBIT 8B            (In 1 Page)

EXHIBIT 9             (In 11 Pages)

EXHIBIT 10            (In 5 Pages)

EXHIBIT 11            (In 1 Page)

EXHIBIT 12            (In 2 Pages)

EXHIBIT 13            (In 6 Pages)

EXHIBIT 14            (In 1 Page)

EXHIBIT 15            (In 3 Pages)

EXHIBIT 16            (In 2 Pages)

EXHIBIT 17            (In 3 Pages)

EXHIBIT 18            (In 2 Pages)

EXHIBIT 19            (In 4 Pages)

EXHIBIT 20            (In 1 Page)

EXHIBIT 21            (In 2 Pages)

EXHIBIT 22            (In 1 Page)

EXHIBIT 23            (In 2 Pages)

EXHIBIT 24            (In 13 Pages)

EXHIBIT 25            (In 14 Pages)

EXHIBIT 26          (In 2 Pages)

EXHIBIT 27          (In 4 Pages)

EXHIBIT 28          (In 12 Pages)

EXHIBIT 29          (In 1 Page)

EXHIBIT 30          (In 4 Pages)

EXHIBIT 31          (In 5 Pages)

EXHIBIT 32          (In 2 Pages)

EXHIBIT 33          (In 1 Page)

EXHIBIT 34          (In 5 Pages)

EXHIBIT 35          (In 10 Pages)

EXHIBIT 36A         (In 36 Pages)

EXHIBIT 36B         (In 14 Pages)

EXHIBIT 37          (In 5 Pages)

EXHIBIT 38          (In 6 Pages)

EXHIBIT 39          (In 3 Pages)

EXHIBIT 40          (In 3 Pages)

EXHIBIT 41          (In 4 Pages)

EXHIBIT 42          (In 3 Pages)

EXHIBIT 43          (In 11 Pages)

EXHIBIT 44          (In 3 Pages)

EXHIBIT 45          (In 2 Pages)

EXHIBIT 46          (In 3 Pages)

EXHIBIT 47          (In 17 Pages)

EXHIBIT 48          (In 5 Pages)

EXHIBIT 49          (In 4 Pages)

EXHIBIT 50          (In 4 Pages)